UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | New Case No. 08-cv-4040 |
| | ) | Hon. Matthew F. Kennelly |
| RESOURCE TECHNOLOGY | ) | |
| CORPORATION, | ) | |
| | ) | Hearing:  Thursday, |
| Debtor. | ) | July 24, 2008 at 9:30 a.m. |

## MOTION TO RECONSIDER OR, IN THE ALTERNATIVE, TO EXTEND STAY PENDING APPEAL OF BANKRUPTCY COURT ORDER

Chiplease, Inc. ("Chiplease"), by its undersigned attorneys, moves this Court to extend the limited stay the Court granted by order dated July 17, 2008.  In support of its motion, Chiplease states[1]:

1. On June 25, 2008, the Bankruptcy Court (Judge Wedoff) ruled in *In re Resource Technology Corporation*, case no. 99B35434, that Chiplease must pay $500,000.00 into Arnstein & Lehr, plus compound interest in the amount of $47,367.47, by July 17, 2008.  (Docket No. 4318)

2. On July 1, 2008, Chiplease filed a notice of appeal of that order.  (Docket No. 4322)  On July 11, 2008, Chiplease filed its statement of issues and designation of the items for the record on appeal (Docket No. 4329).

3. On July 16, 2008, the Bankruptcy Court denied Chiplease's motion (Docket No. 4328) for a stay of the June 25, 2008 order.

4. Later on July 16, 2008, Chiplease filed before this Court a Motion For Limited Stay Pending Appeal Of Bankruptcy Court Order (the "Motion").  Among other arguments, Chiplease argued in the Motion that it is likely to succeed on the merits but would suffer

---

[1] Chiplease incorporates by reference its Motion For Limited Stay Pending Appeal in this case.

irreparable harm in the absence of a stay.  This Court heard argument on the Motion on July 17, 2008.

5.      By order dated July 17, 2008, this Court required Chiplease to deposit $500,000.00 into an interest-bearing account at Much Shelist on or before July 24, 2008.

6.      Chiplease submits that reconsideration of the Court's order, or an extension of the stay, is warranted here for two reasons.  First, as alleged in the Motion, Chiplease already has paid more than $1 million in Chapter 7 operating expenses since the closing on the Settlement Agreement with the Chapter 7 trustee.  These payments demonstrate Chiplease's good faith in paying operating expenses and performing its obligations under the Settlement Agreement.

7.      Second, Chiplease simply does not have sufficient funds in its account nor the monthly cashflow to deliver a $500,000 deposit by July 24, 2008.  The Chapter 7 trustee and the administrative claimants should know, by virtue of trial testimony in February 2008 (in another *Resource Technology* appeal currently before this Court under case no. 08cv2425), that Chiplease's monthly cashflow is limited, as follows:

> Q:   Okay.  Approximately how much each month does Chiplease receive from its loans and leases?
> A:   $150,000.
> Q:   Okay.  And after expenses, what's the net amount available to Chiplease to lend or what's available after expenses?
> A:   That was after expenses.
> Q:   Oh, okay, $150,000 a month?
> A:   Yes.

(*See* trial transcript attached as Exhibit A at p. 14, lines 14-22.)

8.      At that monthly cashflow rate, Chiplease needs at least three months to obtain $500,000.  Accordingly, Chiplease requests an extension to September 15, 2008 to deposit $500,000 in an interest-bearing account at Much Shelist.  As Chiplease also argued in the

2

Motion, no parties will be prejudiced by this extension because no parties' administrative claims have been allowed or otherwise entitled to payment pursuant to any Bankruptcy Court order.

**WHEREFORE**, Chiplease, Inc. prays that this Court enter an order extending to September 15, 2008 the time by which Chiplease must deposit $500,000 into an interest-bearing account at Much Shelist, and for such other relief as the Court deems just and proper.

**CHIPLEASE, INC.**

By: /s/ Colleen E. McManus
     One of its attorneys

Louis D. Bernstein, ARDC No. 6192379
Colleen E. McManus, ARDC No. 06243473
**Much Shelist Denenberg**
    **Ament & Rubenstein, P.C.**
191 North Wacker Drive, Suite 1800
Chicago, IL  60606
Telephone:  312-521-2000

```
                IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION


Resource Technology Corporation,)   No. 99 B 35434
                                )   Chicago, Illinois
                                )   9:30 a.m.
                Debtor.          )   February 13, 2008


               TRANSCRIPT OF PROCEEDINGS BEFORE THE
                   HONORABLE EUGENE R. WEDOFF


APPEARANCES:


For the Trustee:                Mr. George Apostolides;


For IIT:                        Mr. Gregory Jordan;
                                Mr. Peter Schmidt;


For Allied:                     Mr. David Bohan;
                                Mr. Robert O'Meara;


For the City and County
of Peoria:                      Ms. Linda Kujaca;




Court Reporter:                 Amy Doolin, CSR, RPR
                                U.S. Courthouse
                                219 South Dearborn
                                Room 661
                                Chicago, IL  60604.
```

