IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| RESOURCE TECHNOLOGY | ) | |
| CORPORATION, | ) | Case No. 08 C 4040 |
| | ) | |
| Debtor. | ) | |

## REPLY IN SUPPORT OF ALLEGATIONS OF CONTEMPT

The Estate of Resource Technology Corporation (the "Estate"), by and through Jay A. Steinberg, not individually but solely in his capacity as Chapter 7 Trustee (the "Trustee") of the Estate, by its attorneys, Arnstein & Lehr LLP and Greenberg Traurig LLP, submits this Reply in support of its Motion for Rule to Show Cause, which this Court has taken as allegations of contempt, against Chiplease, Inc. ("Chiplease"), as follows.

The Court should find that Chiplease is in contempt for willful violation of its July 18, 2008 Order (the "July 18 Order"), a copy of which is attached as Exhibit A. Paragraph Two (2) of the July 18 Order states, unequivocally, that Chiplease:

> is ordered to deposit the sum of $500,000.00 in an interest-bearing account (the "Deposit") at the law firm of Much Shelist Denenberg Ament & Rubenstein, P.C. on or before July 24, 2008 at 4:30 p.m.

Chiplease failed to do so, and is in clear violation of the Order.

The arguments which Chiplease makes in its Response in Opposition to Trustee's Allegations of Contempt (the "Response") are unavailing and are not a justification for Chiplease's conduct. The Court should disregard them, and enter an Order of contempt against Chiplease which (1) requires Chiplease to pay $500,000.00 plus interest at 4% per annum consistent with the July 18 Order; (2) requires Chiplease

to pay the Estate's fees and costs litigating this matter since the entry of the July 18 Order; (3) requires the payment to be made by a date certain into an Estate account at the law firm of Arnstein & Lehr LLP; and (4) restrains Chiplease from making any payments or dissipating any assets until it has made the payment. Finally, the Order of contempt should include a self-executing sanction requiring Chiplease to account of all of Chiplease's revenues and expenditures from February 13, 2008 in the event that it does not make the payment.

**Response to Chiplease's Recitation of Facts**

The Response recites "facts" in three distinct areas which are simply wrong and which this Court should reject.

First, the Court should reject Chiplease's contention that it "deposited in excess of $500,000.00 into the Dykema account, which was used to pay Chapter 7 operating expenses pursuant to the Settlement Agreement." Chiplease neither set up the Dykema account pursuant to the Settlement Agreement nor paid Chapter 7 operating expenses pursuant to the Settlement Agreement.

Chiplease did not set up the $500,000.00 escrow account contemplated in the Settlement Agreement, by its own admission. The best evidence of this is Chiplease's own statement in its June 3, 2008 Response to American Grading's Motion to Compel Posting of Security, a copy of which is attached as Exhibit B. In that pleading, Chiplease stated:

> Chiplease acknowledges that it did not deposit with Dykema Gossett on or before the closing date the $500,000.00 of 'adequate security.'

Exhibit B, at p. 3, par. 9. While Chiplease qualifies that statement by saying that it paid some Chapter 7 operating expenses "with monies that Chiplease had deposited into a

2

Dykema Gossett client trust account," it is clear that it did not set up the account as contemplated by the Settlement Agreement.

Chiplease also did not make any payments for Chapter 7 operating expense claims pursuant to the Settlement Agreement. As the Estate has argued in previous papers, and this Court has acknowledged from the bench, the Settlement Agreement set up a mechanism by which unpaid Chapter 7 operating expense claims would be paid. That mechanism is set forth in paragraph 11(i) of the agreement:

> The Chapter 7 Trustee shall advise Chiplease in writing of Chiplease's obligation to pay one or more Expenses (the "Expense Request"). Chiplease shall have seven (7) days from receipt of the Expense Request to either pay the Estate sufficient funds to fully satisfy the Expense Request, or to dispute the payment of the Requested Expenses in writing ("Expense Dispute"). If Chiplease fails to make a timely Expense Dispute, the Expense Request will be deemed allowed and Chiplease will be required to pay it. If an Expense Dispute is timely made, the Estate shall have ten (10) days from the receipt of the Expense Dispute to seek to have the Expense Request allowed or disallowed by the Court (the "Expense Motion"). In the event that the Estate does not file an Expense Motion within the ten (10) day period, Chiplease shall be granted standing for the limited purpose of seeking to have the Expense Request disallowed.

See Settlement Agreement, attached as Exhibit C at par. 11(i). Chiplease does not have the right to determine unilaterally what constitutes allowed unpaid Chapter 7 operating expense claims. That is exactly what it says it has done here.

Finally, there has not been any showing whatsoever that the expenses which Chiplease claims to have paid would even qualify as unpaid allowed Chapter 7 operating expenses. No Chapter 7 operating expense claims have been allowed to this point. The hearings on objections to these claims have been continued until Chiplease deposits the required funds. Further, only a cursory examination of the affidavit of John Connolly, upon which Chiplease relies without direct citation in the Response, shows

that many of the expenses are outside the period of September 21, 2005 through April, 2006, when the Estate was operating RTC. These expenses, even if paid, are not unpaid allowed Chapter 7 operating expenses pursuant to the terms of the Settlement Agreement.

Second, this Court should reject Chiplease's contention that the alleged value of the claims somehow excuses it from making the $500,000.00 deposit. As part of the settlement and the order approving it nearly two and a half years ago, Chiplease agreed to pay all Chapter 7 operating expenses in excess of $150,000.00. It assumed the risk of payment of those expenses. It was to make the $500,000.00 deposit as adequate security for the payment of those expenses. And then, by its own admission, it failed to make the deposit. This failure is not mitigated by the value of the Chapter 7 operating expense claims made to date. As the Settlement Agreement says, the estimate of $250,000.00 to $400,000.00 was made "based upon the information and analysis of the Chapter 7 Trustee and John Connolly." Exhibit C, at p. 4. Mr. Connolly was the President of RTC and the Trustee of Illinois Investment Trust – an entity whose beneficiary is Chiplease, the sole shareholder and officer of which is Leon Greenblatt. See February 12, 2008 trial testimony of John Connolly, attached as Exhibit D, at p. 74, line 18 to p. 75, line 1 and February 13, 2008 trial testimony of Leon Greenblatt, attached as Exhibit E, at p 10, line 19 to p. 11, line 5. Though the claims as filed are currently in excess of that amount, none of those claims have actually been allowed. There is valid reason to believe that the actual value of the claims is much closer to $500,000.00 than the amounts set forth on the claims as filed.

Third, this Court should reject Chiplease's contention that its financial condition precludes it from making the $500,000.00 adequate security deposit. The affidavit of Leon Greenblatt attached to the Response is wholly inconsistent with Mr. Greenblatt's sworn testimony before the Bankruptcy Court on February 13, 2008. At that time, Mr. Greenblatt, who is the sole director and officer of Chiplease, testified that Chiplease had assets of "About 15, 16 million." Exhibit E at p. 12, lines 21-23. He also testified that Chiplease had "the net amount available to Chiplease to lend or what's available after expenses" of $150,000.00 per month. Exhibit E at p. 14, lines 14-22. Thus, the plea of poverty in the Response is belied by testimony from Chiplease's principal from approximately six months ago, and the production of a single checking account statement is not nearly enough to disprove that live testimony. Further, as set forth above, this Court should reject the contention that Chiplease has "used its own funds to pay more than $1 million in Chapter 7 operating expenses", as that contention is simply not true.

## Argument

A contempt order against Chiplease is appropriate because of its contumacious disregard of this Court's July 18, 2008 Order and the impact on both the Estate and the Chapter 7 operating expense claimants. For the reasons set forth below, this Court should enter an Order of contempt against Chiplease which (1) requires Chiplease to pay $500,000.00 plus interest at 4% per annum consistent with the July 18 Order; (2) requires Chiplease to pay the Estate's fees and costs litigating this matter since the entry of the July 18 Order; (3) requires the payment to be made by a date certain into an Estate account at the law firm of Arnstein & Lehr LLP; and (4) restrains Chiplease from

making any payments or dissipating any assets until it has made the payment.  Finally, the Order of contempt should include a self-executing sanction requiring Chiplease to account of all of Chiplease's revenues and expenditures from February 13, 2008 in the event that it does not make the payment.

In the Seventh Circuit, "[c]ivil contempt sanctions are designed for the dual purposes of compelling compliance with a court order and compensating the complainant for losses caused by contemptuous actions."  Tranzact Technologies v. 1Source Worldwide, 406 F.3d 851, 856 (7th Cir. 2005).  A contempt sanction is considered civil if it is remedial, and is "characterized by the court's desire to compel obedience to a court order or to compensate the contemnor's adversary for the injuries which result from the non-compliance."  Manez v. Bridgestone Firestone, [citation] (7th Cir. July 11, 2008).  To establish civil contempt, the movant must show, by clear and convincing evidence,

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) . . . that the decree was in the movant's "favor"; (3) . . . that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) . . . that [the] movant suffered harm as a result.

Id., quoting Ashcraft v. Conoco, 218 F.3d 288, 301 (4th Cir. 2000).  Further, "[w]hen the purpose is to make the defendant comply, the court must consider the 'character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired."  Autotech v. Integral, 499 F.3d 737, 752 (7th Cir. 2007).

There is no question at all that this Court entered an Order requiring Chiplease to deposit the money, and Chiplease has failed to do so.  There is also no question that

Chiplease's expressed reasons for its failure, as set forth in the Response, are at best not credible and at worst disingenuous. In light of the character and magnitude of the harm occasioned by Chiplease's brazen defiance of this Court's Order and its obligations under the Settlement Agreement, this Court should take appropriate actions in its contempt order.

The Court should take the following actions. First, it is beyond question that Chiplease should have to make the deposit of $500,000.00. That deposit should include interest at a rate of 4% per annum from the date of the Order, July 18, 2008. The Estate's counsel calculates that interest amount to September 16, 2008, a date one week after the September 9, 2008 status on this matter, as $3,287.67. Second, Chiplease should have to compensate the Estate for its attorney's fees litigating this issue since the entry of the July 18 Order. Those total $8,862.50 and are set forth on the Affidavit of George P. Apostolides, attached as Exhibit F. Third, given Chiplease's refusal to make the appropriate deposit with its counsel pursuant to the Settlement Agreement, the deposit of should be made with the Estate's counsel, Arnstein & Lehr LLP. Fourth, this Court should enter an Order restraining Chiplease from making any payments from its accounts or dissipating any of its assets until the payment is made. Finally, in the event Chiplease fails to take the steps outlined above, this Court should require Chiplease to make an accounting to the Estate of all monies paid into and out of Chiplease since the time of Leon Greenblatt's February 13, 2008 trial testimony.

These sanctions are reasonably necessary to compel obedience by Chiplease to this Court's orders. The $500,000.00 security deposit was an important component of the settlement agreement and its approval. It was undoubtedly a factor in the decision

7

by the various creditors not to object to the Settlement Agreement, and in the Bankruptcy Court's approval of the settlement.    Ironically, Chiplease's actions before this Court have underscored its importance.

### Conclusion

For the foregoing reasons, this Court should enter a finding of civil contempt against Chiplease, and as a sanction enter an Order which requires Chiplease to pay $512,150.17, consisting of the original $500,000.00 security amount, $3,287.67 in interest, and $8,862.50 in attorneys fees, by September 16, 2008 into an Estate account at the law firm of Arnstein & Lehr LLP; and restrains Chiplease from making any payments or dissipating any assets until it has made the payment.  Further, the Order of contempt should include a self-executing sanction requiring Chiplease to account of all of Chiplease's revenues and expenditures from February 13, 2008 in the event that it does not make the $512,150.17 payment into an Estate account at Arnstein & Lehr LLP on or before September 16, 2008.

THE CHAPTER 7 ESTATE OF RESOURCE TECHNOLOGY CORPORATION, BY AND THROUGH JAY A. STEINBERG, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE

By:____ /s/ George P. Apostolides_____

| | |
|---|---|
| Barry A. Chatz | James G. Richmond |
| George P. Apostolides | Gregory E. Ostfeld |
| Arnstein & Lehr LLP | Greenberg Traurig LLP |
| 120 S. Riverside Plaza, Suite 1200 | 77 W. Wacker Drive, Suite 2500 |
| Chicago, IL  60606 | Chicago, IL  60601 |
| (312) 876-7100 | (312) 456-8400 |
| Fax: (312) 876-0288 | Fax: (312) 456-8435 |

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE:                                    )
                                          )
**RESOURCE TECHNOLOGY**                   )
**CORPORATION,**                          )        **Case No. 08 C 4040**
                                          )
                    Debtor.               )

## ORDER

This matter coming to be heard on Chiplease, Inc.'s Emergency Motion for Limited Stay Pending Appeal of Bankruptcy Court Order (the "Motion"), due notice having been given the parties, responses having been served on the Court by the Estate of Resource Technology Corporation, by its counsel, and American Grading Co. and Congress Development Co., by their counsel, and the Court having heard argument from the parties, IT IS HEREBY ORDERED THAT:

1.    The Motion is granted in part for the reasons stated on the record;

2.    Chiplease, Inc. is ordered to deposit the sum of $500,000.00 in an interest-bearing account (the "Deposit") at the law firm of Much Shelist Denenberg Ament & Rubenstein, P.C. on or before July 24, 2008 at 4:30 p.m.;

3.    Chiplease, Inc. is to file a report under oath with both the Clerk of the United States Bankruptcy Court for the Northern District of Illinois and the Clerk of the United States District Court for the Northern District of Illinois on or before July 25, 2008 confirming that it has made the Deposit described in Paragraph 2;

4.    The Deposit is not to be disbursed without further order of either the United States Bankruptcy Court for the Northern District of Illinois or the United States District Court for the Northern District of Illinois;

5.    This matter is set for status on July 29, 2008 at 9:30 a.m. before Hon. Matthew F. Kennelly in Courtroom 2106, without further notice.

HON. MATTHEW F. KENNELLY

Date:  July 18, 2008

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | Hon. Eugene R. Wedoff |
| RESOURCE TECHNOLOGY | ) | |
| CORPORATION, | ) | Case No. 99 B 35434 |
| | ) | Hearing: June 17, 2008 |
| Debtor. | ) | |

**RESPONSE OF CHIPLEASE, INC. IN OPPOSITION TO MOTION
OF AMERICAN GRADING TO COMPEL POSTING OF SECURITY**

Chiplease, Inc. ("Chiplease"), by its undersigned attorneys, submits this response in opposition to the motion (the "Motion") of American Grading Company ("AGC") to compel Chiplease to post security to pay Chapter 7 administrative claims. As Chiplease argues more fully below, this Court should give *res judicata* effect to its order approving the Settlement Agreement between Chiplease and Chapter 7 trustee Jay A. Steinberg (the "Trustee") and not allow modification of the Settlement Agreement.

**The Motion is barred**

1.      The Motion contains two major flaws. First, Chiplease has objected to AGC's Chapter 7 administrative claim, so it is now a contested matter. Unless and until AGC's claim is allowed, its argument for payment is not even ripe.

2.      Second, the Motion is a thinly veiled collateral attack on the order approving the settlement between the Trustee and Chiplease. Under applicable law, AGC is precluded from making such an attack.

3.      A bankruptcy court order approving an estate's entry into a settlement agreement is a final order. *In re Dow Corning*, 86 F.3d 482, 488 (6th Cir. 1996) (an order finally disposing

of "discreet disputes within the larger bankruptcy case," is a final order); *In re Brooks Sand & Gravel, LLC*, 361 B.R. 477, 479-80 (Bankr. W.D. Ky. 2007) (finding settlement order resolving parties' claims to be final order not subject to collateral attack; objector's remedy would have been to timely appeal that order).

4.      Under Illinois law, for an order to be given *res judicata* effect, it must (i) have reached a final judgment on the merits; (ii) involve the same parties as the current claims; and (iii) constitute the same claim as the current claim. *See e.g., Garcia v. Village of Mount Prospect*, 360 F.3d 630, 635-636 (7th Cir. 2004).

5.      If the order meets those criteria, the court then must determine whether the party seeking new litigation had a full and fair opportunity to litigate his claims previously. *Id.* at 639. If he did, then he is barred from pursuing the new litigation.

6.      Here, on March 16, 2006, this Court entered an order (the "Settlement Order") approving the March 14, 2006 Settlement Agreement (the "Settlement") between Chiplease, Scattered Corporation and the Trustee. (*See* docket no. 3170.). The Settlement Order constitutes a final judgment on the merits of the Trustee's motion for authority to enter into the Settlement. The Settlement Order even provides that it is a "final order." (*Id.* at p. 15.) AGC was as much a party—indeed, an active participant—in this case at the time of entry into the Settlement between the Trustee and Chiplease as it is now. Moreover, the claims involved then and now are the same, *i.e.*, the obligations of Chiplease, pursuant to the Settlement, to post adequate security and to fund Chapter 7 operating expenses. Finally, AGC objected to the Settlement (docket no. 3107) but did not appeal the Settlement Order. All of the elements of *res judicata* are satisfied here, and thus, AGC is barred from challenging the Settlement and the Settlement Order.

**Chiplease did pay Chapter 7 operating expenses**

7.      Although AGC would have it the other way, the Settlement in fact does *not* require Chiplease to post a letter of credit in the amount of $5 million; does *not* require Chiplease to post "adequate security" for 25% of the disputed Chapter 7 administrative claims; and does *not* require Chiplease to make disclosures about its future solvency.  The Trustee and Chiplease could have included these provisions in the Settlement, but they did not.

8.      Instead, the Settlement required Chiplease to deliver, on or before closing, $500,000 to its counsel for use in paying expenses, referred to as "Adequate Security."  Then, after this estate had paid a total of $150,000.00 of "operating expenses," Chiplease would be asked to pay operating expenses, or dispute the same, pursuant to additional procedures outlined in the Settlement Agreement.  (*See* Settlement at ¶ 11(i)).

9.      Chiplease acknowledges that it did not deposit with Dykema Gossett on or before the closing date the $500,000.00 of "adequate security."[1]  But by the time Chiplease's counsel left Dykema Gossett to join the Polsinelli firm in July 2007, Chiplease already had paid out many Chapter 7 operating expenses.  (*See* <u>Exhibit A</u>, spreadsheet listing Chiplease's payments of Chapter 7 operating expenses.)

10.      Indeed, Chiplease's compliance with paragraph 11 of the Settlement has been significant: *It has paid in excess of $1,000,000 worth* of Chapter 7 operating expenses, *e.g.*, RTC payroll, insurance premiums and trade payables. *See* Ex. A.  At least $500,000 of these expenses were paid with monies that Chiplease had deposited into a Dykema Gossett client trust account.

---

[1]      If anyone has the right to enforce the Settlement it is the Trustee who, unlike AGC, was a party to the Settlement.

11.     Specifically with respect to insurance, Chiplease entered into Commercial Premium Finance Agreements & Disclosure Statements (Group Exhibit B attached), whereby First Funding Insurance Corp. initially made the premium payments, and then Chiplease became liable.  Chiplease's payments of the down-payment of $40,251.80 and subsequent insurance premiums are evidenced in Exhibit A (*i.e.*, payments to Thilman & Filippini, insurance broker). The insurance coverage was "bound," and thus effective, as of January 25, 2006 and covered the 12 month-period immediately thereafter.  (Examples of invoices for insurance premiums are attached as Group Exhibit C.)

12.     Insurance was a crucial component of Chapter 7 operating expenses as it allowed the Trustee to preserve estate assets. *See* 11 U.S.C. § 503(b).  The insurance that Chiplease paid for included general liability, workers' compensation and employers liability, contractors pollution liability, mobile equipment insurance.  (Excerpts of the insurance policies are attached as Group Exhibit D.[2])

13.     The Trustee was aware of Chiplease's payment of certain payroll expenses by virtue of his being copied on a letter dated May 17, 2006 from Chiplease's counsel. (*See* Exhibit E, letter from G. Jordan to J. Connolly, copying J. Steinberg, dated May 17, 2006).