1                       I N D E X

2

3

4    Witness:             DX        CX      REDX     RECX

5

6    Leon Greenblatt      10        23       48

7    Patrick Sloan        54        91      106

8    Michael Reed        123       167      176

9                        165

10   John Connolly       177

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Taking up the court's
2   10:30 set matter, Resource Technology Corporation,
3   99 B 35434.
4          MR. JORDAN:  Your Honor, Mr.
5   Apostolides and I had a conversation after court.
6   And Mr. Apostolides, correctly I think, wanted to
7   clarify something with me.
8          Mr. Connolly testified that he was
9   getting paid by RTC.  It's not the debtor.  It's not
10  the same FEIN number.  It is not any of the parties
11  to this proceeding.  But Mr. Apostolides, I think
12  wisely, wanted to make sure that there wasn't anybody
13  on the side incurring debts on behalf of the debtor.
14  And that's not the case.  No payroll is being paid
15  under the FEIN, no payroll tax liabilities are being
16  incurred.
17         THE COURT:  At earlier stages in this
18  case, the question of what happens to a corporate
19  debtor when a trustee is appointed was raised but
20  never resolved the issue became moot, and at some
21  point I may be called upon to resolve it.
22         But in the meantime, I understand that
23  the former owners, who are owners of the debtor, take
24  the position that the debtor, the entity, continues
25  to exist, even though there is a bankruptcy pending

1  with the debtor's estate. I am not sure how that
2  works, but I understand that's their position, and I
3  understand that the payments made to Mr. Connolly in
4  the name of RTC are not coming out of this bankruptcy
5  estate.
6              MR. JORDAN: No. It's not even coming
7  out of the same FEIN numbers.
8              THE COURT: I understand.
9              MR. JORDAN: It's not even coming out
10 of the same corporation.
11             MR. APOSTOLIDES: It's not coming from
12 the debtor.
13             MR. JORDAN: Right. But at some
14 point, I at least sense that you are interested in
15 that -- in nothing more than an academic issue,
16 that's fine. I am interested in that issue, too. So
17 at some point I think we -- I would like to resolve
18 that issue because I think it's fascinating.
19             THE COURT: Well, if it comes up in a
20 context that requires its resolution, I'll do it.
21 But I have too many real disputes to resolve to
22 engage in merely academic ones.
23             MR. JORDAN: I'm not saying that we
24 are going to have an advisory opinion.
25             THE COURT: Okay.

1          MR. JORDAN:  I'm just saying I am
2  interested in the issue.
3          THE COURT:  Now, in a similar vein of
4  understanding precisely what entities we're dealing
5  with, I did want to get clarification on one point.
6  Illinois Investment Trust is a common law trust; is
7  that not correct?
8          MR. JORDAN:  You know, I'm not a trust
9  lawyer.  It's a business trust, I guess, or a common
10 law -- I mean, it's a trust created under the laws of
11 Illinois with all the powers that a trust created
12 under the law of Illinois have.
13         THE COURT:  Let me check something.
14         Is this trust created pursuant to any
15 statutory provisions of the state of Illinois or is
16 it merely an Illinois common law trust?
17         MR. JORDAN:  I have no idea.  I would
18 -- I would call it an Illinois common law trust.  We
19 can brief the issue.  I could check on that.  It's
20 never been raised by any of the parties here.  It may
21 be created under a statute.  I just don't know.
22         THE COURT:  Well, I think it may be
23 very important to find out whether this trust has the
24 capacity to sue or be sued, and whether this trust is
25 amenable to an involuntary bankruptcy proceeding.  If

1   it's a common law trust, my understanding is that it

2   does not have the capacity to sue or be sued, it

3   could only take action in the name of the trustee,

4   and that it would not be subject to an involuntary

5   bankruptcy proceeding.

6              MR. JORDAN:  You know, I'm not -- I

7   haven't updated the chapter that I'm writing on

8   involuntary bankruptcies yet, but I'm not sure that

9   even a statutory trust would be subject to an

10  involuntary bankruptcy.