14.     Finally, should Chiplease be required to deposit "adequate security" or otherwise fund an escrow account for additional Chapter 7 operating expenses, Chiplease argues that it be permitted to exercise a right of setoff in a form and an amount acceptable to the Trustee.

15.     In sum, there is no factual or legal basis to overturn the Settlement Order or to modify the Settlement.  The Motion should be denied in its entirety.

---

[2]     The insurance policies are voluminous, so Chiplease attaches only the first pages of each policy, but copies of the entire policies are available upon request.

WHEREFORE, Chiplease, Inc. prays that this Court enter an order denying American Grading Company's motion to compel Chiplease to post security to pay Chapter 7 operating expenses, and for such other relief as this Court deems just and proper.

Respectfully submitted,

**CHIPLEASE, INC.**

By: _/s/ Colleen E. McManus_
One of its attorneys

Louis D. Bernstein ARDC No. 6192379
Colleen E. McManus ARDC No. 06243473
**Much Shelist Denenberg Ament
& Rubenstein, P.C.**
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606
Phone: 312-521-2000

5

777228_1

# EXHIBIT C

IN THE UNITED STATES BANKRUPTY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:

RESOURCE TECHNOLOGY
CORPORATION,

                Debtor.

Chapter 7
Case No. 99 B 35434

Hon. Eugene R. Wedoff

## ORDER APPROVING SETTLEMENT BETWEEN THE ESTATE OF RESOURCE TECHNOLOGY CORPORATION AND THE GREENBLATT ENTITIES AND GRANTING FURTHER RELIEF

This matter coming before the Court on the motion filed by Jay A. Steinberg, not individually, but solely as the Chapter 7 Trustee (the "Chapter 7 Trustee") for the Chapter 7 estate of Resource Technology Corporation (the "Estate") for entry of an order to (i) approve a settlement agreement, a copy of which is attached hereto and incorporated herein as Exhibit "A", (Settlement Agreement") by and between the Estate and the Greenblatt Entities (defined below); (ii) authorize the conveyance, designation and abandonment of certain estate assets to Chiplease, Inc. or its designee ("Chiplease") and Scattered Corporation or its designee ("Scattered") (Chiplease and Scattered, as applicable, (collectively "Purchaser")) pursuant to the terms of the Agreements (defined below); (iii) approve a designation rights agreement in favor of Purchaser, a copy of which is attached as Exhibit "A" to the Settlement Agreement ("Designation Rights Agreement") (the Settlement Agreement and Designation Rights Agreement are jointly referred to as the "Agreements"); (iv) authorize the disbursement of $250,000 to NEC Electric Corporation ("NEC"); and (v) approve shortened notice of this Motion (the "Settlement Motion"); the Court having afforded the Chapter 7 Trustee and all other parties in interest an opportunity to be heard, having considered the testimony provided at the hearing on these matters, and having considered the

Settlement Motion and the entire record in this proceeding to date; the Court being otherwise fully advised in the premises, and finding notice of the Settlement Motion to be sufficient under the circumstances; the Court makes the following Findings of Facts, Conclusions of Law and other determinations:

### Findings of Fact and Other Determinations

A.     On November 15, 1999, (the "Petition Date"), an involuntary petition for relief under Chapter 7 of the Bankruptcy Code (11 U.S.C. Section 101 et.seq.) was filed against Resource Technology Corporation ("RTC" or the "Debtor").  An order for relief was entered on January 18, 2000, at which time the case was converted to one under Chapter 11.  Gregg E. Szilagyi was appointed as the Chapter 11 Trustee (the "Chapter 11 Trustee").

B.     The case was converted back to a Chapter 7 proceeding on September 21, 2005.  The Chapter 7 Trustee was appointed as interim trustee in September 2005 and became the permanent trustee in November 2005.

C.     The Debtor is in the business of capturing and converting methane landfill gas into electric energy, which the Debtor then sold to utilities like Commonwealth Edison.  The Debtor operates its business at a number of landfill sites.

D.     Leon Greenblatt, Chiplease, Inc. and Banco Panamericano, Inc. (collectively, the "Banco Secured Lenders") assert pre-petition and post-petition secured claims against the Estate based upon various pre-petition loan documents and post-petition debtor-in-possession loans.  Based upon their loans, the Banco Secured Lenders assert a lien on certain gas rights agreements and other assets of the Estate as collateral for their loans.

2

E.     Network Electric Corporation ("NEC") asserts a secured claim against the Estate in an amount in excess of $43 Million relating to a borrowing facility approved by this Court on August 1, 2000. NEC asserts a first priority secured claim on certain property and assets relating to the Estate's Congress, Beecher and Pontiac landfill sites.

F.     NEC also loaned the Chapter 7 Estate the sum of $250,000 to pay for the Chapter 7 administration of the estate (the "Chapter 7 Loan"). The first recoveries by the Estate are to be paid to NEC in repayment of the Chapter 7 Loan.

G.     On January 17, 2006, the Banco Secured Lenders filed an adversary proceeding against NEC entitled "Objection to Claim and Request for Determination as to the Validity and Extent of Lien of NEC." In the adversary proceeding, the Banco Secured Lenders objected to the secured administrative claim filed by NEC and request that NEC's claim be disallowed in its entirety. The Banco Secured Lenders do not contest the payment of $250,000 to NEC as repayment of the Chapter 7 Loan.

H.     Various adversary complaints were filed by the Estate against the Banco Secured Lenders and other defendants (the "Trustee's Litigation") as follows:

(i)     On October 22, 2004, the Chapter 11 Trustee filed his Verified Complaint for Turnover of Property of the Estate, for Damages including Punitive Damages for Conversion of Property of the Estate, for Imposition of a Constructive Trust, and for Injunctive and Other Relief against the Banco Secured Lenders, as Adv. Pro. No. 04-03867 (the "October 2004 Complaint"). The Chapter 11 Trustee dismissed the October 2004 Complaint on February 17, 2005.

(ii)     On November 16, 2004, the Chapter 11 Trustee filed his Verified Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Lenders, Delaware Gas and Electric Inc., Scattered Corporation and Green Gas Delaware Statutory Trust incorrectly identified as Green Gas Delaware Business Trust as Adv. Pro. No. 04-04068 (the "November 2004 Complaint"). On December 30, 2004, the Court granted the Chapter 11 Trustee's Motion for Preliminary Injunctive Relief enjoining the Banco Secured Parties from taking certain actions (the "December 2004 Injunctive Relief").

3

(iii)    On January 10, 2005, the Chapter 11 Trustee filed his Complaint for Unauthorized Postpetition Transfers against Loop Properties and Loop Properties, Inc. as Adv. Pro. No. 05-00025 (the "January 2005 Complaint").

(iv)    On October 27, 2005, the Estate filed a Complaint for Breach of Fiduciary Duty, Equitable Subordination, Violation of RICO, Injunctive Relief, Turnover of Property and Other Relief against the Banco Secured Lenders, Scattered Corporation and Green Gas Delaware Business Trust (the "October 2005 Complaint") as Adv. Pro. No. 05-02521.

(v)    On November 2, 2005, the Court entered an order consolidating the November 2004 Complaint and the October 2005 Complaint. On November 2, 2005, the Court entered an order granting in part the Estate's Motion for Preliminary Injunction (the "November 2005 Injunctive Relief").

(vi)    On January 23, 2006, the Estate filed an Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Parties as Adv. Pro. No. 06-00436 (the "January 2006 Complaint").

I.    On December 28, 2005, this Court entered an Order approving the Estate's Motion to Approve Settlement of 506(c) Claim with the Banco Secured Lenders pursuant to Section 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (Rule 101 et.seq., the "Bankruptcy Rules"). The Court required that Arnstein & Lehr LLP, as escrowee, hold $1.5 Million in settlement funds in escrow, pending further Order of the Court (the "506(c) Funds"). The Banco Secured Lenders filed a Motion to Reconsider the Court's approval of the 506(c) settlement, and objected to the Estate's motion for distribution of the 506(c) Funds. This Motion is still pending as of the date of this Order.

J.    On January 12, 2006, this Court approved sale procedures relating to the Estate's sale of certain assets, which included landfill gas-fired Solar Turbine combustion generators and ancillary equipment including (1) the three Solar Taurus Model Units located at the Congress landfill; (2) the one Taurus Model Unit located at the Beecher landfill; and (3) the one Solar Titan Model Unit located at the Pontiac landfill, together with all books and records pertaining to said equipment, the

4

maintenance and operation of said equipment, spare parts and items related to said equipment (the "DTE Sale Assets") to DTE Biomass Energy, Inc. ("DTE") for $6,000,000, or such higher offer (the "Sale").

K.   On February 6, 2006, the Court conducted a hearing on the Sale. The Court authorized the Sale free and clear of all liens, claims and encumbrances, with all valid liens to attach to proceeds in the same amount, extent and priority (the "Sale Order"). The Court authorized the distribution of funds to the Chapter 7 Trustee in payment of his statutory compensation. The Court ordered that the remaining funds be held in escrow pending further Order of the Court determining the extent and priority of liens between NEC and the Banco Secured Lenders as to the DTE Sale Assets.

L.   The Banco Secured Lenders filed an appeal of the Sale Order to the United States District Court (the "Sale Appeal"). On February 17, 2006, the United States District Court stayed the Sale pending the appeal.

M.   On March 2, 2006, the United States District Court affirmed the Sale Order. On the same date, the Estate closed on the Sale to DTE and conveyed the DTE Sale Assets to DTE free and clear of all liens, claims and encumbrances. The Chapter 7 Trustee received the statutory compensation authorized by the Court at the closing of the Sale to DTE.

N.   The Chapter 7 Trustee, on the one hand, and the Banco Secured Lenders and Scattered Corporation (collectively, the "Greenblatt Entities"), on the other hand, have decided to resolve all issues between the Estate and the Greenblatt Entities, and toward that end seek Court approval of the Settlement Agreement, approval of the Designation Rights Agreement and approval of and authorization of the conveyance, designation and abandonment of certain Estate assets to Purchaser as set forth in the Agreements, approval and authorization of releases, attached to the Settlement

5

Agreement as Exhibits D and E (the "Releases") and the dismissal of various causes of action and the granting of other relief, pursuant to Sections 105, 363, 365 and 554 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.

O.     The terms of the Agreements are supported by sound business reasons and are consistent with fundamental policies of the Bankruptcy Code. Approval of the Agreements will serve to benefit the Estate. This Court has discretion to authorize and approve the Agreements and the other relief granted herein.

P.     The settlement as set forth in the Settlement Agreement, sale of assets as set forth in the Settlement Agreement and the transfer and conveyance of certain Designation Rights as defined in the Designation Rights Agreement ("Designation Rights") to Purchaser and the Releases are each a reasonable and valid exercise of the Estate's business judgment and is otherwise appropriate under Sections 363 and 365 of the Bankruptcy Code.

Q.     The Agreements were negotiated, proposed and entered into by the Estate and the Greenblatt Entities, respectively at arms length and in good faith and without collusion. The Purchaser, as defined herein, is a good faith purchaser for value within the meaning of Section 363(m) of the Bankruptcy Code and entitled to all of the protections afforded by said provision

R.     The consideration provided pursuant to the Agreements is fair and reasonable.

S.     The Estate makes no representations or warranties with respect to the Designation Rights (Paragraph 14) causes of action (Paragraph 20) and equipment, inventory, supplies, work in progress and general intangibles (Paragraph 13). Specifically, the Estate makes no representations or warranties whether (i) any of the Contracts, as defined herein, which may be designated, are executory in nature; (ii) any

of the Contracts are unexpired or expired; (iii) whether the Contracts are assumable; (iv) whether the Estate owns or has any interest in any of the Contracts or other assets conveyed or that may be designated under the Agreements and pursuant to this Order.

T.     All objections to the Settlement Motion have been overruled or withdrawn.

U.     This Court shall retain jurisdiction to enforce this Order.

### Conclusions of Law and Other Determinations

1.     This Court has core jurisdiction to enter a final Order with respect to the Settlement Motion and all of the relief requested thereby pursuant to 28 U.S.C. §§ 157(b)(A), (M), (N) and (O).  This Court has exclusive jurisdiction over the Debtor's property and property of the Estate, wherever located, pursuant to 28 U.S.C. § 1334(d).

2.     Due and proper notice of the hearing on the Settlement Motion has been given to all parties in interest as required by Sections 105(a), 363(b), 365(a) and 554 of the Bankruptcy Code and Rules 2002(a)(2), 2002(c)(l), 2002(d), 6004, 6006 and 6007 of the Bankruptcy Rules.

3.     This Court has statutory authority to grant the relief in the Settlement Motion pursuant to Sections 105(a), 363, 365 and 554 of the Bankruptcy Code.

4.     Good business reasons justify granting the relief requested in the Settlement Motion. Therefore, Chapter 7 Trustee shall be and hereby is authorized to enter into the Agreements on behalf of the Estate and to take such actions necessary to effectuate the Agreements as being in the best interest of the Estate and its creditors.

5.     Permits issued to RTC for the operation of its business ("Permits"), which the Chapter 7 Trustee on behalf of the Estate seeks to abandon,  are burdensome to

the Estate, and are of inconsequential value and benefit to the Estate.  Further, the abandonment of the Permits is in the best interest of the estate.

6.    This Court will retain jurisdiction over the subject matters of this Order, the Agreements and the Settlement Motion, as well as the parties that have appeared with respect to the Settlement Motion, to enforce, interpret and enter supplemental orders with respect to the subject matter of this Order and the Settlement Motion.

### Decretal Provisions

Based on the foregoing Findings of Fact, Conclusions of Law and Other Determinations,

IT IS ORDERED, ADJUDGED AND DECREED as follows:

7.    To the extent set forth in this Order, the relief requested in the Settlement Motion is herewith granted.

8.    The terms and provisions of the Settlement Agreement are approved in their entirety.

9.    The terms and provisions of the Designation Rights Agreement are approved in their entirety.

10.    In the event of any inconsistency between the Agreements and this Order, this Order shall be controlling unless this Order specifically states that one of the Agreements is controlling.

11.    The Chapter 7 Trustee is herewith authorized to execute and deliver all documents on behalf of the Estate, as may be reasonably necessary to consummate

and effectuate the Agreements in a manner consistent with and not in violation of the terms of this Order.

12.    The Chapter 7 Trustee on behalf of the Estate and the Greenblatt Entities are herewith authorized and directed to take all actions that may reasonably be required for the purpose of consummating and implementing the Settlement.

13.    Pursuant to Section 363 of the Bankruptcy Code, the Estate is authorized to sell, transfer and convey to the Purchaser the assets (including causes of action) to be conveyed as set forth in Paragraphs 4, 5 and 8 of the Settlement Agreement.  Such assets are sold, transferred and conveyed free and clear of all liens, claims and encumbrances, with the exception of Permitted Liens. Permitted Liens are all liens that are asserted by the Greenblatt Entities.   Any potential Defendant that has a counterclaim, to any cause of action herein conveyed, shall maintain the right to assert that counterclaim, as a set-off up to the amount of the claim.

14.    Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Estate is authorized to transfer and convey all of its right, title and interest, if any, in all contracts, executory or otherwise, including any alleged executory contracts listed on Exhibit "C" to the Settlement Agreement, ("Contracts"), to the Purchaser consistent with the terms of the Designation Rights Agreement.  The conveyance of Designation Rights shall be effective on the closing date of the Settlement Agreement (the "Effective Date"). Upon the Effective Date, Purchaser shall have the sole, exclusive and continuing right to designate (on one or more occasions), to the same extent and validity as the Estate had at the Effective Date, (i) which Contracts shall be assumed and assigned; and (ii) which Contracts shall be rejected pursuant to the terms of the Designation Rights

9

Agreement. The Purchaser shall not have the right to designate any Contract that has previously been terminated by a final non-appealable Court Order or if the Estate believes in good faith that a particular designation will result in the Estate being subject to sanctions pursuant the Fed. R. Bankr. P. 9011 or allegations of bad faith, but the Purchaser shall have the right to petition the Court to compel the Trustee to comply with the Purchaser's direction to designate. The conveyance of the Designation Rights shall be free and clear of all liens, claims and encumbrances, with the exception of Cure Costs, as such term is defined in the Designation Rights Agreement and Permitted Liens. In accordance with the Designation Rights Agreement, the Purchaser shall remain obligated to cure any defaults under any Contract affected thereunder, including without limitation, Cure Costs, and provide adequate assurance of future performance, pursuant to the terms of the Designation Rights Agreement. The Estate shall not be liable for Cure Costs or for adequate assurance of future performance costs or any obligations or damage claims under the Contracts, or for any other claims which may arise as a result of the entry into or operation of the Designation Rights Agreement. Purchaser shall pay all costs and expenses incurred in the preparation, presentation and trial, if necessary, related to all actions required of the Estate pursuant to the Designation Rights Agreement.

15.     The provisions of Paragraph S of this Order, contained in the Findings of Fact and Other Determinations, are hereby Ordered and approved.

16.     Each Purchaser is a good faith purchaser pursuant to the terms of Section 363(m) of the Bankruptcy Code. The Purchaser negotiated the terms of the sale of assets at arms length and in good faith. The Purchaser did not seek or take unfair advantage over any other prospective bidder. Further, neither the Chapter 7 Trustee,

nor his employees, attorneys, agents or representatives have colluded with either Purchaser or their respective officers, employees, attorneys, agents or representatives, or in any manner whatsoever violated the provisions of Section 363(n) of the Bankruptcy Code.

17. The Greenblatt Entities reserve the right to assert that any extension or renewal option in a Contract which purports to be "personal" only to the Estate or to be exercisable only by the Estate is an unenforceable restriction on assignment within in the meaning of Section 365(f) and (l) of the Bankruptcy Code and, in fact, may be freely exercised by Purchaser to its full extent, without prejudice to any affected party asserting a contrary position.

18. The Purchaser shall have no successor liability or other liability for any of the Estate's employee obligations.

19. Pursuant to Section 554 of the Bankruptcy Code, the Chapter 7 Trustee's abandonment of the Permits is hereby approved, and the Permits are deemed abandoned as of the Effective Date. By agreement, the Estate, the Greenblatt Entities and the People of the State of Illinois will not assert or pursue any causes of action that remain in the pending adversary proceeding known as People of the State of Illinois and Stryker International, Inc. v. Resource Technology Corporation, Adversary Proceeding No. 00 A 1143, or with relation to any matters relating to the Stryker International, Inc. bankruptcy estate  In addition, the State of Illinois will not file or assert any environmental claims against the Estate.