11             THE COURT:  Well, that may be an

12  important consideration in coming to a conclusion as

13  to whether Illinois Investment Trust can give

14  adequate assurance of future performance, in that if

15  it fails to do that, it may not be amenable to suit.

16  And if it fails to make payments, it may be

17  impossible for creditors, such as the counter-parties

18  to these agreements that are sought to be assumed, to

19  marshal its assets in an involuntary proceeding.

20  So...

21             MR. JORDAN:  I'm not sure -- I would

22  respectfully disagree that they don't have the right

23  to sue the trust to which they have the contract.

24             THE COURT:  It certainly raises a

25  question.  To me it is a real concern.  If, for

1  example, the creditors of the Illinois Investment

2  Trust could only attempt to sue the trustee for

3  whatever assets were in the trust as trustee, and the

4  trust had no assets because it had not received loan

5  proceeds from the entities, Scattered Corporation,

6  that have some contractual obligation to make those

7  loan proceeds, it might be impossible for the

8  creditors to take action that would force the trustee

9  to collect whatever rights it had.

10            MR. JORDAN:  That's fine, Your Honor.

11 So what we will do is we'll agree that since the

12 contract's freely assignable, that one time -- and

13 there is no intentions of doing it otherwise -- we

14 will set up a corporation to accept the assets.  It

15 will be called, you know, assuming the name is

16 available, Illinois Investment Trust Corporation.

17 And John Connolly will be the sole officer and

18 director of that entity.

19            And that way it can sue, it can be

20 sued and it can be brought into an involuntary

21 bankruptcy case.  But it remains -- it will be in the

22 same position.  And I presume that its shareholders

23 would be Scattered Corporation and Chiplease, Inc.

24 And that way we are dealing with the same parameters

25 that we have previously.

1          THE COURT:  Well, I just raised the
2    question.
3          MR. JORDAN:  That's fine.  We will
4    agree to that.
5          MR. O'MEARA:  Your Honor, we'd
6    obviously object to that.  We're in the middle of
7    trial.  It's their burden of proof, and they want to
8    change, you know, everything in the middle of the
9    case.
10         MR. JORDAN:  Actually, we are not
11   changing to their detriment.  We are changing to
12   their benefit, so I don't know what objection they
13   could possibly have.
14         MR. O'MEARA:  Well, we were first told
15   this was going to be Scattered and Chiplease who were
16   taking these contracts.  Then it was IIT.  Now we're
17   talking about an unknown entity under an unknown
18   agreement.  Obviously we would object to this.
19         MR. JORDAN:  Actually --
20         THE COURT:  I am not going to try to
21   resolve the question right now.  I just raised the
22   issue.
23         MR. O'MEARA:  Okay.  Thank you.
24         THE COURT:  And if it is not dealt
25   with in a way that gives me comfort that there would

1    be a potential for enforcement by counter-parties,
2    then I would find a lack of adequate assurance.  So
3    we will see.
4                    MR. O'MEARA:  Thank you.
5                    MR. JORDAN:  That is, by the way,
6    agreeable to Mr. Connolly.  We will take that action,
7    assuming that the assignment is made, the assumption
8    is made and the assignment is made.
9                    THE COURT:  All right.  Anything else
10   to take up before we resume with the testimony?
11                   MR. JORDAN:  No, Your Honor.
12                   MR. APOSTOLIDES:  Judge, I just wanted
13   to clarify, we had -- I had discussed with Mr. Jordan
14   putting Mr. Connolly on the stand to raise this issue
15   of his employment and the FEIN of the entity that's
16   paying him.  I assume that Your Honor is comfortable
17   with this discussion?
18                   THE COURT:  I will take that
19   representation if that's not in dispute among the
20   parties.
21                   MR. O'MEARA:  No objection.
22                   MS. KUJACA:  No objection.
23                   THE COURT:  All right.  That's fine.
24                   MR. APOSTOLIDES:  Thank you, Judge.
25