20. Notwithstanding anything to the contrary in the Agreement or in this Order, the Estate and the Greenblatt Entities, including Chiplease, as the purchaser of the

11

Estate's assets located in Shelton, Connecticut, and any designee or assignee of the Greenblatt Entities, will not assert or pursue any causes of action against Connecticut Resources Recovery Authority ("CRRA") or relating to the Shelton, Connecticut landfill site, including, without limitation, any causes of action asserted in the adversary proceeding pending in this Court known as Resource Technology Corporation v. Connecticut Resources Recovery Authority, No. 00 A 0150 (the "CRRA Adversary") and any request for reconsideration, appeal or review from the judgment entered in the U.S. District Court case known as Resource Technology Corporation v. Connecticut Resources Recovery Authority, No. 05 C 4535 (the "CRRA Appeal"). In addition, no claim, cause of action or right of review or appeal against CRRA or relating to the Shelton, Connecticut landfill site and no contract with CRRA or relating to the Shelton, Connecticut landfill site will be included in any transfer or assignment authorized under this Order or in the Agreement. Also, the Shelton, Connecticut site and all contracts with CRRA or relating to the Shelton, Connecticut site will be excluded from Schedule A and Exhibit C to the Settlement Agreement and will be excluded from the Designation Rights Agreement and will be excluded from the contracts as to which the Estate seeks an extension of time to assume or reject. CRRA withdraws its Chapter 7 administrative claim against the Estate and will not file or assert any other Chapter 7 administrative claim against the Estate. However, CRRA preserves its Chapter 11 administrative claim and its pre-bankruptcy claims against the Estate. Notwithstanding the foregoing, the Greenblatt Entities do not waive any lien rights held by them or the right to enforce the same. *In addition, notwithstanding any language in this Order transferring assets free and clear of liens, claims and encumbrances, CRRA preserves its existing liens, if any.*

21.    Pursuant to Section 363 of the Bankruptcy Code, the Estate's conveyance of the Estate's right, title and interest, if any, in and to causes of action with the *and interests in any of the Estate's assets located in Shelton, Connecticut,* on *to the extent they have priority over any or all of the Greenblatt Entities' existing liens or interests.*

exception of Excluded Causes of Action, is approved.  Excluded Causes of Action include, specifically, the Estate's rights, if any, in (i) the Estate's causes of action against NEC, if any; the Estate's causes of action in adversary No. 00 A 1143, as described in Paragraph 19 above, or with relation to any matters relating to the Stryker International, Inc. bankruptcy estate; and the Estate's causes of action, if any, against CRRA (as defined in paragraph 20) or relating to the Shelton, Connecticut landfill, including without limitation, any claim asserted in the CRRA Adversary or any request for reconsideration, appeal or review of the judgment entered in the CRRA Appeal; (ii) preference or fraudulent transfer causes of action arising pursuant to Sections 502(d), 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, or arising pursuant to state law fraudulent transfers; (iii) ~~causes of action relating to the disgorgement or recovery of~~ any ~~disbursements made to professionals during the~~ *disgorgement rights* Chapter 11 or Chapter 7 ~~cases including without limitation the Chapter 7 and/or Chapter 11 Trustee's statutory compensation and the Chapter 7 and/or Chapter 11 Trustee's professional fees or other expenses paid during the pendency of the Bankruptcy Case~~; and (iv) any causes of action against the Chapter 11 or Chapter 7 Trustees or their professionals.  The Estate retains and does not convey to Chiplease or any other party the Excluded Causes of Action.

22.    The Chapter 7 Trustee on behalf of the Estate is authorized to execute the Releases.  The Releases shall be effective only upon the Closing Date, as such term is defined in Paragraph 12 of the Settlement Agreement.

23.    As more fully set forth in Paragraph 11 of the Settlement Agreement: (i) the Purchaser shall deposit the sum of $500,000.00 to be held in escrow by its counsel, Dykema Gossett PLLC, for the payment of all unpaid Chapter 7 operating expenses

13

above $150,000.00 and any expenses incurred while the Estate continues to operate the Debtor's business; (ii) Chiplease and, to the extent necessary, any of the Greenblatt Entities, waive any interest in the 506(c) Funds and, by the entry of this Order, consent to the payment of the 506(c) Funds by Arnstein & Lehr LLP as escrowee to Jay A. Steinberg, not individually but solely as Chapter 7 Trustee of the Estate of Resource Technology Corporation; (iii) Chiplease shall pay the sum of $275,000.00 to Jay A. Steinberg, not individually but solely as Chapter 7 Trustee of the Estate of Resource Technology Corporation, and the Banco Secured Lenders waive any right to a distribution from such funds; (iv) Chiplease shall pay 20% of any recovery (net of attorney's fees and costs) on any cause of action conveyed hereunder; (v) all parties receiving a release from the Estate pursuant to the Settlement Agreement shall not file a Chapter 7 claim and shall not receive a distribution on any Chapter 7 claim they may have; (vi) any party receiving a release from the Estate pursuant to the Settlement Agreement shall maintain any Chapter 11 claim that it may own, and in the case of a claim purchased from a third party, the distribution relating thereto shall be limited to the amount paid for the claim, and specifically the claim purchased from Aquila Energy Capital Corporation and other entities shall be limited to $7,000,000.00 (notwithstanding the foregoing, no claim purchased after February 1, 2006 shall be entitled to a distribution); (vii) in no event do the Banco Secured Lenders otherwise waive their claims, liens or debt, but the Banco Secured Lenders waive the right to receive any Chapter 7 distribution, and the Banco Secured Lenders agree that they will not pursue any claims or remedies against the Chapter 7 Trustee or his professionals; (viii) the Parties shall execute and exchange the releases attached as Exhibits D and E to the Settlement Agreement; and (ix) the Purchaser and the Estate shall execute the

14

documents required and perform the acts required to finalize the settlement pursuant to the terms of the Settlement Agreement and the Designation Rights Agreement.

24.     The Estate is authorized to pay the Chapter 7 Loan to NEC upon receipt of the 506(c) Funds or the $275,000 payment by Chiplease, Inc.

25.     If Purchaser determines that it will remove any property from a landfill for which the gas rights agreement has not been assigned to it, Purchaser agrees to give not less than 5 days notice in writing to the landfill owner at the last known address available to Purchaser of the intended removal and further agrees to advise the landfill owner as to the removal of such property.  If no agreement is reached, either party has the right to petition this Court for resolution of the dispute.

26.     The lien of NEC, if any, shall attach to the proceeds of the Settlement Agreement, subject to the payment of all costs of administration of the Estate.  A subsequent hearing will be held to determine the validity, priority and amount, if any, of the NEC lien.  Nothing in this order shall create for or provide to NEC lien rights other than those that previously existed.

27.     This Court retains jurisdiction over:

A.     the Agreements;

B.     the determination of any dispute or controversies arising in connection with the Agreements; and

C.     the determination of any dispute relating to the enforcement and interpretation of the terms and conditions of this Order or the Agreements.

28.     This Order is intended to be final and immediately effective when docketed by the clerk of this Court, pursuant to Fed. R. Bankr. P. 7062, made applicable by Fed. R. Bankr. P. 6004, 6006 and 9014

15

29.    To the extent any Finding of Fact is determined to be a Conclusion of Law, and to the extent any Conclusion of Law is determined to be a Finding of Fact, then each such Finding of Fact is incorporated into this Court's Conclusions of Law, and each such Conclusion of Law is incorporated into this Court's Findings of Fact.

Dated: March 16, 2006


ENTERED FOR THE COURT:

United States Bankruptcy Judge

16



## SETTLEMENT AGREEMENT

This Settlement Agreement is made and entered into on March 14, 2006, between the Estate of Resource Technology Corporation (the "Estate"), on the one hand, and Chiplease, Inc. ("Chiplease"), Leon Greenblatt ("Greenblatt"), Banco Panamericano, Inc. ("Banco") and Scattered Corporation ("Scattered") (Chiplease, Greenblatt, Banco and Scattered collectively referred to as the "Greenblatt Entities") on the other hand. The Estate and the Greenblatt Entities collectively referred to in this Settlement Agreement as the "Parties".

## RECITALS

WHEREAS, a bankruptcy case (the "Bankruptcy Case") was commenced on November 15, 1999, when an involuntary petition was filed against Resource Technology Corporation ("RTC" or "Debtor"). On February 1, 2000, a consensual Order of Relief and Order Converting the Bankruptcy Case to a case under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §101 et.seq. (the "Bankruptcy Code") became effective;

WHEREAS, on August 26, 2003, Gregg E. Szilagyi was appointed as the Chapter 11 Trustee ("Chapter 11 Trustee");

WHEREAS, on September 21, 2005, the United States Bankruptcy Court, Northern District of Illinois, Eastern Division (the "Court") entered an order converting the case to a case under Chapter 7 of the Bankruptcy Code. Thereafter, Jay A. Steinberg, not individually but as Chapter 7 Trustee (the "Chapter 7 Trustee") was appointed as the Chapter 7 trustee for the Estate;

WHEREAS, it is the intention of the Parties that any reference to an order shall mean an order entered by the Court ("Order");

WHEREAS, Greenblatt, Chiplease and Banco (collectively, the "Banco Secured Lenders") assert pre-petition and post-petition secured claims against the Estate based upon various pre-petition loan documents and post-petition debtor in possession loan documents. Based upon their loans, the Banco Secured Lenders assert a lien on certain gas rights agreements and other assets of the Estate as collateral for their loans;

WHEREAS, Network Electric Corporation ("NEC") asserts a secured claim against the Estate in an amount in excess of $43 Million relating to a borrowing facility approved by this Court on August 1, 2000. NEC asserts a first priority secured claim on certain property and assets relating to the Estate's Congress, Beecher and Pontiac landfill sites.;

WHEREAS, NEC loaned the Chapter 7 Estate the sum of $250,000 to pay for the Chapter 7 administrative expenses of the Estate (the "Chapter 7 Loan"). Pursuant to an order entered in the Bankruptcy Case, the first recoveries by the Estate must be paid to NEC in repayment of the Chapter 7 Loan;

WHEREAS, on January 17, 2006, the Banco Secured Lenders filed an adversary proceeding against NEC entitled "Objection to Claim and Request for Determination as to the Validity and Extent of Lien of NEC." In the adversary proceeding, the Banco Secured *Lenders*

- 1 -

objected to the secured administrative claim filed by NEC and request that NEC's claim be *disallowed in its entirety*. The Banco Secured Lenders do not contest the payment of $250,000 to NEC as repayment of NEC's loan to the Chapter 7 Estate;

WHEREAS, during the course of the Bankruptcy Case, the Chapter 11 Trustee and/or the Chapter 7 Trustee filed adversary complaints against one or more of the Greenblatt Entities and others as follows:

(i)    On October 22, 2004, the Chapter 11 Trustee filed his Verified Complaint for Turnover of Property of the Estate, for Damages including Punitive Damages for Conversion of Property of the Estate, for Imposition of a Constructive Trust, and for Injunctive and Other Relief against the Banco Secured Lenders as Adv. Pro. No. 04-03867 (the "October 2004 Complaint"). The Chapter 11 Trustee dismissed the October 2004 Complaint on February 17, 2005;

(ii)    On November 16, 2004, the Chapter 11 Trustee filed his Verified Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Lenders, Delaware Gas and Electric Inc., Scattered Corporation and Green Gas Delaware Business Trust as Adv. Pro. No. 04-04068 (the "November 2004 Complaint");

(iii)    On January 10, 2005, the Chapter 11 Trustee filed his Complaint for Unauthorized Postpetition Transfers against Loop Properties and Loop Properties, Inc. as Adv. Pro. No. 05-00025 (the "January 2005 Complaint");

(iv)    On December 30, 2004, the Court granted the Chapter 11 Trustee's Motion for Preliminary Injunctive Relief enjoining the Banco Secured Parties from taking certain actions (the "December 2004 Injunctive Relief");

(v)    On October 27, 2005, the Estate filed a Complaint for Breach of Fiduciary Duty, Equitable Subordination, Violation of RICO, Injunctive Relief, Turnover of Property and Other Relief against the Banco Secured Lenders, Scattered Corporation and Green Gas Delaware Business Trust as Adv. Pro. No. 05-02521(the "October 2005 Complaint");

(vi)    On November 2, 2005, the Court entered an order consolidating the November 2004 Complaint and the October 2005 Complaint;

(vii)    On November 2, 2005, the Court entered an order granting in part the Estate's Motion for Preliminary Injunction (the "November 2005 Injunctive Relief");

(viii)    On January 23, 2006, the Estate filed an Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Parties as Adv. Pro. No. 06-00436 (the "January 2006 Complaint")

The October 2004 Complaint, the November 2004 Complaint, the January 2005 Complaint, the December 2004 Injunctive Relief, the October 2005 Complaint, November 2005 Injunctive Relief, and the January 2006 Complaint are hereinafter collectively referred to as the "Trustee Litigation";

WHEREAS, on December 28, 2005, the Court entered an Order approving the Estate's Motion to Approve Settlement of §506(c) Claim with the Banco Secured Lenders (the "506(c) Settlement"). The Court required that Arnstein & Lehr LLP, as escrowee, hold $1.5 million in settlement funds (the "506(c) Funds") in escrow, pending further Order;

WHEREAS, the Estate moved for an Order requiring that the escrowed funds be transferred to the Estate. The Banco Secured Lenders filed a Motion to Reconsider the Court's approval of the 506(c) Settlement, and objected to the Estate's motion for distribution of funds. Both the Banco Secured Lenders' Motion to Reconsider and the Estate's Motion for Distribution of Funds remain on the Court's docket and have been continued from time to time;

WHEREAS, on January 12, 2006, the Court approved sale procedures relating to the Estate's sale ("Sale") of certain assets (the "DTE Sale Assets"), which included landfill gas-fired Solar Turbine combustion generators and ancillary equipment including (1) the three Solar Taurus Model Units located at the Congress landfill; (2) the one Taurus Model Unit located at the Beecher landfill; and (3) the one Solar Titan Model Unit located at the Pontiac landfill, together with all books and records pertaining to said equipment, the maintenance and operation of said equipment, spare parts and items related to said equipment to DTE Biomass Energy, Inc. ("DTE") for $6,000,000, or such higher offer;

WHEREAS, on February 6, 2006, the Court entered an Order (the "DTE Sale Order") authorizing the Sale of the Sale Assets to DTE free and clear of all liens, claims and encumbrances, with all valid liens to attach to proceeds in the same amount, extent and priority. The Court authorized the distribution of Sale proceeds to the Chapter 7 Trustee in payment of his statutory compensation. The Court ordered that the remaining funds be held in escrow pending further Order determining the extent and priority of liens between NEC and the Banco Secured Lenders as to the Sale Assets;

WHEREAS, the Banco Secured Lenders filed an appeal of the DTE Sale Order (the "Sale Appeal") with the United States District Court (the "District Court"). On February 14, 2006, the District Court stayed the Sale pending the appeal;

WHEREAS, on March 2, 2006, the District Court affirmed the DTE Sale Order. On the same date, the Estate closed on the Sale to DTE and conveyed the Sale Assets to DTE free and clear of all liens, claims and encumbrances. The Chapter 7 Trustee received the statutory compensation authorized by the Court at closing of the DTE Sale;

WHEREAS, the deadline for the Estate to assume or reject executory contracts and/or unexpired leases of real property (collectively, "Executory Contracts"), if any, has been extended pursuant to Orders entered from time to time through February 28, 2006;

WHEREAS, the Estate has filed a Fifth Motion Seeking to Extend the Time to Assume or Reject Contracts until April 28, 2006 for presentment on February 28, 2006. The Estate has also filed a Motion to Extend the Time to Assume or Reject Certain Contracts (namely, the Executory Contracts relating to the Estate's Congress, Corpus Christi and Columbus landfill sites) through April 28, 2006 for presentment on February 28, 2006. Those motions and all other matters

- 3 -

before the Court on February 28, 2006 were entered and have been continued for hearing on March 14, 2006;

WHEREAS, the lessors to the Executory Contracts have retained their rights to assert that the Executory Contracts have been previously rejected or terminated;

WHEREAS, one of the Executory Contracts is an Amended and Restated Agreement for Construction and Operation of Gas Collection Facility and Gas-To-Electric Plant dated December 2, 1997 between Congress Development Company and RTC, and later amended by the First Amendment to Amended and Restated Agreement for Construction and Operation of Gas Collection Facility and Gas-to-Electric Plant" executed June 30, 1999 and further amended by a certain side-letter agreement dated July 1, 1999 (collectively, the "Congress Agreement");

WHEREAS, one of the Executory Contracts is an Agreement dated December 27, 1995 between RTC and American Disposal Services, Inc. ("ADS") relating to certain gas collection facilities and certain gas to energy facilities including the Pontiac facility ("ADS Agreement"). The ADS Agreement as it relates to Pontiac Illinois was previously assumed by the Chapter 11 Trustee;

WHEREAS, one of the Executory Contracts is an Agreement between American Grading Company ("AGC") and RTC dated December 27, 1995 (the "American Grading Agreement");

WHEREAS, the Banco Secured Lenders assert that John Connolly, as President of RTC, was authorized to and delivered to AGC a proper Notice of Extension of the American Grading Agreement extending the term of the American Grading Agreement;

WHEREAS, the Estate is seeking to abandon its right, title and interest, if any, in permits issued to RTC for the operation of its business ("Permits"), as the Estate maintains that the Permits have inconsequential value to the Estate and are burdensome to the Estate;

WHEREAS, Scattered purchased the note and security interest of Aquila Energy Capital Corporation in and to the assets relating to Estate's Pontiac facility;

WHEREAS, the Estate lacks sufficient resources to assume any Executory Contracts or to satisfy the costs of administration of the Chapter 7 Estate that are currently estimated to be approximately $250,000 to $400,000 based upon the information and analysis of the Chapter 7 Trustee and John Connolly. Further the Estate lacks sufficient resources to pursue adequately the Trustee Litigation due to the elimination of the monthly payment, of approximately $40,000.00, from the operations of the Pontiac Facility that the Estate was receiving before Aquila sold its note and security interest.

WHEREAS, the Estate and the Greenblatt Entities have engaged in substantial good faith negotiations in an effort to resolve the many disputes between the Parties including without limitation, (i) the Trustee Litigation, (ii) the Banco Secured Lenders' Motion to Reconsider the approval of the 506(c) Settlement; (iii) the Banco Secured Lenders' objection to the distribution of the 506(c) Funds to the Estate; and (iv) the Banco Secured Lender's objection to the Estate's rejection of Executory Contracts;

- 4 -

WHEREAS, in conjunction with this Agreement, the Estate, on the one hand, and Chiplease, Scattered, and their respective designees, on the other hand, wish to enter into a Designation Rights Agreement, in the form attached hereto as Exhibit A (the "Designation Rights Agreement"); and

WHEREAS, the Estate and the Greenblatt Entities wish to settle their differences under and pursuant to the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the sufficiency of which is hereby acknowledged, and subject to approval of the Court, the Parties hereby agree as follows.

## AGREEMENT

1. **Recitals Incorporated Into Agreement.** The Recitals set forth above are incorporated herein by reference.

2. **Effective Date.** This Settlement Agreement shall become effective (the "Effective Date") upon the entry of a final nonappealable Order approving this Settlement Agreement including all of its exhibits, the form of which has been mutually agreed to by the Estate and the Greenblatt Entities (the "Approval Order"). The Parties specifically agree that the form of Order attached hereto as Exhibit B has been agreed to by them. The Parties further agree that following the hearing on this Settlement Agreement, the Parties reserve the right to revise the Order attached hereto as Exhibit B to conform to the proofs.

3. **The Sale Appeal and NEC Claim Litigation.** The Sale and the Banco Secured Lenders' right to prosecute the Sale Appeal including the asserted right to credit bid, the Banco Secured Lenders' assertion of a secured claim, the objection to NEC's secured claim including the NEC Claim Litigation are unaffected by this Settlement Agreement. Nothing in this Settlement Agreement shall be interpreted as an impediment to the Banco Secured Lenders or a waiver of any claims or lien rights that may be necessary to prosecute or provide standing to continue the NEC Claim Litigation. Nothing in this Settlement Agreement shall be interpreted as an impediment to NEC asserting any claim or counterclaim in that litigation that NEC would have had but for this Settlement Agreement. The Estate will continue in its efforts to finalize the Sale.