1                    THE COURT:  Your next witness then,
2    Mr. Jordan.
3                    MR. JORDAN:  Leon Greenblatt.
4                    (Witness sworn.)
5                    MR. JORDAN:  Your Honor, just to
6    clarify, because it became an issue at the NEC
7    deposition, Mr. Greenblatt actually does have an eye
8    condition, and he has difficulty with bright lights.
9    He had sunglasses on in court.  He has taken them off
10   so he can testify.  But that is the reason that Mr.
11   Greenblatt had his sunglasses on.
12                   THE COURT:  Okay.  Go ahead.
13              LEON GREENBLATT, WITNESS, SWORN
14                       DIRECT EXAMINATION
15   BY MR. JORDAN:
16        Q    Can you please state your name and spell
17   your last name for record.
18        A    Leon Greenblatt, G-r-e-e-n-b-l-a-t-t.
19        Q    Mr. Greenblatt, have you ever heard of
20   Illinois Investment number 92-7163?
21        A    Yes.
22        Q    It's my understanding that you have a
23   relationship with Chiplease, Inc.; is that correct?
24        A    Yes.
25        Q    And are you the sole director and officer

1   of Chiplease, Inc.?

2       A    Yes.

3       Q    And is Chiplease, Inc., a beneficiary of
4   the Illinois Investment Trust number 92-7163?

5       A    Yes.

6       Q    And it's my understanding that you're a
7   director and majority shareholder of Scattered
8   Corporation; is that correct?

9       A    I'm a director.  I'm not a majority
10  shareholder.

11      Q    Okay.  Are you agreeable to, as a director
12  of Scattered Corporation and as sole officer and
13  director of Chiplease, to transferring assets from
14  Illinois Investment Trust to a new corporation along
15  the lines that I outlined with the court a moment
16  ago?

17      A    That would be fine.

18           MS. KUJACA:  Your Honor, I can't hear
19  the witness.  Could we have him speak into the
20  microphone perhaps.

21           THE WITNESS:  That would be fine.
22  BY MR. JORDAN:

23      Q    Mr. Greenblatt, what is the nature of
24  Chiplease's business?

25      A    Chiplease is a lender and lessor.

1        Q    And can you tell me whether it has been a
2   lender since at least 1999 or not?
3        A    Yes.
4        Q    Okay. And can you tell me whether it was a
5   lender to Resource Technology Corporation?
6        A    It was.
7        Q    And at the time of the filing of the case,
8   was it, along with you and Banco Panamericana, the
9   sole secured lender?
10       A    Yes.
11       Q    Okay. Has it been a lessor since the year
12  2000 or not?
13       A    Yes.
14       Q    Okay. To whom is Chiplease a lessor?
15       A    Chiplease is a lessor to dry cleaning
16  shops.
17       Q    Okay. How long has it been a lessor to dry
18  cleaning shops?
19       A    Since its inception.
20       Q    How long has it -- I'm sorry.
21            Approximately how much are its current
22  assets?
23       A    About 15, 16 million.
24       Q    Now, yesterday in court Mr. Jahelka
25  testified with regard to a lawsuit relating to the

1   401 South Dearborn property.  And I am wondering
2   whether you're aware of that lawsuit?
3       A   Yes.
4       Q   Okay.  And can you tell me whether the
5   counter-parties to that contract sued for specific
6   performance or did they sue for something else?
7       A   They sued for specific performance.
8       Q   Have you ever heard of Gold Coast Realty,
9   LLC?
10      A   Yes.
11      Q   Who is that?
12      A   They are one of the plaintiffs or actually
13  defendants who filed a counter...
14      Q   Have you ever heard of 407 South Dearborn,
15  LLC?
16      A   Yes.
17      Q   Who are they?
18      A   Likewise, they are one of the plaintiffs in
19  the --
20      Q   And C&L Holdings, Inc., do you know who
21  that is?
22      A   Yes.
23      Q   Who is that?
24      A   They are a defendant in one of our
25  complaints against those other two parties.

1   Q   Okay. And do you know what the status of
2   those entities are at the current time?
3   A   They filed Chapter 7.
4   Q   Okay. Have you -- has 401 Dearborn owners
5   ever heard from the trustee in their cases?
6   A   Yes.
7   Q   And what was the purpose of that
8   communication?
9   A   They offered to settle the specific
10  performance suit for $10,000.
11  Q   Okay. Is that acceptable to the owners of
12  the 401 South Dearborn property?
13  A   No. We are just going to wait the 60 days.
14  Q   Okay. Approximately how much each month
15  does Chiplease receive from its loans and leases?
16  A   $150,000.
17  Q   Okay. And after expenses, what's the net
18  amount available to Chiplease to lend or what's
19  available after expenses?
20  A   That was after expenses.
21  Q   Oh, okay, $150,000 a month?
22  A   Yes.
23  Q   It's my understanding that Chiplease is a
24  party to a loan agreement with the trust; is that
25  correct?