4. **The Estate's Conveyance of Assets.** With regard to contracts including Executory Contracts and assets listed in this Section 4, on the Closing Date, as defined in paragraph 12 of this Agreement, the Estate shall either convey designation rights to Executory Contracts (if any), assign nonexecutory contracts (if any) with the assignee having the right and opportunity to cure any defaults, and provide any necessary adequate assurance of future performance, or sell, transfer and convey all other assets (if any), all in conformance with the requirement of the Bankruptcy Code:

(i)     the Estate shall sell, transfer and convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in the Congress Agreement and any gas rights agreement or other agreements relating to the Hillside Illinois facility or arising as a result of the Congress Agreement in accordance with the terms of this Settlement Agreement;

(ii)     the Estate shall sell, transfer and convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in all equipment, inventory, supplies, work in process, general intangibles and causes of action ("Equipment") related to the Congress site and/or located in Hillside Illinois, except that the Estate does not convey to Chiplease or its designee any Equipment conveyed to or which the Estate has agreed to convey to DTE;

(iii)     the Estate shall sell, transfer and convey to Scattered or its designee all of the Estate's right, title and interest, if any, in the ADS Agreement and any gas rights agreement or other agreements relating to the facilities that are the subject of the ADS Agreement or arising as a result of the ADS Agreement in accordance with the terms of this Settlement Agreement;

(iv)     the Estate shall sell, transfer and convey to Scattered all of the Estate's right, title and interest, if any, in all Equipment related to the ADS Agreement and/or located in or related to the facilities in Pontiac Illinois, Wyandot Ohio, Clarion Pennsylvania and Wheatland Kansas;

(v)     the Estate shall sell, transfer and convey Chiplease or its designee all of the Estate's right, title and interest, if any, in the American Grading Agreement and any gas rights agreement or other agreements relating to McCook facility or arising as a result of the American Grading Agreement in accordance with the terms of this Settlement Agreement;

(vi)     the Estate shall sell, transfer and convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in all Equipment related to the American Grading Agreement (including without limitation, five generators) and/or located in Lyons Illinois; and

(vii)     the Estate shall sell, transfer and convey Chiplease or its designee all of the Estate's right, title and interest, if any, in all contracts including but in no way limited to all executory contracts, which shall include any landfill agreements and gas rights agreements to which RTC is a party, to which the Estate has sought an extension of time to assume or reject as listed on Exhibit C, pursuant to the terms of the Designation Rights Agreement. The Estate shall sell, transfer and convey all of the Estate's right, title and interest, if any, to all of the Estate's personal property including but not limited to furniture, fixtures and all Equipment at or related to all facilities, contracts and sites not mentioned above, as listed on the attached Schedule A, including but not limited to the contracts set forth in Exhibit C, but specifically excluding the Estate's interest in any contracts regarding the Beecher, Illinois and Paxton, Illinois sites.

(viii)     Nothing herein shall be construed to excuse either Chiplease or its designee or Scattered Corporation from the obligations, if any, to comply with the provisions relating to assumption and assignment and assignment provided under Section 365 of the Bankruptcy Code and any sale, transfer and conveyance of rights under an Executory Contract shall be conditioned on and subject to the terms and conditions contained in the Designation Rights Agreement.     In the event that the Chapter 11 Trustee has previously assumed an Executory Contract, prior to assignment to Chiplease or its designee or Scattered or its designee, it shall be a requirement of any assignment that the Chapter 7 Trustee, at the sole cost and liability of the designating party, cure or provide adequate assurance that any default will be promptly cured and compensate or provide adequate assurance that any nondebtor party to an Executory Contract will be promptly compensated for any actual pecuniary loss to such party resulting from any default. In all events, the designating party shall provide adequate assurance of future performance by the designating

- 6 -

party of such Executory Contract, whether or not there has been a default in such contract or lease. The Estate makes no representations or warranties with respect to extent and validity of the Estate's right, title and interest, if any, in any of the foregoing assets, or whether such assets exist.

5.    **Designation Rights.** On the Closing Date, the Estate shall sell, transfer and convey to Chiplease, Scattered or their respective designees all of the Estate's rights, if any, to assume, assign and/or reject all Executory Contracts (collectively, "Designation Rights") pursuant to the terms of a Designation Rights Agreement to be entered into between the Estate and Chiplease, Scattered or their respective designees. On the Closing Date, Chiplease, Scattered or their respective designees shall have the sole, exclusive and continuing right to designate (on one or more occasions) through the Designation Period (defined in the Designation Agreement), to the same extent and validity as the Estate had on the Closing Date, (i) which Executory Contracts shall be assumed and assigned; and (ii) which Executory Contracts shall be rejected. As part of the Designation Rights Agreement, the Estate shall bear no liability for Cure Costs, as that term is defined in the Designation Rights Agreement, for costs, if any, related to adequate assurance of future performance, or for any obligations or damages under any contract conveyed under this Agreement or subsequent to such conveyance. Chiplease or its designee or Scattered or its designee, as the case may be, shall pay all reasonable costs and expenses incurred in the preparation, presentation and trial, if necessary, related to all actions required of the Estate pursuant to the Designation Rights Agreement.

6.    **Extension of Time to Assume or Reject Executory Contracts.** The Estate has sought an extension of time to assume or reject Executory Contracts beyond the current February 28, 2006. As a material term of this Agreement, the Court must enter an order extending such time to April 28, 2006. The Chapter 7 Trustee makes no representations or warranties with respect to extent and validity of the Estate's right, title and interest in any of Executory Contracts, or whether any of Executory Contracts are assumable or assignable.

7.    **Abandonment of Permits.** The Estate shall seek Court approval for the abandonment of Permits. The Estate's abandonment of the Permits shall be deemed effective as of the Closing Date.

8.    **Estate's Conveyance of Certain Causes of Action.** On the Closing Date, the Estate shall sell, transfer and convey to Chiplease or its designee all of the Estate's right, title and interest, if any, in all of the Estate's causes of action, except that the Estate shall not convey and the Estate shall retain its rights, if any, in (i) the Estate's causes of action against NEC, if any; (ii) the Estate's cause of action in People of the State of Illinois and Stryker International, Inc. v. RTC, Adversary Proceeding No. 00 A 1143 (iii) preference or fraudulent transfer causes of action arising pursuant to 11 U.S.C. §502(d), 544, 545, 546, 547, 548, 549, 550, 551 and 553, or arising pursuant to state law fraudulent transfers; (iv) causes of action relating to the disgorgement or recovery of any disbursements made to professionals during the Chapter 11 or Chapter 7 cases including without limitation the Chapter 7 and/or Chapter 11 Trustee's statutory compensation and the Chapter 7 and/or Chapter 11 Trustee's professional fees or other expenses paid during the pendency of the Bankruptcy Case; and (v) any causes of action against the Chapter 11 or Chapter 7 Trustees or their professionals. The Estate retains and does not convey to Chiplease or its designee or any other party the above-referenced excluded causes of action.

9.    **Release.** On the Closing Date, the Parties shall execute the Releases attached hereto as Exhibits D and E (the "Releases"). The terms of the Releases are specifically incorporated herein.

10.    **The Trustee's Litigation and Objection to Banco Secured Lenders' Claims.** The Estate shall withdraw all objections to the claims filed by the Banco Secured Lenders or any claims purchased by any of the Banco Secured Lenders or Scattered Corporation. In addition, the Estate shall seek dismissal with prejudice of each of the adversary proceedings defined as the "Trustee Litigation". In the event that the "Trustee Litigation" is not dismissed with prejudice, the Banco Secured Lenders may terminate this Agreement without liability for breach and the parties shall return to the status quo ante.

11.    **Consideration.** Chiplease for itself and on behalf of the other Banco Secured Lenders shall pay to the Estate the following consideration:

(i)    Chiplease shall pay all unpaid Chapter 7 operating expenses above $150,000 and any expenses incurred while the Estate continues to operate the Debtor's business ("Expenses"). The Estate shall pay the first $150,000 of these expenses. On or before the Closing Date, Chiplease shall deliver to its counsel, Dykema Gossett PLLC the sum of $500,000.00 to be used to pay the Expenses ("Adequate Security"). After the Estate has paid a total of $150,000 in Chapter 7 Expenses, Chiplease will be requested to pay all additional Chapter 7 operating expenses. The Chapter 7 Trustee shall advise Chiplease in writing of Chiplease's obligation to pay one or more Expenses (the "Expense Request"). Chiplease shall have seven (7) days from receipt of the Expense Request to either pay the Estate sufficient funds to fully satisfy the Expense Request, or to dispute the payment of the Requested Expenses in writing ("Expense Dispute"). If Chiplease fails to make a timely Expense Dispute, the Expense Request will be deemed allowed and Chiplease will be required to pay it. If an Expense Dispute is timely made, the Estate shall have ten (10) days from the receipt of the Expense Dispute to seek to have the Expense Request allowed or disallowed by the Court (the "Expense Motion"). In the event that the Estate does not file an Expense Motion within the ten (10) day period, Chiplease shall be granted standing for the limited purpose of seeking to have the Expense Request disallowed;

(a)    The term "Chapter 7 operating expenses" shall not include the Chapter 7 Loan or any Chapter 7 Trustee's fees or expenses or any professional fees and expenses, which the Estate shall pay from the Estate's assets including but not limited to the consideration below including the 506(c) Funds;

(ii)    Chiplease and to the extent necessary the other Banco Secured Lenders waive any interest in the 506(c) Funds and consents to the payment of the 506(c) Funds by Arnstein & Lehr, as escrowee, to the Estate;

(iii)    Chiplease shall pay $275,000 on the Closing Date to the Estate. The Banco Secured Lenders waive any right to a distribution from such funds. On the Closing Date, Chiplease's counsel shall provide assurance that it holds the Adequate Security;

(iv)    The Estate shall be entitled to 20% of any recovery (net of attorney's fees and costs) on any cause of action conveyed hereunder and brought by Chiplease or its designee and

- 8 -

20% of any recovery (net of attorney's fees and costs) obtained through the prosecution of the NEC Claim Litigation. Notwithstanding this subsection (v), the Estate does not convey or assign any cause of action against NEC to the Greenblatt Entities including Chiplease;

(v)    The Banco Secured Lenders, as pre-petition and post-petition secured lenders, waive their right to any distribution from the Estate that may be paid from the consideration delivered pursuant to the settlement set forth herein, including any right to receive a distribution from the 506(c) Settlement. In no event shall the Banco Secured Lenders be entitled to a distribution on account of any Chapter 7 administrative claim they may hold;

(vi)    The Banco Secured Lenders shall otherwise maintain any Chapter 11 claim and Chapter 7 nonadministrative claim, as the case may be. In the case of purchased claim, the Banco Secured Lenders shall not be entitled to a distribution for any claim purchased after February 1, 2006. For distribution purposes, any distribution on account of a purchased claims shall be limited to the amount of the purchase price including the claim purchased from Aquila Energy Capital Corporation, Concert Capital Resources, LP, Concert Capital Resources A, LP, Concert Capital Resources B, LP, Concert Capital Resources C, LP, Concert Capital Resources A/B, Inc., and AECC Pontiac LLC, which shall be limited to $7,000,000; and

(vii)    In no event do the Banco Secured Lenders otherwise waive their claims, liens or debt. However, the Banco Secured Lenders waive the right to receive any Chapter 7 distribution. The Banco Secured Lenders agree that they will not pursue any claims or remedies against the Chapter 7 Trustee or his professionals.

12.    **The Closing Date.**  The term "Closing Date" shall mean and the closing shall occur on the next business day after the Effective Date. On the Closing Date, the Parties shall meet and exchange the following:

(i)    The Chiplease shall:

(a)    Pay the Estate the sum of $275,000;

(b)    Provide the Estate with evidence of the deposit of the Adequate Security;

(c)    Execute the Releases; and

(d)    Execute an agreed order authorizing the disbursement of the 506(c) Funds to the Estate.

(ii)    The Estate shall:

(a)    Execute the Releases;

(b)    Execute the Designation Rights Agreement designating the Estate's rights, if any, in the Designation Rights to Chiplease or its designee;

(c)    Execute a Bill of Sale; and

- 9 -

(d)   Execute a Stipulation seeking dismissal of the Trustee Litigation with prejudice.

Notwithstanding the foregoing, the Closing Date shall not be deemed to have occurred until the foregoing documents and payments are executed, provided and/or exchanged.

13.   **Governing Law.** This Settlement Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Illinois.

14.   **Representations and Warranties.** The parties represent and warrant that they have the proper authority to sign for and on behalf of the respective entities, and the parties are all bound by the terms of this Settlement Agreement.

15.   **Amendment of Agreement.** This Settlement Agreement shall not be amended except by a writing signed by all of the parties hereto.

16.   **Binding Effect.** This Settlement Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

17.   **Entire Agreement.** This Settlement Agreement and all of its Exhibits constitute the entire agreement of the parties hereto as to the subject matter hereof. The undersigned acknowledge that there are no communications or oral understandings contrary, different, or which in any way restrict this Settlement Agreement, and that all prior agreements or understandings within the scope of the subject matter of this Settlement Agreement are, upon the execution and delivery of this Settlement Agreement, suspended, null and void.

18.   **Execution in Counterparts.** This Settlement Agreement may be executed in one or more counterparts, each counterpart to be considered an original portion of this Settlement Agreement.

| Chiplease, Inc.¶ | The Chapter 7 Bankruptcy Estate of Resource Technology Corporation |
|---|---|
| By: _____ ____ ____ ____<br>    Leon Greenblatt<br>    Its Agent and Officer<br><br>**Leon Greenblatt**<br><br>By: _____ ____ ____ ____ __<br>    Leon Greenblatt<br>    Individually | By: _____ ____ ____ ____ __<br>    Jay A. Steinberg, not individually, but<br>    solely as Chapter 7 Trustee for the<br>    Estate of Resource Technology<br>    Corporation |

**Banco Panamericano**

By: _____
       Leon Greenblatt
       Its Agent and Officer

**Scattered Corporation**

By: _____
       Leon Greenblatt
       Its Agent and Officer

**SCHEDULE A**

**LIST OF LANDFILL SITES**

### Schedule "A"

#### List of Facilities

1.    Bi-State Landfill, 2248 Parks Road, Belleville, Illinois 62220;

2.    Bloomington Landfill, R.R. 3 Box 145, Bloomington, Illinois;

3.    Chastang Landfill, 17045 Hwy 43, Mt. Vernon, AL 36562;

4.    Clarion Landfill, Meadville, Pennsylvania 16335;

5.    Columbus/Pine Grove Landfill, 7160 Sacerdote Lane, Columbus, Georgia 31907;

6.    Congress Landfill, 4100 West Frontage Road, Hillside, Illinois 60160;

7.    Elliot Landfill, 7001 Ayers, Corpus Christi, Texas 78415;

8.    NC Iowa RSWA, 3319 5th Ave. South, Ft. Dodge, Iowa 50501;

9.    City of Gary Landfill, 1900 Burr Street, Gary, Indiana 46403;

10.   GNOL Landfill, 5700 Hwy. 90 West, Avondale, Louisiana 70002;

11.   Kewanee/National Closure Corp. Landfill, Rte. 81, Kewanee, Illinois, 61443;

12.   Lansing/National Closure Corp. Landfill, 2600 W. 170th St., Lansing, IL 60438;

13.   Litchfield-Hillsboro Landfill, 2782 Landfill Trail, Litchfield, Illinois 62056;

14.   Lyons/McCook Landfill, 5101 S. Lawndale Ave. (Private Road), McCook, IL 60525;

15.   New Haven Landfill, 260 Middletown Avenue, New Haven, Connecticut 06510;

16.   Ottawa Landfill, P.O. Box 520 Koenig Road, Ottawa, Illinois 61350;

17.   Peoria Landfill, 11501 West Cottonwood Lane, Brimfield, Peoria County, Illinois;

18.   Pontiac Landfill, RR 3 14206 East 2100 North Road, Pontiac, IL 61764

19.   Rosencranse Landfill, Rosencranse Road, TR 4860, Wayne County, Berlin Township, Pennsylvania 18405;

20.   Springfield Landfill, RR#9, Sand Hill Road, Springfield, Illinois 62707;

21.   Taylor Ridge Landfill, 8400 77th Street West, Taylor Ridge, Illinois 61232;

22.   Viola Landfill, Greene Township, Illinois;

23.     Wheatland Landfill, PT SW/4, Section 19 Township 325 Range 24 E Columbus, Kansas 66725; and

24.     Wyandot Landfill, 11164 County Road 4, Carey, Ohio 43316.

# EXHIBIT A

## DESIGNATION RIGHTS AGREEMENT

# DESIGNATION RIGHTS AGREEMENT

THIS DESIGNATION RIGHTS AGREEMENT, is made and entered into **on** March 14, 2006 between the Estate of Resource Technology Corporation (the "Estate" or "Seller"), on the one hand, and Chiplease, Inc. or its designee ("Chiplease") and Scattered Corporation or its designee ("Scattered") (Chiplease, and Scattered collectively referred to as the "Purchaser") on the other hand.   The Estate and Purchaser individually be referred to in this Settlement Agreement as a "Party" and collectively referred to in this Settlement Agreement as the "Parties".

## RECITALS

WHEREAS, the bankruptcy case known as In re Resource Technology Corporation, Case No. 99 B 35434 (the "Bankruptcy Case") was commenced on November 15, 1999, when an involuntary petition was filed against Resource Technology Corporation ("RTC" or "Debtor"). On February 1, 2000, a consensual Order of Relief and Order Converting the Bankruptcy Case to a case under Chapter 11 of the Bankruptcy Code became effective;

WHEREAS, on August 26, 2003, Gregg E. Szilagyi was appointed as the Chapter 11 Trustee ("Chapter 11 Trustee");

WHEREAS, on September 21, 2005, the United States Bankruptcy Court, Northern District of Illinois, Eastern Division (the "Court") entered an order converting the case to a case under Chapter 7 of the Bankruptcy Code.  Thereafter, Jay A. Steinberg, not individually but as Chapter 7 Trustee (the "Chapter 7 Trustee") was appointed as the Chapter 7 trustee for the Estate;

WHEREAS, The Seller and Purchaser contemporaneously with this Agreement entered into an Settlement Agreement of even date; and

WHEREAS, Purchaser, as a part of the settlement under the Settlement Agreement, desires to purchase and Seller desires to sell, the Designation Rights (defined below) upon the terms and subject to the conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the Parties covenant and agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

"Affected Parties" means, with respect to a Contract, (i) the lessor under such Contract, and (ii) any sublessee under any sublease relating to such Contract.

"Agreement" means this Designation Rights Agreement.

"Approval Order" means the final and nonappealable order entered by the Court approving the Settlement Agreement and this Agreement in a form of Order attached to the Settlement Agreement as Exhibit B, which the Parties specifically agree has been agreed to by them.

"Authorized Officer" of any Person means the chief executive officer, the president, any vice president or any secretary of that Person.

"Banco Secured Creditors" means collectively, Leon Greenblatt, Chiplease, Inc. and Banco Panamericano, Inc.

"Bankruptcy Case" has the meaning set forth in the recitals above.

"Bankruptcy Code" means 11 U.S.C. §101 et.seq. and applicable portions of Titles 18 and 28 of the United States Code, as amended from time to time.

"Court" has the meaning set forth in the recitals above.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time.

"Closing Date" shall have the same meaning as that term has in Paragraph 12 of the Settlement Agreement.

"Contracts" are those contracts and leases listed on Exhibit C to the Settlement Agreement and made a part hereof. The Seller makes no representations with regard to the Contracts including without limitation the Seller makes no representations whether (i) any of the Contracts are executory in nature; (ii) any of the Contracts are unexpired or expired; (iii) whether the Contracts are assumable; (iv) whether the Seller has any interest in any of the Contracts; or (v) the existence of any Contract.

"Cure Costs" means all actions and monetary payments necessary to cure any defaults (monetary or otherwise) in a Contract. In the event that the Purchaser and Affected Party disagree as to the Cure Costs of a Contract that the Purchaser seeks to assume, the Cure Costs shall be the amount determined by the Court or actions to be taken as required by the Court, after notice and hearing, as necessary to cure any defaults (monetary or otherwise) in a Contract. Under no circumstances shall the Estate have any obligations whatsoever as set forth in more detail in the Approval Order, including but not limited to Paragraph 14 of the Approval Order "Designation Motion" has the meaning set forth in Section 2.1(c) below.

"Designation Period" has the meaning set forth in Section 2.1(b) below.

"Designation Rights" has the meaning set forth in Section 2.1(b) below.

"Effective Date" has the meaning set forth in Article III below.

"Greenblatt Entities" mean collectively the Banco Secured Creditors and Scattered Corporation.

- 2-

"Objection Period" has the meaning set forth in Section 2.1(d) below.

"Order" means an order entered by the Court.

"Permitted Liens" means all liens that are asserted by the Greenblatt Entities.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, trust union, association, court, agency, government, tribunal, instrumentality or other entity or authority.

"Purchase Price" has the meaning set forth in Section 2.3 below.

"Settlement Agreement" is that certain Settlement Agreement entered into _on_ March 14, 2006 between the Estate, on the one hand, and the Banco Secured Creditors and Scattered Corporation, on the other hand.

"Settlement Motion" has the meaning set forth in Section 3.3 below.

## ARTICLE II

## THE TRANSACTION

2.1     Purchase and Sale of Designation Rights and Properties.

(a)     On the terms and subject to the conditions contained in this Agreement and the Approval Order, on the Closing Date, Purchaser shall purchase from Seller, and Seller shall sell, convey, assign, transfer and deliver to Purchaser, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Estate's right, title and interest, if any, in and to the Designation Rights for all of the Contracts free and clear of all liens of any kind whatsoever to the fullest extent permissible pursuant to the Bankruptcy Code, but subject to Cure Costs, Permitted Liens and the provisions of Article 2.1 ( c ) below.

(b)     During the Designation Period, and on the terms and subject to the conditions contained in this Agreement and the Approval Order, the Purchaser shall have the sole, exclusive and continuing right to select, identify and designate (on one or more occasions): (i) which Contracts shall be assumed and assigned in connection with an assumption and assignment, and to whom; and (ii) which Contracts shall be rejected (all of which rights are referred to herein as the "Designation Rights"). Subject to the terms and provisions of this Agreement, Purchaser shall have the right to designate as the designee with respect to any particular property either itself, or any other Person. Purchaser's Designation Rights shall expire with respect to each Contract on the later of (i) the date of the expiration of the applicable Sections 365(d)(1) and 365(d)(4) of the Bankruptcy Code extension period for the assumption or rejection of the applicable Contract including any further extension granted by order of the Court, (the "Extension Period"), or (ii) April 28, 2006 (the "Designation Period"). Seller agrees as a condition of this Agreement and related agreements to use reasonable efforts to seek an extension of the Extension Period to April 28, 2006 and upon receipt of written request by the Purchaser agrees to seek and prosecute, but in no way guaranty, one further extension as may be required to effectuate the matters that are the essence of this Agreement.   Notwithstanding

-3-

anything contained herein, from the date hereof until the expiration of the Designation Period, Seller shall not reject any Contract unless and until Purchaser, in accordance with this Agreement, excludes such Contract from this transaction. The Designation Rights to be acquired shall include, among other things, the exclusive power to designate to a designee (and to have Seller convey and assign to such designee) all rights, title, interests, options, contract rights, if any, of the Seller in and to one (1) or more of the Contracts of the Seller. Notwithstanding any provision to the contrary, any costs, expenses or claims attributable to a time period after the entry of the Approval Order shall be deemed a Chapter 7 Operating Expense (the "Chapter 7 Operating Expenses") and shall be the sole obligation of Purchaser.

(c)     Notwithstanding subsections (a) and (b) above, in order to effectuate either an assumption and assignment or a rejection of a Contract, the Purchaser shall draft prior to the expiration of the Designation Period within sufficient time for filing and presentation to the Court prior to the expiration of the Designation Period, a motion (the "Designation Motion"), and such Designation Motion shall: (i) identify the Contract at issue; (ii) state whether the Purchaser intends to assume and assign or reject the Contract at issue; (iii) state the identity of Purchaser's designee; (iv) state the proposed use of the Contract by the Purchaser's designee, (v) provide documentation or other information from Purchaser's designee relating to "adequate assurance of future performance" by the designee as required by Section 365 of the Bankruptcy Code; (vi) set forth a list of the Contract and all of the documents amending, modifying, supplementing or restating the Contract (which list shall be consistent with the applicable list with respect to the applicable Contracts set forth on Exhibit C attached to the Settlement Agreement and made a part hereof); (vii) request Court approval of the assumption and assignment of a Contract or rejection of a Contract, at the Purchaser's election; (viii) request a hearing before the Court on the relief requested including without limitation a hearing to determine whether the Contract was previously rejected and, therefore, not assumable or assignable under Section 365 of the Bankruptcy Code, on Cure Costs, on the adequacy of the Purchaser and/or its designee's assurance of future performance under the Contract and satisfaction of Cure Costs; and (ix) include as an attachment a proposed Order. The Seller shall use reasonable efforts to file the Designation Motion within two (2) business days of receipt from the Purchaser for presentment to the Court within the Designation Period. The Seller shall serve a copy of the Designation Motion on the Affected Parties. The Seller shall not have any liability with respect to Cure Costs or other assurances of future performance with respect to any Contract that the Purchaser seeks to have assumed and assigned as set forth in more detail in the Approval Order, including but not limited to Paragraph 14 of the Approval Order.

(d)     The Affected Parties shall have, ten (10) days from their receipt of the Designation Motion from the Seller (the "Objection Period") to file with the Court an objection in writing to the proposed assignment of the Contract to the Purchaser's designee (and concurrently deliver a copy of the said objection to the Purchaser, Seller and such other parties as are specified in the notice to the Affected Parties.

(e)     Seller shall use its reasonable efforts to have any Designation Motion and notice thereof provide that if an objection to any assumption and assignment is not timely filed prior to the expiration of the applicable Objection Period, or such objection involves a "cure issue," the objection will not preclude the assumption and assignment of the Contract, the assumption and assignment shall be deemed effective and binding (without further Order) contingent upon the

- 4-

determination of any Cure Costs by the Court and the satisfaction of such Cure Costs in accordance with an Order. Notwithstanding the foregoing, the Affected Parties shall be deemed to have consented to the assumption and assignment and to have waived all objections thereto (other than as to cure amounts), if no objection is filed within the Objection Period. The Designation Motion must clearly state that the failure to object may result in the entry of an Order allowing assumption and assignment of a Contract without any obligations on the part of the Purchaser for adequate assurance of future performance.

(f)      Any Contract not identified in any timely filed Designation Motion shall be deemed rejected as of the expiration of the Designation Period; provided, however, Seller shall be prohibited from rejecting any Contract until such time as Purchaser has designated such Contract for rejection or the period to assume and assign such Contract, as provided under sections 365(d)(1), (d)(4) has expired and has not been further extended by the Court.

(g)      Any Contract to which the Purchaser requests by Designation Motion to be rejected, shall be deemed rejected upon the filing of a Designation Motion with the Court.

(h)      Notwithstanding the above, the Seller shall use reasonable efforts to file and present the Designation Motion. However, the Seller shall have no obligation or liability whatsoever to present any evidence or argument in favor or against assumption or assignment of a Contract including without limitation, any evidence or argument relating to the assumability of a Contract, Cure Costs and/or adequate assurance of future performance by the Purchaser or its designee. The Purchaser shall not have the right to designate any Contract that has previously been terminated by a final non-appealable Court Order or if the Seller believes in good faith that a particular designation will result in the Seller being subject to allegations of bad faith, but the Purchaser shall have the right to petition the Court to compel the Seller to comply with the Purchaser's direction to designate.

(i)      The Seller shall bear no liability for Cure Costs or for adequate assurance of future performance costs or obligations relating to any Contracts, or any other costs or expenses relating thereto.

2.2      Assumption and Assignment of Contracts.  An assumption and assignment of any Contract, pursuant to Section 365 of the Bankruptcy Code, shall be effective only upon the entry of a final and nonappealable Order approving the assumption and assignment of a Contract after notice and hearing on a timely filed and served Designation Motion; provided, however, if no such objection to the assumption and assignment is timely filed prior to the expiration of the applicable Objection Period, or such objection involves a "cure issue" which, pursuant to the Designation Order, will not preclude the assumption and assignment of the Contract, however, the assumption and assignment shall be deemed effective and binding (without further Order) upon the Court's determination of the Cure Costs and the Purchaser's satisfaction of same. Notwithstanding the foregoing, the Affected Parties shall be deemed to have consented to the assumption and assignment and to have waived all objections thereto (other than as to cure amounts), if no objection is filed prior to the expiration of the Objection Period.

2.3      Purchase Price.  The purchase price for the Designation Rights (the "Purchase Price") is included in the consideration paid or to be paid by Chiplease pursuant to Section 11 of

- 5 -

the Settlement Agreement. Except for the Purchase Price, the Purchaser shall have no obligation to pay the Estate any other funds other than the Purchase Price in order to assume, assign or reject any Contract. Notwithstanding the foregoing, the Purchase Price shall specifically include any obligations of the Purchaser as to the Contracts, including but not limited to, Cure Costs, adequate assurance of future performance and the payment of Chapter 7 Operating Expenses.

2.4 Purchaser shall use its best efforts to identify designees to obtain assignments of the Contracts before the expiration of the applicable Extension Period; provided, however, Purchaser shall have the right to request that Seller obtain an Order extending the Designation Period for an additional period reasonably requested by Purchaser. Should Purchaser make any such request, Seller shall use its reasonable efforts to obtain promptly such an Order. If the Court denies to extend the Designation Period, the Designation Period is terminated at the later of (i) the date of docketing of the Order denying the extension of the Extension Period; or (ii) April 28, 2006.

## ARTICLE III

## CONDITIONS FOR EFFECTIVE DATE, CLOSING DATE AND APPROVAL ORDER

3.1 The Effective Date of this Agreement is the date when the Approval Order is a final and nonappealable Order.

3.2 The Approval Order must be in the form attached as Exhibit B to the Settlement Motion is entered, unless the Parties mutually agree to revise the Order.

3.3 The Closing Date of this Agreement shall be the Closing Date as defined by Paragraph 12 of the Settlement Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

4.1 Seller makes no other representations or warranties with respect to the Contracts including without limitation the Seller makes no representations whether (i) any of the Contracts are executory in nature; (ii) any of the Contracts are unexpired or expired; (iii) whether the Contracts are assumable; (iv) whether the Seller has any interest in any of the Contracts; or (v) whether any Contract exists. Seller is conveying and designating the Contracts to Purchaser in a "WHERE-IS, AS-IS" condition.

4.2 Purchaser hereby represents and warrants to Seller as follows:

(a) Authorization. Purchaser has the power and authority, to enter into this Agreement and to carry out its obligations hereunder. The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated hereby have been duly authorized by all requisite (and to the extent applicable to Purchaser) corporate, partnership or limited liability corporation action.

-6-

(b)    WHERE-IS/AS-IS.  Purchaser and its designees agree to accept the applicable Contracts in a "WHERE-IS/AS-IS" condition.

## ARTICLE V

## COVENANTS

5.1    Further Transfers and Assurances.  Seller and Purchaser will execute and deliver such further instruments of conveyance and transfer and take such additional action as Purchaser may reasonably request to effect, consummate, confirm or evidence the assignment to Purchaser's designees of the Contracts.  This Section 5.1 shall survive for six (6) months following each respective Contract transferred by this Agreement.

5.2    Taxes.  All charges for or in connection with the recording of any document or instrument contemplated hereby shall be paid by Purchaser's designees.  Seller and Purchaser or Purchaser's designee, as required by local law, will file all necessary tax returns and other documentation in connection with the taxes and fees encompassed in this Section 5.2 relating to the assignment of Contracts.

5.3    Insurance.  Without the prior written consent of Purchaser, Seller will not cancel any insurance policy relating to any landfill site listed on Schedule A to the Settlement Agreement or permit any such policy to expire prior to the later of the Designation Period or the entry of a final Order either approving or denying any pending Designation Motion as of the expiration of the Designation Period.  Purchaser shall waive the Seller's obligations under the prior sentence in the event that after demand the Purchaser does not timely pay any amounts due under any such insurance policy.  If Purchaser fails to pay the amounts due hereunder and the insurance policy lapses as a result, it will not be the responsibility of Seller to reinstate and it will not be a default of Seller under this Agreement.  Seller shall not, on its own, cancel any such insurance policy.

## ARTICLE VI

## MISCELLANEOUS

6.1    Termination: Other Remedies.

(a)    This Agreement may be terminated and the transactions contemplated hereby may be abandoned by the mutual consent of Purchaser and Seller.

(b)    Upon termination of this Agreement pursuant to Section 6.1(a) above, the Contracts are immediately deemed rejected without further Order.

6.2    Default and Remedies.

(a)    The Court shall retain jurisdiction over this Agreement in the event of any default by either Party.

(b)    In the event of a material breach of, or material default under, this Agreement by Purchaser prior to the Closing Date, Seller shall, provided Seller is not in material breach of or material default under, this Agreement, be entitled, as its sole and exclusive remedy, either (i) to terminate this Agreement or (ii) to seek specific performance of this Agreement. In the event of a material breach of, or material default under, this Agreement by Purchaser after the Closing Date, Seller shall, provided Seller is not in material breach of or material default under this Agreement, be entitled, as its sole and exclusive remedy, to seek specific performance of this Agreement.

6.3    Successors and Assigns. This Agreement is made solely and specifically by and for the benefit of the Parties, and their respective successors and assigns.

6.4    Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if and when delivered personally, or sent by facsimile transmission, or mailed, by certified or registered mail, return receipt requested, first class postage prepaid, or by Federal Express or some other reputable overnight carrier, to the Parties at the following addresses and facsimile numbers:

If to Seller addressed to:

> Barry A. Chatz
> Arnstein & Lehr LLP
> 120 S. Riverside Plaza, Suite 1200
> Chicago, IL 60606
> Fax Number: (312) 876-0288

If to Purchaser addressed to:

> Gregory J. Jordan
> Dykema Gossett PLLC
> 10 S. Wacker Drive, Suite 2300
> Chicago, IL 60606
> Fax Number:  (312) 876-1155

or to such other place and with such other copies as any Party may indicate by written notice to the other Party provided in the manner set forth above.

6.5    Entire Agreement.  This Agreement, and the agreements referenced herein (including without limitation, the Settlement Agreement and the exhibits to the Settlement Agreement) supersede all prior discussions and agreements between the Parties with respect to the subject matter hereof. This Agreement and other documents to be delivered in connection herewith, including without limitation the Settlement Agreement, contains the sole and entire agreement between the Parties with respect to the subject matter hereof.  Notwithstanding the foregoing, the Settlement Agreement shall continue to be a binding agreement between the Parties.  To the extent that there are any discrepancies between the Settlement Agreement and this Agreement, the terms of the Settlement Agreement shall control.

6.6    Waiver.  Except as otherwise specifically provided for in this Agreement, any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof.  To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term or condition being waived, and shall be executed by an Authorized Officer of such Party.  A waiver on one occasion shall not be deemed a waiver of the same or any other breach on a future occasion.

6.7    Amendment.  This Agreement may be modified or amended only in a writing duly executed by or on behalf of each of the Parties.

6.8    Counterparts; Facsimile Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile and facsimile signatures hereof shall be deemed effective and binding as original signatures.

6.9    Invalid Provisions.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future law, rule, or regulation, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof.  The remaining provisions of this Agreement shall remain in full force and effect, and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

6.10    Headings, Gender, Etc.  The headings used in this Agreement have been inserted for convenience, do not modify the terms of this Agreement and do not constitute matter to be construed or interpreted in connection with this Agreement.  Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other Gender, (b) words using the singular or plural number shall also include the plural or singular number, respectively, (c) references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement, and (d) the words "include" and "including" shall be construed as incorporating "but not limited to" or "without limitation."  The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent and no rule of strict construction shall be applied against any Person.

6.11    Continuing Jurisdiction.  The Parties agree that the Court shall retain jurisdiction over the enforcement of this Agreement, including, but not limited to, the performance of the obligations and transactions contemplated hereunder.

6.12    Choice of Law.  This Agreement shall be construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Illinois.  In the event of any litigation concerning this Agreement, proper venue shall be in the Court and the Parties consent to such jurisdiction.

6.13    No Partnership or Joint Venture.  Nothing contained in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of seller and purchaser between the Parties.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed as of the date first above written.

PURCHASER:

CHIPLEASE, INC.


By:_____
     Leon Greenblatt, Secretary

SCATTERED CORPORATION


By:_____
     Leon Greenblatt, President

SELLER:

THE CHAPTER 7 BANKRUPTCY
ESTATE OF RESOURCE TECHNOLOGY
CORPORATION


By:_____
     Jay A. Steinberg, not individually but
     solely as Chapter 7 Trustee for the
     Estate of Resource Technology
     Corporation

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:

RESOURCE TECHNOLOGY
CORPORATION,

                    Debtor.

Chapter 7
Case No. 99 B 35434

Hon. Eugene R. Wedoff

## ORDER APPROVING SETTLEMENT BETWEEN THE ESTATE OF RESOURCE TECHNOLOGY CORPORATION AND THE GREENBLATT ENTITIES AND GRANTING FURTHER RELIEF

This matter coming before the Court on the motion filed by Jay A. Steinberg, not individually, but solely as the Chapter 7 Trustee (the "Chapter 7 Trustee") for the Chapter 7 estate of Resource Technology Corporation (the "Estate") for entry of an order to (i) approve a settlement agreement, a copy of which is attached hereto and incorporated herein as Exhibit "A", (Settlement Agreement") by and between the Estate and the Greenblatt Entities (defined below); (ii) authorize the conveyance, designation and abandonment of certain estate assets to Chiplease, Inc. or its designee ("Chiplease") and Scattered Corporation or its designee ("Scattered") (Chiplease and Scattered, as applicable, (collectively "Purchaser")) pursuant to the terms of the Agreements (defined below); (iii) approve a designation rights agreement in favor of Purchaser, a copy of which is attached as Exhibit "A" to the Settlement Agreement ("Designation Rights Agreement") (the Settlement Agreement and Designation Rights Agreement are jointly referred to as the "Agreements"); (iv) authorize the disbursement of $250,000 to NEC Electric Corporation ("NEC"); and (v) approve shortened notice of this Motion (the "Settlement Motion"); the Court having afforded the Chapter 7 Trustee and all other parties in interest an opportunity to be heard, having considered the testimony provided at the hearing on these matters, and having considered the

Settlement Motion and the entire record in this proceeding to date; the Court being otherwise fully advised in the premises, and finding notice of the Settlement Motion to be sufficient under the circumstances; the Court makes the following Findings of Facts, Conclusions of Law and other determinations:

## Findings of Fact and Other Determinations

A.    On November 15, 1999, (the "Petition Date"), an involuntary petition for relief under Chapter 7 of the Bankruptcy Code (11 U.S.C. Section 101 et.seq.) was filed against Resource Technology Corporation ("RTC" or the "Debtor").  An order for relief was entered on January 18, 2000, at which time the case was converted to one under Chapter 11.  Gregg E. Szilagyi was appointed as the Chapter 11 Trustee (the "Chapter 11 Trustee").

B.    The case was converted back to a Chapter 7 proceeding on September 21, 2005.  The Chapter 7 Trustee was appointed as interim trustee in September 2005 and became the permanent trustee in November 2005.

C.    The Debtor is in the business of capturing and converting methane landfill gas into electric energy, which the Debtor then sold to utilities like Commonwealth Edison.  The Debtor operates its business at a number of landfill sites.

D.    Leon Greenblatt, Chiplease, Inc. and Banco Panamericano, Inc. (collectively, the "Banco Secured Lenders") assert pre-petition and post-petition secured claims against the Estate based upon various pre-petition loan documents and post-petition debtor-in-possession loans.  Based upon their loans, the Banco Secured Lenders assert a lien on certain gas rights agreements and other assets of the Estate as collateral for their loans.

E.     Network Electric Corporation ("NEC") asserts a secured claim against the Estate in an amount in excess of $43 Million relating to a borrowing facility approved by this Court on August 1, 2000.  NEC asserts a first priority secured claim on certain property and assets relating to the Estate's Congress, Beecher and Pontiac landfill sites.

F.     NEC also loaned the Chapter 7 Estate the sum of $250,000 to pay for the Chapter 7 administration of the estate (the "Chapter 7 Loan").  The first recoveries by the Estate are to be paid to NEC in repayment of the Chapter 7 Loan.

G.     On January 17, 2006, the Banco Secured Lenders filed an adversary proceeding against NEC entitled "Objection to Claim and Request for Determination as to the Validity and Extent of Lien of NEC."  In the adversary proceeding, the Banco Secured Lenders objected to the secured administrative claim filed by NEC and request that NEC's claim be disallowed in its entirety.  The Banco Secured Lenders do not contest the payment of $250,000 to NEC as repayment of the Chapter 7 Loan.

H.     Various adversary complaints were filed by the Estate against the Banco Secured Lenders and other defendants (the "Trustee's Litigation") as follows:

    (i)     On October 22, 2004, the Chapter 11 Trustee filed his Verified Complaint for Turnover of Property of the Estate, for Damages including Punitive Damages for Conversion of Property of the Estate, for Imposition of a Constructive Trust, and for Injunctive and Other Relief against the Banco Secured Lenders, as Adv. Pro. No. 04-03867 (the "October 2004 Complaint"). The Chapter 11 Trustee dismissed the October 2004 Complaint on February 17, 2005.

    (ii)     On November 16, 2004, the Chapter 11 Trustee filed his Verified Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Lenders, Delaware Gas and Electric Inc., Scattered Corporation and Green Gas Delaware Statutory Trust incorrectly identified as Green Gas Delaware Business Trust as Adv. Pro. No. 04-04068 (the "November 2004 Complaint"). On December 30, 2004, the Court granted the Chapter 11 Trustee's Motion for Preliminary Injunctive Relief enjoining the Banco Secured Parties from taking certain actions (the "December 2004 Injunctive Relief").

3

(iii)    On January 10, 2005, the Chapter 11 Trustee filed his Complaint for Unauthorized Postpetition Transfers against Loop Properties and Loop Properties, Inc. as Adv. Pro. No. 05-00025 (the "January 2005 Complaint").

(iv)    On October 27, 2005, the Estate filed a Complaint for Breach of Fiduciary Duty, Equitable Subordination, Violation of RICO, Injunctive Relief, Turnover of Property and Other Relief against the Banco Secured Lenders, Scattered Corporation and Green Gas Delaware Business Trust (the "October 2005 Complaint") as Adv. Pro. No. 05-02521.

(v)    On November 2, 2005, the Court entered an order consolidating the November 2004 Complaint and the October 2005 Complaint.  On November 2, 2005, the Court entered an order granting in part the Estate's Motion for Preliminary Injunction (the "November 2005 Injunctive Relief").

(vi)    On January 23, 2006, the Estate filed an Adversary Complaint for Injunctive and Declaratory Relief against the Banco Secured Parties as Adv. Pro. No. 06-00436 (the "January 2006 Complaint").

I.    On December 28, 2005, this Court entered an Order approving the Estate's Motion to Approve Settlement of 506(c) Claim with the Banco Secured Lenders pursuant to Section 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (Rule 101 et.seq., the "Bankruptcy Rules").  The Court required that Arnstein & Lehr LLP, as escrowee, hold $1.5 Million in settlement funds in escrow, pending further Order of the Court (the "506(c) Funds").  The Banco Secured Lenders filed a Motion to Reconsider the Court's approval of the 506(c) settlement, and objected to the Estate's motion for distribution of the 506(c) Funds.  This Motion is still pending as of the date of this Order.

J.    On January 12, 2006, this Court approved sale procedures relating to the Estate's sale of certain assets, which included landfill gas-fired Solar Turbine combustion generators and ancillary equipment including (1) the three Solar Taurus Model Units located at the Congress landfill; (2) the one Taurus Model Unit located at the Beecher landfill; and (3) the one Solar Titan Model Unit located at the Pontiac landfill, together with all books and records pertaining to said equipment, the

4

maintenance and operation of said equipment, spare parts and items related to said equipment (the "DTE Sale Assets") to DTE Biomass Energy, Inc. ("DTE") for $6,000,000, or such higher offer (the "Sale").

K.    On February 6, 2006, the Court conducted a hearing on the Sale.    The Court authorized the Sale free and clear of all liens, claims and encumbrances, with all valid liens to attach to proceeds in the same amount, extent and priority (the "Sale Order").  The Court authorized the distribution of funds to the Chapter 7 Trustee in payment of his statutory compensation.  The Court ordered that the remaining funds be held in escrow pending further Order of the Court determining the extent and priority of liens between NEC and the Banco Secured Lenders as to the DTE Sale Assets.

L.    The Banco Secured Lenders filed an appeal of the Sale Order to the United States District Court (the "Sale Appeal").  On February 17, 2006, the United States District Court stayed the Sale pending the appeal.

M.    On March 2, 2006, the United States District Court affirmed the Sale Order.  On the same date, the Estate closed on the Sale to DTE and conveyed the DTE Sale Assets to DTE free and clear of all liens, claims and encumbrances.  The Chapter 7 Trustee received the statutory compensation authorized by the Court at the closing of the Sale to DTE.

N.    The Chapter 7 Trustee, on the one hand, and the Banco Secured Lenders and Scattered Corporation (collectively, the "Greenblatt Entities"), on the other hand, have decided to resolve all issues between the Estate and the Greenblatt Entities, and toward that end seek Court approval of the Settlement Agreement, approval of the Designation Rights Agreement and approval of and authorization of the conveyance, designation and abandonment of certain Estate assets to Purchaser as set forth in the Agreements, approval and authorization of releases, attached to the Settlement

5

Agreement as Exhibits D and E (the "Releases") and the dismissal of various causes of action and the granting of other relief, pursuant to Sections 105, 363, 365 and 554 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.

O.    The terms of the Agreements are supported by sound business reasons and are consistent with fundamental policies of the Bankruptcy Code. Approval of the Agreements will serve to benefit the Estate. This Court has discretion to authorize and approve the Agreements and the other relief granted herein.

P.    The settlement as set forth in the Settlement Agreement, sale of assets as set forth in the Settlement Agreement and the transfer and conveyance of certain Designation Rights as defined in the Designation Rights Agreement ("Designation Rights") to Purchaser and the Releases are each a reasonable and valid exercise of the Estate's business judgment and is otherwise appropriate under Sections 363 and 365 of the Bankruptcy Code.

Q.    The Agreements were negotiated, proposed and entered into by the Estate and the Greenblatt Entities, respectively at arms length and in good faith and without collusion. The Purchaser, as defined herein, is a good faith purchaser for value within the meaning of Section 363(m) of the Bankruptcy Code and entitled to all of the protections afforded by said provision

R.    The consideration provided pursuant to the Agreements is fair and reasonable.

S.    The Estate makes no representations or warranties with respect to the Designation Rights (Paragraph 14) causes of action (Paragraph 20) and equipment, inventory, supplies, work in progress and general intangibles (Paragraph 13). Specifically, the Estate makes no representations or warranties whether (i) any of the Contracts, as defined herein, which may be designated, are executory in nature; (ii) any

6

of the Contracts are unexpired or expired; (iii) whether the Contracts are assumable; (iv) whether the Estate owns or has any interest in any of the Contracts or other assets conveyed or that may be designated under the Agreements and pursuant to this Order.

T.    All objections to the Settlement Motion have been overruled or withdrawn.

U.    This Court shall retain jurisdiction to enforce this Order.

## Conclusions of Law and Other Determinations

1.    This Court has core jurisdiction to enter a final Order with respect to the Settlement Motion and all of the relief requested thereby pursuant to 28 U.S.C. §§ 157(b)(A), (M), (N) and (O). This Court has exclusive jurisdiction over the Debtor's property and property of the Estate, wherever located, pursuant to 28 U.S.C. § 1334(d).

2.    Due and proper notice of the hearing on the Settlement Motion has been given to all parties in interest as required by Sections 105(a), 363(b), 365(a) and 554 of the Bankruptcy Code and Rules 2002(a)(2), 2002(c)(l), 2002(d), 6004, 6006 and 6007 of the Bankruptcy Rules.

3.    This Court has statutory authority to grant the relief in the Settlement Motion pursuant to Sections 105(a), 363, 365 and 554 of the Bankruptcy Code.

4.    Good business reasons justify granting the relief requested in the Settlement Motion. Therefore, Chapter 7 Trustee shall be and hereby is authorized to enter into the Agreements on behalf of the Estate and to take such actions necessary to effectuate the Agreements as being in the best interest of the Estate and its creditors.

5.    Permits issued to RTC for the operation of its business ("Permits"), which the Chapter 7 Trustee on behalf of the Estate seeks to abandon,  are burdensome to

7

the Estate, and are of inconsequential value and benefit to the Estate. Further, the abandonment of the Permits is in the best interest of the estate.

6.    This Court will retain jurisdiction over the subject matters of this Order, the Agreements and the Settlement Motion, as well as the parties that have appeared with respect to the Settlement Motion, to enforce, interpret and enter supplemental orders with respect to the subject matter of this Order and the Settlement Motion.

### Decretal Provisions

Based on the foregoing Findings of Fact, Conclusions of Law and Other Determinations,

IT IS ORDERED, ADJUDGED AND DECREED as follows:

7.    To the extent set forth in this Order, the relief requested in the Settlement Motion is herewith granted.

8.    The terms and provisions of the Settlement Agreement are approved in their entirety.

9.    The terms and provisions of the Designation Rights Agreement are approved in their entirety.

10.    In the event of any inconsistency between the Agreements and this Order, this Order shall be controlling unless this Order specifically states that one of the Agreements is controlling.

11.    The Chapter 7 Trustee is herewith authorized to execute and deliver all documents on behalf of the Estate, as may be reasonably necessary to consummate

8

and effectuate the Agreements in a manner consistent with and not in violation of the terms of this Order.

12.     The Chapter 7 Trustee on behalf of the Estate and the Greenblatt Entities are herewith authorized and directed to take all actions that may reasonably be required for the purpose of consummating and implementing the Settlement.

13.     Pursuant to Section 363 of the Bankruptcy Code, the Estate is authorized to sell, transfer and convey to the Purchaser the assets (including causes of action) to be conveyed as set forth in Paragraphs 4, 5 and 8 of the Settlement Agreement. Such assets are sold, transferred and conveyed free and clear of all liens, claims and encumbrances, with the exception of Permitted Liens. Permitted Liens are all liens that are asserted by the Greenblatt Entities. Any potential Defendant that has a counterclaim, to any cause of action herein conveyed, shall maintain the right to assert that counterclaim, as a set-off up to the amount of the claim.

14.     Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Estate is authorized to transfer and convey all of its right, title and interest, if any, in all contracts, executory or otherwise, including any alleged executory contracts listed on Exhibit "C" to the Settlement Agreement, ("Contracts"), to the Purchaser consistent with the terms of the Designation Rights Agreement. The conveyance of Designation Rights shall be effective on the closing date of the Settlement Agreement (the "Effective Date"). Upon the Effective Date, Purchaser shall have the sole, exclusive and continuing right to designate (on one or more occasions), to the same extent and validity as the Estate had at the Effective Date, (i) which Contracts shall be assumed and assigned; and (ii) which Contracts shall be rejected pursuant to the terms of the Designation Rights

9

Agreement. The Purchaser shall not have the right to designate any Contract that has previously been terminated by a final non-appealable Court Order or if the Estate believes in good faith that a particular designation will result in the Estate being subject to sanctions pursuant the Fed. R. Bankr. P. 9011 or allegations of bad faith, but the Purchaser shall have the right to petition the Court to compel the Trustee to comply with the Purchaser's direction to designate. The conveyance of the Designation Rights shall be free and clear of all liens, claims and encumbrances, with the exception of Cure Costs, as such term is defined in the Designation Rights Agreement and Permitted Liens. In accordance with the Designation Rights Agreement, the Purchaser shall remain obligated to cure any defaults under any Contract affected thereunder, including without limitation, Cure Costs, and provide adequate assurance of future performance, pursuant to the terms of the Designation Rights Agreement. The Estate shall not be liable for Cure Costs or for adequate assurance of future performance costs or any obligations or damage claims under the Contracts, or for any other claims which may arise as a result of the entry into or operation of the Designation Rights Agreement. Purchaser shall pay all costs and expenses incurred in the preparation, presentation and trial, if necessary, related to all actions required of the Estate pursuant to the Designation Rights Agreement.

15.    The provisions of Paragraph S of this Order, contained in the Findings of Fact and Other Determinations, are hereby Ordered and approved.

16.    Each Purchaser is a good faith purchaser pursuant to the terms of Section 363(m) of the Bankruptcy Code. The Purchaser negotiated the terms of the sale of assets at arms length and in good faith. The Purchaser did not seek or take unfair advantage over any other prospective bidder. Further, neither the Chapter 7 Trustee,

nor his employees, attorneys, agents or representatives have colluded with either Purchaser or their respective officers, employees, attorneys, agents or representatives, or in any manner whatsoever violated the provisions of Section 363(n) of the Bankruptcy Code.

17.    The Greenblatt Entities reserve the right to assert that any extension or renewal option in a Contract which purports to be "personal" only to the Estate or to be exercisable only by the Estate is an unenforceable restriction on assignment within in the meaning of Section 365(f) and (l) of the Bankruptcy Code and, in fact, may be freely exercised by Purchaser to its full extent, without prejudice to any affected party asserting a contrary position.

18.    The Purchaser shall have no successor liability or other liability for any of the Estate's employee obligations.

19.    Pursuant to Section 554 of the Bankruptcy Code, the Chapter 7 Trustee's abandonment of the Permits is hereby approved, and the Permits are deemed abandoned as of the Effective Date.  By agreement, the Estate, the Greenblatt Entities and the People of the State of Illinois will not assert or pursue any causes of action that remain in the pending adversary proceeding known as People of the State of Illinois and Stryker International, Inc. v. Resource Technology Corporation, Adversary Proceeding No. 00 A 1143, or with relation to any matters relating to the Stryker International, Inc. bankruptcy estate   In addition, the State of Illinois will not file or assert any environmental claims against the Estate.

20.    Notwithstanding anything to the contrary in the Agreement or in this Order, the Estate and the Greenblatt Entities, including Chiplease, as the purchaser of the

11

Estate's assets located in Shelton, Connecticut, and any designee or assignee of the Greenblatt Entities, will not assert or pursue any causes of action against Connecticut Resources Recovery Authority ("CRRA") or relating to the Shelton, Connecticut landfill site, including, without limitation, any causes of action asserted in the adversary proceeding pending in this Court known as Resource Technology Corporation v. Connecticut Resources Recovery Authority, No. 00 A 0150 (the "CRRA Adversary") and any request for reconsideration, appeal or review from the judgment entered in the U.S. District Court case known as Resource Technology Corporation v. Connecticut Resources Recovery Authority, No. 05 C 4535 (the "CRRA Appeal"). In addition, no claim, cause of action or right of review or appeal against CRRA or relating to the Shelton, Connecticut landfill site and no contract with CRRA or relating to the Shelton, Connecticut landfill site will be included in any transfer or assignment authorized under this Order or in the Agreement. Also, the Shelton, Connecticut site and all contracts with CRRA or relating to the Shelton, Connecticut site will be excluded from Schedule A and Exhibit C to the Settlement Agreement and will be excluded from the Designation Rights Agreement and will be excluded from the contracts as to which the Estate seeks an extension of time to assume or reject. CRRA withdraws its Chapter 7 administrative claim against the Estate and will not file or assert any other Chapter 7 administrative claim against the Estate. However, CRRA preserves its Chapter 11 administrative claim and its pre-bankruptcy claims against the Estate. Notwithstanding the foregoing, the Greenblatt Entities do not waive any lien rights held by them or the right to enforce the same.

21.     Pursuant to Section 363 of the Bankruptcy Code, the Estate's conveyance of the Estate's right, title and interest, if any, in and to causes of action with the

12

exception of Excluded Causes of Action, is approved. Excluded Causes of Action include, specifically, the Estate's rights, if any, in (i) the Estate's causes of action against NEC, if any; the Estate's causes of action in adversary No. 00 A 1143, as described in Paragraph 19 above, or with relation to any matters relating to the Stryker International, Inc. bankruptcy estate; and the Estate's causes of action, if any, against CRRA (as defined in paragraph 20) or relating to the Shelton, Connecticut landfill, including without limitation, any claim asserted in the CRRA Adversary or any request for reconsideration, appeal or review of the judgment entered in the CRRA Appeal; (ii) preference or fraudulent transfer causes of action arising pursuant to Sections 502(d), 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, or arising pursuant to state law fraudulent transfers; (iii) causes of action relating to the disgorgement or recovery of any disbursements made to professionals during the Chapter 11 or Chapter 7 cases including without limitation the Chapter 7 and/or Chapter 11 Trustee's statutory compensation and the Chapter 7 and/or Chapter 11 Trustee's professional fees or other expenses paid during the pendency of the Bankruptcy Case; and (iv) any causes of action against the Chapter 11 or Chapter 7 Trustees or their professionals. The Estate retains and does not convey to Chiplease or any other party the Excluded Causes of Action.

22.    The Chapter 7 Trustee on behalf of the Estate is authorized to execute the Releases. The Releases shall be effective only upon the Closing Date, as such term is defined in Paragraph 12 of the Settlement Agreement.

23.    As more fully set forth in Paragraph 11 of the Settlement Agreement: (i) the Purchaser shall deposit the sum of $500,000.00 to be held in escrow by its counsel, Dykema Gossett PLLC, for the payment of all unpaid Chapter 7 operating expenses

13

above $150,000.00 and any expenses incurred while the Estate continues to operate the Debtor's business; (ii) Chiplease and, to the extent necessary, any of the Greenblatt Entities, waive any interest in the 506(c) Funds and, by the entry of this Order, consent to the payment of the 506(c) Funds by Arnstein & Lehr LLP as escrowee to Jay A. Steinberg, not individually but solely as Chapter 7 Trustee of the Estate of Resource Technology Corporation; (iii) Chiplease shall pay the sum of $275,000.00 to Jay A. Steinberg, not individually but solely as Chapter 7 Trustee of the Estate of Resource Technology Corporation, and the Banco Secured Lenders waive any right to a distribution from such funds; (iv) Chiplease shall pay 20% of any recovery (net of attorney's fees and costs) on any cause of action conveyed hereunder; (v) all parties receiving a release from the Estate pursuant to the Settlement Agreement shall not file a Chapter 7 claim and shall not receive a distribution on any Chapter 7 claim they may have; (vi) any party receiving a release from the Estate pursuant to the Settlement Agreement shall maintain any Chapter 11 claim that it may own, and in the case of a claim purchased from a third party, the distribution relating thereto shall be limited to the amount paid for the claim, and specifically the claim purchased from Aquila Energy Capital Corporation and other entities shall be limited to $7,000,000.00 (notwithstanding the foregoing, no claim purchased after February 1, 2006 shall be entitled to a distribution); (vii) in no event do the Banco Secured Lenders otherwise waive their claims, liens or debt, but the Banco Secured Lenders waive the right to receive any Chapter 7 distribution, and the Banco Secured Lenders agree that they will not pursue any claims or remedies against the Chapter 7 Trustee or his professionals; (viii) the Parties shall execute and exchange the releases attached as Exhibits D and E to the Settlement Agreement; and (ix) the Purchaser and the Estate shall execute the

14

documents required and perform the acts required to finalize the settlement pursuant to the terms of the Settlement Agreement and the Designation Rights Agreement.

24.     The Estate is authorized to pay the Chapter 7 Loan to NEC upon receipt of the 506(c) Funds or the $275,000 payment by Chiplease, Inc.

25.     If Purchaser determines that it will remove any property from a landfill for which the gas rights agreement has not been assigned to it, Purchaser agrees to give not less than 5 days notice in writing to the landfill owner at the last known address available to Purchaser of the intended removal and further agrees to advise the landfill owner as to the removal of such property.  If no agreement is reached, either party has the right to petition this Court for resolution of the dispute.

26.     The lien of NEC, if any, shall attach to the proceeds of the Settlement Agreement, subject to the payment of all costs of administration of the Estate.  A subsequent hearing will be held to determine the validity, priority and amount, if any, of the NEC lien.  Nothing in this order shall create for or provide to NEC lien rights other than those that previously existed.

27.     This Court retains jurisdiction over:

A.      the Agreements;

B.      the determination of any dispute or controversies arising in connection with the Agreements; and

C.      the determination of any dispute relating to the enforcement and interpretation of the terms and conditions of this Order or the Agreements.

28.     This Order is intended to be final and immediately effective when docketed by the clerk of this Court, pursuant to Fed. R. Bankr. P. 7062, made applicable by Fed. R. Bankr. P. 6004, 6006 and 9014

15

29.    To the extent any Finding of Fact is determined to be a Conclusion of Law, and to the extent any Conclusion of Law is determined to be a Finding of Fact, then each such Finding of Fact is incorporated into this Court's Conclusions of Law, and each such Conclusion of Law is incorporated into this Court's Findings of Fact.

Dated:  March 16, 2006

ENTERED FOR THE COURT:

_____

United States Bankruptcy Judge

16

**EXHIBIT C**

**CONTRACT LIST**

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Bi-State | Agreement | Resource Technology corporation and Noble Earth Corporation | 10/27/95 |
| Bi-State | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Bi-State | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Bloomington | Agreement | Resource Technology Corporation and John Sexton Contractors Co. | 12/29/95 |
| Bloomington | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Bloomington | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Clarion | Agreement | Resource Technology Corporation and American Disposal Services, Inc. | 12/21/95 |
| Clarion | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Clarion | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Columbus | Agreement | Resources Technology Corporation and City of Columbus, GA | 08/15/95 |
| Columbus | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Columbus | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Congress/Hillside | Power Purchase Agreement | Resource Technology Corporation and Commonwealth Edison | Various Dates |
| Congress/Hillside | Amended and Restated Agreement for Construction and Operation of Gas Collection Facility and Gas-To-Electric Plant | Resource Technology Corporation and Congress Development Company | 12/02/97 |
| Congress/Hillside | Agreement for Construction and Operation of Gas Collection Facility and Gas-To-Electric Plant | Resource Technology Corporation and Congress Development Company | 11/29/96 |
| Congress/Hillside | First Amendment to Amended and Restated Agreement for Construction and Operation of Gas Collection Facility and Gas-To-Electric Plant | Resource Technology Corporation and Congress Development Company | 06/30/99 |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Congress/Hillside | Second Amendment to Agreement for Construction and Operation of Gas Collection Facility and Gas-To-Electric Plant | Resource Technology Corporation and Congress Development Company | 11/29/96 |
| Congress/Hillside | Security Agreement | Resource Technology Corporation and Congress Development Company | 11/29/96 |
| Congress/Hillside | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 05/15/99 |
| Congress/Hillside | Landfill Gas Rights and Collection Facility Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Corpus Christi (Elliott) | Landfill Gas Collection and Conversion Agreement | Resources Technology Corporation and City of Corpus Christi | 11/26/96 |
| Corpus Christi | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Corpus Christi | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
|  |  |  |  |

- 3 -

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Corpus Christi | Gas Sales Agreement | Resource Technology Corporation and Texas Energy Transfer | Various Dates |
| Fort Dodge | Agreement | Resource Technology Corporation and the North Central Iowa Regional Solid Waste Agency | 10/28/94 |
| Fort Dodge | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Fort Dodge | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Gary | Agreement | Resource Technology Corporation and the City of Gary, Indiana | 12/26/96 |
| Gary | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Gary | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Gary | Gas Sales Agreement | Resource Technology Corporation and Texas Energy Transfer | Various Dates |
|  |  |  |  |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| GNOL | Gas Sales Agreement | Resource Technology Corporation and Texas Energy Transfer | Various Dates |
| GNOL | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| GNOL | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| GNOL | Agreement | Resource Technology Corporation and Southern Recovery Management Inc. | 09/18/96 |
| GNOL | Addendum to Contract Between Resource Technology Corporation and Southern Recovery Management, Inc. | Resource Technology Corporation and Southern Recovery Management Inc. | 09/18/96 |
| Kewanee | Kewanee Landfill (no Gas Contract-National Closure owns the Site  Deed In Trust | American National Bank and Trust Company of Chicago | 03/31/95 |
| Kewanee | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Kewanee | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Lansing | Agreement | Resource Technology Corporation and John Sexton Contractors Co. | 04/24/95 |
| Lansing | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Lansing | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Lansing | Power Purchase Agreement | Resource Technology Corporation and Commonwealth Edison | Various Dates |
| Litchfield | Agreement | Resource Technology Corporation and Liberty Waste of Ohio | 12/30/96 |
| Litchfield | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Litchfield | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Lyons | Power Purchase Agreement | Resource Technology Corporation and Commonwealth Edison | Various Dates |
|  |  |  |  |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Lyons | Lease | Resource Technology Corporation ("RTC") and American Grading Company | 12/27/95 |
| Lyons | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Lyons | Landfill Gas Rights and Collection Facility Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Lyons | O&M Agreement | Resource Technology Corporation and Run Energy | 2005 |
| Mobile | Agreement | Resource Technology Corporation and TransAmerican Waste Industries, Inc. | 12/23/96 |
| Mobile | Gas Sales Agreement | Resource Technology Corporation and Texas Energy Transfer/Mobile Gas | Various Dates |
| Mobile | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Mobile | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
|  |  |  |  |

- 7 -

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| New Haven | Agreement The City of New Haven and Resource Technology Corporation Pertaining to Landfill Gas-To-Energy Conversion Project | Resource Technology Corporation and The City of New Haven | 12/31/96 |
| New Haven | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| New Haven | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Ottawa | Agreement | Resource Technology Corporation and States Land Improvement Corp. | 04/15/97 |
| Ottawa | Amendment No. 1 to Agreement | Resource Technology Corporation and States Land Improvement Corp. | 06/19/97 |
| Peoria | Lease | Resource Technology Corporation and City and County of Peoria | 11/30/95 |
| Peoria | First Amendment to Lease | Resource Technology Corporation and City and County of Peoria | 06/11/96 |
| Peoria | Second Amendment to Lease | Resource Technology Corporation and City and County of Peoria | 01/30/97 |
| Peoria | Third Amendment to | Resource Technology Corporation and City | 07/01/97 |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| | Lease | and County of Peoria | |
| Peoria | Fourth Amendment to Lease | Resource Technology Corporation and City and County of Peoria | 10/28/97 |
| Peoria | Power Purchase Agreement | Resource Technology Corporation and Cilco | Various Dates |
| Peoria | Landfill Gas Rights and Collection Facilities Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Peoria | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Pontiac | Power Purchase Agreement | Resource Technology Corporation and Commonwealth Edison | Various Dates |
| Pontiac | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Pontiac Delaware Statutory Trust (Including All Applicable Series)" | 4/10/2002 |
| Pontiac | Landfill Gas Sales Agreement | Resource Technology Corporation and Pontiac Delaware Statutory Trust (Including All Applicable Series)" | 4/10/2002 |
| Pontiac | Agreement | Resource Technology Corporation and American Disposal Service, Inc. | 12/21/95 |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Pontiac | Supplemental Fuel Standby Agreement | Resource Technology Corporation and NICOR Gas Company | 8/1/2004 |
| Pontiac | O&M | Resource Technology Corporation and Pontiac Delaware Statutory Trust (Including All Applicable Series)" | 4/10/2002 |
| Rosencranse | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Rosencranse | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Rosencranse | License Agreement | Resource Technology Corporation and Rosencranse Corporation | 12/31/96 |
| Sangamon (Springfield) | Agreement | Resource Technology Corporation and ESG Watts, Inc. | 05/26/95 |
| Sangamon (Springfield) | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Sangamon (Springfield) | Power Purchase Agreement | Resource Technology Corporation and Cilco | Various Dates |
| Sangamon (Springfield) | Landfill Gas Rights and Collection Facility Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Taylor Ridge | Agreement | Resource Technology Corporation and ESG Watts, Inc. | 05/26/95 |
| Taylor Ridge | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Taylor Ridge | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Viola | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Viola | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Viola | Agreement | Resource Technology Corporation and ESG Watts, Inc. | 08/01/96 |
| Wyandot | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Wyandot | Landfill Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Wyandot | Agreement | Resource Technology Corporation and American Disposal Service | 12/21/95 |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
| Wheatland | Landfill Gas Rights and Collection System Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Wheatland | Landfill Gas Sales Agreement | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| Wheatland | Agreement | Resource Technology Corporation and American Disposal Services, Inc. | 12/21/95 |
| Solar Turbines Incorporated | Services and Maintenance Agreement | Resource Technology Corporation, Network Electric Company and Solar Turbines Incorporated | 11/17/00 |
| Solar Turbines Incorporated | Services and Maintenance Agreement | Resource Technology Corporation, Network Electric Company and Solar Turbines Incorporated | 10/25/00 |
| All Sites | Gas Rights and Collection Facilities Lease | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| All Sites | Gas Sales Agreements | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 07/01/99 |
| All Sites | O&M Agreements | Resource Technology Corporation and Green Gas Delaware Statutory Trust | 04/01/99 |
| All Sites | O&M Agreement | Resource Technology Corporation and | 07/01/99 |

| PARTY/SITE | TITLE OF DOCUMENT | BETWEEN | DATE OF DOCUMENT |
|---|---|---|---|
|  |  | Green Gas Delaware Statutory Trust |  |
| Multi-Site | Multi-Site Environmental Permitting/ Monitoring | Resource Technology Corporation and Trinity Consultants | 2005-06 |
| Multi-Site | Waste Condensate Agreement | Resource Technology Corporation and RS Used Oil | 2005 |
| Multi-Site | Environmental Monitoring Software | Resource Technology Corporation and Enviance, Inc. | 2004 |
| John Connolly | Employment Contract | Resource Technology Corporation and John Connolly | 12/95 |
| Richard Walker | Employment Contract | Resource Technology Corporation and Richard Walker | 1997 |
| Multi-Site | Agreement | Resource Technology Corporation and Chicago Climate Exchange | 07/31/04 |

**EXHIBIT D**

**RELEASE OF TRUSTEE, DEBTOR AND ESTATE**

## RELEASE

In consideration *of the payment of the sum of Ten Dollars and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,* provided by Jay A. Steinberg, both individually and as the Chapter 7 Trustee (the "**Chapter 7 Trustee**") for the estate of Resource Technology Corporation (the "**Estate**"), Chiplease, Inc. Elizabeth Sharp, Michael May, Rumpelstiltskin (USA) Corp., Scattered Corporation, Loop Corp., Loop Properties, Inc., Banco Panamericano, Inc., Repurchase Corp., H&M Partners, GP, EZ Links Golf, LLC, EZ Links Golf, Inc., Green Gas Delaware Statutory Trust (previously identified as Green Gas Delaware Business Trust), South Beach Securities, Inc., 200 West Properties, LP, 200 West Partners, Inc., Old Colony Partners, LP, Old Colony Properties, Inc., Telegraph Properties LP, Telegraph Properties, Inc., Randolph Properties, LP, Randolph Properties, Inc., Pontiac Statutory Trust (f/k/a Pontiac Business Trust), Voltaire Gas and Electric, Inc., Archimedes Gas and Electric, Inc., Red Gas, Limited Liability Company and Pink Gas, Limited Liability Company, Leon Greenblatt, II, Leon Greenblatt, III, Richard Nichols, James Nichols, Andrew Jahelka, Robert Jahelka, David Neuhauser and Leslie Jabine, and their respective officers, shareholders, directors, affiliates, trustees, employees, attorneys, assigns, successors, heirs and agents (collectively and individually the "**Releasing Parties**") hereby release and forever discharge the Chapter 7 Trustee, individually and in his capacity as Chapter 7 Trustee, and the Estate and their respective employees, attorneys, advisors, successors, assigns and agents from any and all responsibilities, disputes and causes of action of every nature whatsoever, liquidated or unliquidated, known or unknown, matured or unmatured, fixed or contingent, which the Releasing Parties now own or hold or have at any time heretofore owned or held, or owned or held in the future against the Chapter 7 Trustee, individually and in his capacity as Chapter 7 Trustee, or the Estate (collectively or individually), related in any way to (1) Resource Technology Corporation, (2) Resource Technology Corporation's assets and liabilities, (3) related to any actions taken or not taken by the Chapter 7 Trustee concerning or relating to Resource Technology Corporation's bankruptcy case, Case No. 99-35434, currently pending in the United States Bankruptcy Court for the Northern District of Illinois (the "**Bankruptcy Case**"), any adversary proceeding on behalf of or against the Estate arising from or related to the Bankruptcy Case or any appeal of a ruling in favor of the Estate and against any of the Releasing Parties arising from the Bankruptcy Case or any adversary proceeding, including any past, present or future claims against the Chapter 7 Trustee or the Estate, which the Releasing Parties may have or had at any time. Notwithstanding anything set forth herein to the contrary, the Releasing Parties do not release and/or discharge the Estate from claims, rights, demands, liabilities, responsibilities, disputes, causes of action and obligations arising out of any proof of claim that any of the Releasing Parties have or may file against the Estate, and security interest that any of the Releasing Parties may hold to secure the repayment of an obligation owing by Resource Technology Corporation or the Estate, any of the Releasing Parties rights to prosecute any appeal currently pending or to file a notice of appeal including a writ of certiorari and the right to seek further appeal, or any claims, rights, demands, liabilities, responsibilities, disputes, causes of action and obligations arising out of or set forth in the Motion of Chapter 7 Trustee for an Order Pursuant to 11 U.S.C. §363 and F.R.B.P. 9019 to (i) Approve Settlement, (ii) Authorize the Conveyance

and Abandonment of Certain Estate Assets, (iii) Approve a Designation Rights Agreement, (iv) Authorize The Disbursement Of $250,000 To NEC Electric Corporation and (v) Approve Shortened Notice Filed by the Chapter 7 Trustee on Behalf of the Estate in the Bankruptcy Case.

Notwithstanding the terms of this Release, nothing shall terminate any rights, responsibilities and obligations under any pre-petition loan documents and post-petition debtor in possession loan documents granted by Resource Technology Corporation or the Estate.

IN WITNESS WHEREOF, the undersigned has caused this Release to be executed as of March _____ 2006.

**RELEASING PARTIES:**

**CHIPLEASE, INC.**

By: _____
     Its Agent and Officer

**MICHAEL MAY**

By: _____
     Michael May, Individually

**SCATTERED CORPORATION**

By: _____
Its Agent and Officer

**LOOP PROPERTIES, INC.**

By: _____
Its Agent and Officer

**REPURCHASE CORP.**

By: _____
Its Agent and Officer

**ELIZABETH SHARP**

By: _____
     Elizabeth Sharp, Individually

**RUMPELSTILTSKIN (USA) CORP.**

By: _____
Its Agent and Officer

**LOOP CORP.**

By: _____
Its Agent and Officer

**BANCO PANAMERICANO, INC.**

By: _____
Its Agent and Officer

**H&M PARTNERS, GP**

By: _____
Its Agent and General Partner

**EZ LINKS GOLF, LLC**

By: _____
Its Agent and Officer

**GREEN GAS DELAWARE STATUTORY TRUST**

By: _____
Its Agent and Trustee

**200 WEST PROPERTIES, LP**

By: _____
Its Agent and General Partner

**OLD COLONY PARTNERS, LP**

By: _____
Its Agent and General Partner

**TELEGRAPH PROPERTIES LP**

By: _____
Its Agent and General Partner

**RANDOLPH PROPERTIES, LP**

By: _____
Its Agent and General Partner

**PONTIAC STATUTORY TRUST**

By: _____
Michael Horrell
Its Agent and Trustee

**EZ LINKS GOLF, INC.**

By: _____
Its Agent and Officer

**SOUTH BEACH SECURITIES, INC.**

By: _____
Its Agent and Officer

**200 WEST PARTNERS, INC.**

By: _____
Its Agent and Officer

**OLD COLONY PROPERTIES, INC.**

By: _____
Its Agent and Officer

**TELEGRAPH PROPERTIES, INC.**

By: _____
Its Agent and Officer

**RANDOLPH PROPERTIES, INC.**

By: _____
Its Agent and Officer

**VOLTAIRE GAS AND ELECTRIC, INC.**

By: _____
Its Agent and Officer

EXHIBIT E

RELEASE OF BANCO SECURED LENDERS AND OTHER PERSONS

**EZ LINKS GOLF, LLC**

By: _____
Its Agent and Officer


**GREEN GAS DELAWARE STATUTORY TRUST**

By: _____
Its Agent and Trustee

**200 WEST PROPERTIES, LP**

By: _____
Its Agent and General Partner

**OLD COLONY PARTNERS, LP**

By: _____
Its Agent and General Partner

**TELEGRAPH PROPERTIES LP**

By: _____
Its Agent and General Partner

**RANDOLPH PROPERTIES, LP**

By: _____
Its Agent and General Partner

**PONTIAC STATUTORY TRUST**

By: _____
Michael Horrell
Its Agent and Trustee

**EZ LINKS GOLF, INC.**

By: _____
Its Agent and Officer

**SOUTH BEACH SECURITIES, INC.**

By: _____
Its Agent and Officer

**200 WEST PARTNERS, INC.**

By: _____
Its Agent and Officer

**OLD COLONY PROPERTIES, INC.**

By: _____
Its Agent and Officer

**TELEGRAPH PROPERTIES, INC.**

By: _____
Its Agent and Officer

**RANDOLPH PROPERTIES, INC.**

By: _____
Its Agent and Officer

**VOLTAIRE GAS AND ELECTRIC, INC.**

By: _____
Its Agent and Officer

**ARCHIMEDES GAS AND ELECTRIC, INC.**

By: _____
Its Agent and Officer

**RED GAS, LIMITED LIABILITY COMPANY**

By: _____
Its Agent And Officer

**PINK GAS, LIMITED LIABILITY COMPANY**

By: _____
Its Agent and Officer

**LEON GREENBLATT, II**

By: _____
Leon Greenblatt, II, Individually

**LEON GREENBLATT, III**

By: _____
Leon Greenblatt, III, Individually

**RICHARD NICHOLS**

By: _____
Richard Nichols, Individually

**JAMES NICHOLS**

By: _____
James Nichols, Individually

**ANDREW JAHELKA**

By: _____
Andrew Jahelka, Individually

**ROBERT JAHELKA**

By: _____
Robert Jahelka, Individually

**DAVID NEUHAUSER**

By: _____
David Neuhauser, Individually

**LESLIE JABINE**

By: _____
Leslie Jabine, Individually

## RELEASE

In consideration of the payment of Ten Dollars and other good and valuable consideration by Chiplease, Inc. for and on behalf of its itself, Elizabeth Sharp, Michael May, Rumpelstiltskin (USA) Corp., Scattered Corporation, Loop Corp., Loop Properties, Inc., Banco Panamericano, Inc., Repurchase Corp., H&M Partners, GP, EZ Links Golf, LLC, EZ Links Golf, Inc., Delaware Statutory Trust (previously identified as Green Gas Delaware Business Trust), South Beach Securities, Inc., 200 West Properties, LP, 200 West Partners, Inc., Old Colony Partners, LP, Old Colony Properties, Inc., Telegraph Properties LP, Telegraph Properties, Inc., Randolph Properties, LP, Randolph Properties, Inc., Pontiac Statutory Trust (f/k/a Pontiac Business Trust), Voltaire Gas and Electric, Inc., Archimedes Gas and Electric, Inc., Red Gas, Limited Liability Company and Pink Gas, Limited Liability Company, Leon Greenblatt, II, Leon Greenblatt, III, Richard Nichols, James Nichols, Andrew Jahelka, Robert Jahelka, David Neuhauser and Leslie Jabine (collectively and individually the "**Released Parties**") *to Jay A. Steinberg, not individually but solely  as the Chapter 7 Trustee (the "Chapter 7 Trustee")* for the Estate of Resource Technology Corporation, (hereinafter the "Estate"), and to Jay A. Steinberg, individually in the limited capacity as a releasing party (the "Releasing Parties"), and their respective officers, shareholders, directors, affiliates, trustees, advisors, employees, attorneys, assigns, successors, heirs and agents hereby release and forever discharge the Released Parties and their respective officers, shareholders, affiliates, directors, trustees, employees, attorneys, successors, assigns and agents from any and all claims, rights, demands, liabilities, responsibilities, disputes, causes of action and obligations of every nature whatsoever, liquidated or unliquidated, known or unknown, matured or unmatured, fixed or contingent, which the *Chapter 7* Trustee, individually and in his capacity as *Chapter 7* Trustee, or the Estate now owns or holds or has at any time heretofore owned or held or owned or held in the future against the Released parties (collectively or individually), related in any way to RTC, RTC's bankruptcy case, Case No. 99-35434, currently pending in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Case"), any adversary proceeding arising from or related to the Bankruptcy Case or any appeal arising from the Bankruptcy Case or any adversary proceeding, and any past, present or future claims against the Released parties, individually or collectively, and each of them, which the *Chapter 7* Trustee, individually and in his capacity as *Chapter 7* Trustee, the Estate or Resource Technology Corporation may have or had at any time. Notwithstanding anything set forth herein to the contrary, the *Chapter 7* Trustee and the Estate do not release and/or discharge the *Released Parties* from claims, rights, demands, liabilities, responsibilities, disputes, causes of action and obligations arising out of or set forth *in the* Motion of Chapter 7 Trustee for an Order Pursuant to 11 U.S.C. §363 and F.R.B.P. 9019 to (i) Approve Settlement, (ii) Authorize the Conveyance and Abandonment of Certain Estate Assets, (iii) Approve a Designation Rights Agreement, (iv) Authorize The Disbursement Of $250,000 To NEC Electric Corporation and (v) Approve Shortened Notice Filed by the Chapter 7 Trustee on Behalf of the Estate in the Bankruptcy Case.

IN WITNESS WHEREOF, the undersigned has caused this Release to be executed as of March _____ 2006.

The Estate of Resource Technology Corporation:

By: _____
Jay A. Steinberg, not individually but Soley as Chapter 7 Trustee

_____
Jay A. Steinberg, individually in the limited capacity as a Releasing Party

# EXHIBIT D

Page 1

1              IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3

4     In re:                        )
                                    ) No. 99 B 35434
5     RESOURCE TECHNOLOGY CORPORATION,)
                                    ) Chicago, Illinois
6                                   ) February 12, 2008
                        Debtor.     ) 10:30 a.m.
7                                   )  1:00 p.m.

8

          TRANSCRIPT OF PROCEEDINGS BEFORE THE
9               HONORABLE EUGENE R. WEDOFF

10

11    APPEARANCES:

12    MR. PETER SCHMIDT
      MR. GREGORY JORDAN
13    on behalf of Illinois Investment Trust 92-7163;

14    MR. GEORGE APOSTOLIDES
      on behalf of Jay Steinberg, not individually but
15    soley as Chapter 7 trustee;

16    MR. DAVID BOHAN
      MR. ROBERT O'MEARA
17    on behalf of Allied Waste Industries;

18    MR. LINDA KUJACA
      on behalf of the City and County of Peoria.
19

20

21

22

23

24

25

Page 2

1

2                                    I N D E X

3

4

5      WITNESS:              DX        CX      REDX        RECX

6      ANDREW JAHELKA        27        42        66          71

7                                      64

8      JOHN CONNOLLY         74       179       271

9                                     264

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 74

1              THE COURT:  Anything else?

2                      (No response.)

3              THE COURT:  You may step down.  Thank

4     you.

5              THE WITNESS:  Thank you.

6                      (Witness excused.)

7              THE COURT:  Next witness, Mr. Jordan.

8              MR. JORDAN:  I'm going to call Mr.

9     Connolly.

10                      (Witness sworn.)

11              JOHN CONNOLLY, WITNESS, SWORN

12                  DIRECT EXAMINATION

13    BY MR. JORDAN:

14         Q    Would you please state your name and

15    spell your last name for the record.

16         A    Sure.  It's John Connolly,

17    C-o-n-n-o-l-l-y.

18         Q    Mr. Connolly, you're the president of

19    Resource Technology; is that right?

20         A    Correct.

21         Q    Okay.  And you're also trustee of

22    Illinois Investment Trust; is that right?

23         A    That's correct.

24         Q    Okay.  How long have you been trustee of

25    Investment Trust?

Page 75

1          A    Since August '06.

2          Q    Okay.  Why don't we start by just

3     summarizing your educational background for the

4     court.

5          A    Sure.  I obtained a Bachelor of Science

6     degree in mechanical engineering from Michigan Tech

7     University, Houghton, Michigan, 1984.  I've also

8     attended MBA classes at Georgia State University and

9     Northern Illinois University.  I didn't finish that

10    course work, I got halfway through it.  And then I

11    obtained an environmental engineering certificate

12    from Purdue University by way of General Motors

13    Corporation.

14         Q    Okay.  Have you ever taken any courses in

15    finance?

16         A    Sure, yeah.

17         Q    What courses?

18         A    I took Master's levels financial courses

19    at Georgia State University and Northern Illinois

20    University.  I took accounting courses at both

21    schools, Master's levels.

22         Q    Okay.  Can you please summarize your

23    professional experience since college.

24         A    From 1984 through 1989, and it really

25    goes back to '83 because I was a co-op student, but

# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Resource Technology Corporation,)   No. 99 B 35434
                                 )   Chicago, Illinois
                                 )   9:30 a.m.
                      Debtor.    )   February 13, 2008

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE EUGENE R. WEDOFF

APPEARANCES:

For the Trustee:              Mr. George Apostolides;


For IIT:                      Mr. Gregory Jordan;
                              Mr. Peter Schmidt;

For Allied:                   Mr. David Bohan;
                              Mr. Robert O'Meara;

For the City and County
of Peoria:                    Ms. Linda Kujaca;



Court Reporter:               Amy Doolin, CSR, RPR
                              U.S. Courthouse
                              219 South Dearborn
                              Room 661
                              Chicago, IL  60604.

Page 2

1                         I N D E X

2

3

4    Witness:              DX      CX      REDX      RECX

5

6    Leon Greenblatt        10      23        48

7    Patrick Sloan          54      91       106

8    Michael Reed          123     167       176

9                          165

10   John Connolly         177

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

 1    be a potential for enforcement by counter-parties,

 2    then I would find a lack of adequate assurance.  So

 3    we will see.

 4              MR. O'MEARA:  Thank you.                    •

 5              MR. JORDAN:  That is, by the way,

 6    agreeable to Mr. Connolly.  We will take that action,

 7    assuming that the assignment is made, the assumption

 8    is made and the assignment is made.

 9              THE COURT:  All right.  Anything else

10    to take up before we resume with the testimony?

11              MR. JORDAN:  No, Your Honor.

12              MR. APOSTOLIDES:  Judge, I just wanted

13    to clarify, we had -- I had discussed with Mr. Jordan

14    putting Mr. Connolly on the stand to raise this issue

15    of his employment and the FEIN of the entity that's

16    paying him.  I assume that Your Honor is comfortable

17    with this discussion?

18              THE COURT:  I will take that

19    representation if that's not in dispute among the

20    parties.

21              MR. O'MEARA:  No objection.

22              MS. KUJACA:  No objection.

23              THE COURT:  All right.  That's fine.

24              MR. APOSTOLIDES:  Thank you, Judge.

25

Page 10

1              THE COURT:  Your next witness then,

2     Mr. Jordan.

3              MR. JORDAN:  Leon Greenblatt.

4              (Witness sworn.)

5              MR. JORDAN:  Your Honor, just to

6     clarify, because it became an issue at the NEC

7     deposition, Mr. Greenblatt actually does have an eye

8     condition, and he has difficulty with bright lights.

9     He had sunglasses on in court.  He has taken them off

10    so he can testify.  But that is the reason that Mr.

11    Greenblatt had his sunglasses on.

12             THE COURT:  Okay.  Go ahead.

13            LEON GREENBLATT, WITNESS, SWORN

14                 DIRECT EXAMINATION

15    BY MR. JORDAN:

16       Q    Can you please state your name and spell

17    your last name for record.

18       A    Leon Greenblatt, G-r-e-e-n-b-l-a-t-t.

19       Q    Mr. Greenblatt, have you ever heard of

20    Illinois Investment number 92-7163?

21       A    Yes.

22       Q    It's my understanding that you have a

23    relationship with Chiplease, Inc.; is that correct?

24       A    Yes.

25       Q    And are you the sole director and officer

Page 11

1    of Chiplease, Inc.?

2       A    Yes.

3       Q    And is Chiplease, Inc., a beneficiary of

4    the Illinois Investment Trust number 92-7163?

5       A    Yes.

6       Q    And it's my understanding that you're a

7    director and majority shareholder of Scattered

8    Corporation; is that correct?

9       A    I'm a director.  I'm not a majority

10   shareholder.

11      Q    Okay.  Are you agreeable to, as a director

12   of Scattered Corporation and as sole officer and

13   director of Chiplease, to transferring assets from

14   Illinois Investment Trust to a new corporation along

15   the lines that I outlined with the court a moment

16   ago?

17      A    That would be fine.

18           MS. KUJACA:  Your Honor, I can't hear

19   the witness.  Could we have him speak into the

20   microphone perhaps.

21           THE WITNESS:  That would be fine.

22   BY MR. JORDAN:

23      Q    Mr. Greenblatt, what is the nature of

24   Chiplease's business?

25      A    Chiplease is a lender and lessor.

Page 12

```
 1      Q     And can you tell me whether it has been a

 2   lender since at least 1999 or not?

 3      A     Yes.

 4      Q     Okay.  And can you tell me whether it was a

 5   lender to Resource Technology Corporation?

 6      A     It was.

 7      Q     And at the time of the filing of the case,

 8   was it, along with you and Banco Panamericana, the

 9   sole secured lender?

10      A     Yes.

11      Q     Okay.  Has it been a lessor since the year

12   2000 or not?

13      A     Yes.

14      Q     Okay.  To whom is Chiplease a lessor?

15      A     Chiplease is a lessor to dry cleaning

16   shops.

17      Q     Okay.  How long has it been a lessor to dry

18   cleaning shops?

19      A     Since its inception.

20      Q     How long has it -- I'm sorry.

21            Approximately how much are its current

22   assets?

23      A     About 15, 16 million.

24      Q     Now, yesterday in court Mr. Jahelka

25   testified with regard to a lawsuit relating to the
```

Page 13

```
 1    401 South Dearborn property.  And I am wondering

 2    whether you're aware of that lawsuit?

 3         A    Yes.

 4         Q    Okay.  And can you tell me whether the

 5    counter-parties to that contract sued for specific

 6    performance or did they sue for something else?

 7         A    They sued for specific performance.

 8         Q    Have you ever heard of Gold Coast Realty,

 9    LLC?

10         A    Yes.

11         Q    Who is that?

12         A    They are one of the plaintiffs or actually

13    defendants who filed a counter...

14       · Q    Have you ever heard of 407 South Dearborn,

15    LLC?

16         A    Yes.

17         Q    Who are they?

18         A    Likewise, they are one of the plaintiffs in

19    the --

20         Q    And C&L Holdings, Inc., do you know who

21    that is?

22         A    Yes.

23         Q    Who is that?

24         A    They are a defendant in one of our

25    complaints against those other two parties.
```

Page 14

1      Q      Okay.  And do you know what the status of

2    those entities are at the current time?

3      A      They filed Chapter 7.

4      Q      Okay.  Have you -- has 401 Dearborn owners

5    ever heard from the trustee in their cases?

6      A      Yes.

7      Q      And what was the purpose of that

8    communication?

9      A      They offered to settle the specific

10   performance suit for $10,000.

11     Q      Okay.  Is that acceptable to the owners of

12   the 401 South Dearborn property?

13     A      No.  We are just going to wait the 60 days.

14     Q      Okay.  Approximately how much each month

15   does Chiplease receive from its loans and leases?

16     A      $150,000.

17     Q      Okay.  And after expenses, what's the net

18   amount available to Chiplease to lend or what's

19   available after expenses?

20     A      That was after expenses.

21     Q      Oh, okay, $150,000 a month?

22     A      Yes.

23     Q      It's my understanding that Chiplease is a

24   party to a loan agreement with the trust; is that

25   correct?

Page 15

```
 1      A    Yes.

 2      Q    What, if any, commitments has it made to

 3   the trust as a lender under those agreements?

 4      A    We agreed to loan up to 25 percent or other

 5   amount as we might agree to of the total amount.

 6      Q    How would you fund that 25 percent?

 7      A    Cash flow.

 8      Q    Okay.  And have you reviewed the

 9   projections from Mr. Connolly regarding the timing of

10   when the cash flow is needed?

11      A    Yes.

12      Q    Do you have any doubt that Chiplease would

13   be able to meet its obligations?

14      A    No.

15      Q    How will it meet those obligations and

16   coming up with whatever, a quarter, $3 million or

17   750,000?

18      A    We would just pay.

19      Q    Are you going to accumulate cash?

20      A    If necessary.

21      Q    Okay.  Now, Chiplease, when did it become a

22   beneficiary of the Illinois Investment Trust?

23      A    A year or two ago.  I don't remember

24   exactly.

25      Q    Would it have been in August '06?
```

Page 16

1        A     Sure.

2        Q     Okay.  What, if anything, did Chiplease

3    contribute to the trust when it became beneficiary?

4        A     Property from the estate.

5              THE COURT:  Beneficiaries don't

6    contribute property to trusts.  Settlors do.

7    BY MR. JORDAN:

8        Q     Is it a settlor?

9        A     Yes.

10             MR. JORDAN:  Okay.  I apologize, Your

11   Honor.  Thank you.

12   BY MR. JORDAN:

13       Q     What did you do, if anything, to determine

14   that it was a reasonable investment for Chiplease to

15   make to agree to fund up to 25 percent or so much

16   other as determined to loan to the trust?

17       A     We reviewed the cash flows of the project.

18       Q     Okay.  And based upon those cash flows,

19   what was your conclusion?

20       A     That it was a worthwhile project to do.

21       Q     Okay.  Now, you have an extended history

22   dealing with RTC as a lender; is that correct?

23       A     Yes.

24       Q     Now, from a lender's perspective, taking

25   aside the role of any of the trustees, have those

# EXHIBIT F

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | **Chapter 7** |
| | ) | |
| **RESOURCE TECHNOLOGY** | ) | |
| **CORPORATION,** | ) | **Case No. 08 C 4040** |
| | ) | |
| Debtor. | ) | |

## AFFIDAVIT OF GEORGE P. APOSTOLIDES
## IN SUPPORT OF REASONABLE ATTORNEYS' FEES

I, George P. Apostolides, being duly sworn on oath, depose and states that I am of the attorneys for the Estate of Resource Technology Corporation, by and through Jay A. Steinberg, not individually but solely in his capacity as Chapter 7 Trustee of the Estate (the "Estate"), that I am a partner with the law firm of Arnstein & Lehr LLP, and that as such, I have personal knowledge of that which appears herein, that the same is true in substance and in fact, and that if sworn to testify in connection with the present matter, I could competently state the facts as set forth below:

1.     It was and continues to be in the regular course of its business for the law firm of Arnstein & Lehr LLP to make and keep records concerning the time spent by members of the firm in connection with various matters handled by the firm and to prepare such records in a reasonable time.

2.     I have been the Arnstein & Lehr LLP attorney primarily responsible for handling the dispute between Chiplease, Inc. and the Estate regarding the adequate security deposit of $500,000.00 which is the subject of this appeal.

3.     In connection with the representation of the Estate in this matter, my billing rate is $385.00 per hour and Barry A. Chatz's billing rate is $585.00 per hour.

4.     Arnstein & Lehr LLP attorneys have recorded and worked as follows in connection with this appeal since the entry of an Order dated July 18, 2008:

| | |
|---|---|
| 7/18/08 | E-mail from the District Court with Order Entered by Judge Kennelly (.1); e-mail to Trustee re: Order (.1). (GPA) |
| 7/21/08 | Receipt and review of Chiplease's Motion to Reconsider (.2). (GPA) |
| 7/24/08 | Drafted Response to Chiplease's Motion to Reconsider or, in the Alternative, to Extend Stay Pending Appeal of the Bankruptcy Court Order (2.2); e-mails to Greg Ostfeld and the Trustee re: same (.1); |

telephone conference with Ostfeld (.1); revised document (.3); telephone conferences with Trustee re: changes (.2); further revised the document and e-mail to Trustee (.2); e-mail from Ostfeld re: presentment (.1); court appearance at hearing on Motion for Reconsideration (1.1). (GPA)

7/28/08     Researched and drafted Motion for Rule to Show Cause against Chiplease (3.5); e-mail to Trustee re: same (.1); telephone conference with Trustee re: changes to the draft (.2).  (GPA)

7/29/08     Prepared Amended Notice of Motion re: Motion for Rule to Show Cause (.2); e-mails from and to Greg Ostfeld re: Appearance at renoticed hearing date (.1); telephone conference with Trustee re: events at court (.1)  (GPA)

8/7/08     Receipt and review of Order by Judge Kennelly re: the various pending Chiplease matters (.1).  (GPA)

8/18/08     Telephone conference with Allied counsel Bob O'Meara re: filing, communications with Chiplease counsel, and Motion for Rule to Show Cause (.2).  (GPA)

8/19/08     Receipt and review of Chiplease's Response in Opposition to the Trustee's Allegations of Contempt (.2); research re: cases cited and other civil contempt caselaw (1.4).  (GPA)

8/27/08     Drafted Reply in Support of Allegations of Contempt, including review of caselaw and local rules (3.4); e-mail to Trustee re: draft (.2).  (GPA)

8/28/08     Strategy re: remedy requested in the Reply (.2); telephone conference with Trustee re: revisions to the Reply brief (.3); further drafted revisions to Reply brief (2.2); e-mails to Trustee and Greg Ostfeld and telephone conference with Trustee re: draft (.1); telephone call to Ostfeld and e-mails from, to, and from Ostfeld re: affidavit and further revisions (.1).

8/29/08     Strategy re: Reply brief remedy and further drafted Reply brief (1.0).  (BAC)

8/29/08     Reviewed time entries and drafted Affidavit in support of contempt allegations (.8); e-mail from Trustee with further revisions and made revisions (.3); finalized Reply brief (1.5); prepared exhibits and notices for filing (.6). (GPA)

     5.     In addition, it is anticipated that I will have to spend one hour at court on September 9, 2008 for the previously-set status hearing on this matter.

6.     The total billing on this matter relative to this appeal since July 18, 2008 is $8,862.50, consisting of 21.5 hours of my time at $385.00 per hour and 1 hour of Barry A. Chatz's time at $585.00 per hour.

7.     The fees incurred by Arnstein & Lehr LLP were necessary to prosecute this matter, are reasonable and reflect the amounts customarily charged for similar services by attorneys of similar qualifications and experience in the community.

FURTHER AFFIANT SAYETH NOT.

_George P. Apostolides_
George P. Apostolides

Subscribed and sworn to me this
29th day of August, 2008.

NOTARY PUBLIC

OFFICIAL SEAL
LIVINICE WOOTEN
Notary Public - State of Illinois
My Commission Expires Oct 2, 2010