**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| *In re*: | ) | Case No. 08-cv-4040 |
| | ) | |
| RESOURCE TECHNOLOGY CORPORATION, | ) | Hon. Matthew F. Kennelly |
| | ) | |
| Debtor. | ) | |
| | ) | |

**CONGRESS DEVELOPMENT CORPORATION'S AND
AMERICAN GRADING COMPANY'S REPLY IN SUPPORT OF A FINDING OF
CONTEMPT AND IMPOSITION OF SANCTIONS**

Congress Development Corporation ("Congress") and American Grading Company

("AGC") file the following reply in response to Chiplease, Inc.'s Response in Opposition to

Trustee's Allegations of Contempt (the "Response") and in support of an award of sanctions

against Chiplease and its sole officer and director, Leon Greenblatt, for Chiplease's inexcusable

refusal to comply with the orders of this Court.

**Point One**

Chiplease does not accurately set forth the standards for contempt.  To support a finding

of civil contempt, the moving party must establish only that an order of the Court was in effect,

the contemnor knew of the order, and the contemnor failed to comply with the order.  *In re*

*Kademoglou*, 199 B.R. 35, 36 (N.D.Ill. 1996).  There is no dispute that these elements are

satisfied here, and thus a prima facie case of contempt against Chiplease has already been

established.[1]

Once a moving party makes a prima facie showing that a court order was violated, the

burden of production shifts to the alleged contemnor to show a present inability to comply.

---

[1] In fact, Chiplease's *Motion to Reconsider or, in the Alternative, to Extend Stay Pending Appeal of Bankruptcy Court Order* (Dkt. No. 5) is essentially an admission of a prima facie case of contempt.

*United States v. Rylander,* 460 U.S. 752, 760-61, 103 S.Ct. 1548, 1554-55 (1983). Thus, contrary to that suggested by Chiplease in the Response, the burden here is on Chiplease. Chiplease can surmount this burden only by "com[ing] forward with evidence in support of it." *Id.* at 761. In other words, the "mere assertion of inability" will not suffice to show the factual impossibility of compliance. *United States v. Barnette,* 902 F.Supp. 1522 (M.D.Fla. 1995). Chiplease is required to demonstrate that (1) it was unable to comply, explaining why "categorically and in detail," (2) its inability to comply was not self-induced, and (3) it made, in good faith, all reasonable efforts to comply. *Donovan v. Mazzola,* 716 F.2d 1226 (9th Cir. 1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704 (1984). *See also S.E.C. v. Custable*, 1999 WL 92260 *2 (N.D.Ill. Feb. 11, 1999) ("This evidence must show 'categorically and in detail' why [the alleged contemnor] was unable to comply with the Court's previous order."). In this later regard, "[e]ven if the efforts [the alleged contemnor] did make were 'substantial,' 'diligent' or 'in good faith,' ... the fact that he did not make 'all reasonable efforts' establishes that he did not sufficiently rebut the ... prima facie showing of contempt." *United States v. Hayes,* 722 F.2d 723, 725 (11th Cir. 1984). *See also Custable*, 1999 WL 92260 at *3 ("Courts construe the all-reasonable-efforts requirement strictly.").

With regard to financial impossibility, which is what Chiplease claims excuses its compliance with the Court's orders here, performance is excused only when the party is *absolutely* unable to pay due to poverty or insolvency. *See, e.g., Custable*, 1999 WL 92260 at 2 ("In the case of failure to pay a court-ordered monetary penalty, the defendant must produce evidence of poverty or insolvency that prevent compliance."); *S.E.C. v. Universal Exp., Inc.*, 546 F.Supp.2d 132, 135 (S.D.N.Y. 2008) (when an order requires a party to pay a sum certain, a mere showing that the party was unable to pay the entire amount by the date specified is

2

insufficient to avoid a finding of contempt, but rather, when a party is absolutely unable to comply due to poverty or insolvency, inability to comply is a complete defense, but otherwise, the party must pay what he or she can).  Further, Chiplease must establish its inability to pay "clearly, plainly, and unmistakably." *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995) (in the case of failure to pay a court-ordered monetary penalty, the defendant must produce evidence of poverty or insolvency that prevent compliance). *See also Hicks v. Feiock*, 485 U.S. 624, 638 n. 9, 108 S.Ct. 1432, 1433 n. 9 (1988) ("Our precedents are clear . . . that punishment may not be imposed in a civil contempt proceeding when it is *clearly established* that the alleged contemnor is *unable* to comply with the terms of the order") (emphasis added).

As the above cited authorities make clear, a showing of a "good faith" alone is not sufficient to avoid sanctions.  To avoid a finding of contempt, Chiplease must demonstrate both absolute financial inability and good faith.  As discussed below, Chiplease has failed to set forth facts in its Response that, even if true, meet its burden on both of these requirements.

<u>**Point Two**</u>

Chiplease has failed to allege facts indicating that it made any effort to comply with the Court's orders, much less met its burden of demonstrating that it has acted in good faith.  First, Chiplease's continued reliance on the argument that it has complied with the Settlement Agreement and is not required to deposit $500,000 into an escrow account is misplaced.  It lost this argument before the Bankruptcy Court and this Court has already ruled that it was *not* likely to succeed on the merits of its appeal in this regard.  At this point in time, Chiplease has no reasonable basis upon which to believe that its interpretation of the Settlement Agreement was or is correct.

CHI 11549746.4

More importantly, however, is the fact that Chiplease's subjective beliefs are irrelevant. If an appellant's belief regarding the strength of its appeal was relevant, all matters would be stayed pending appeal. Similarly, if a litigant's belief regarding the correctness of a court order it refuses to comply with was relevant, then no litigant would ever be held in contempt for violating a court order. Of course, Chiplease's view is not the law, and it's "merits" argument should be disregarded by the Court. *Maness v. Meyers,* 419 U.S. 449, 458, 95 S.Ct. 584, 591 (1975) ("If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal."); *McComb v, Jacksonvilel Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499 (1949) (defendant's intent in committing  contempt is not material); *Alexander v. Chicago Park Dist.*, 927 F.2d 1014, 1025 (7th Cir. 1991) ("Parties must obey court orders regardless of their validity, unless the orders are stayed pending appeal. In effect, Cook's only reason for disobeying the order is that he believed it to be wrong. Even if that were true, Cook was obligated to obey the order or be held in contempt.").

Second, Chiplease has alleged no facts in its Response indicating that it has made *any* attempt to comply with this Court's orders, which undoubtedly is because no efforts have been made. For example, Chiplease does not claim that it made any effort to liquidate or borrower against any of its assets, or to obtain an unsecured loan from any of its affiliates. Mr. Greenblatt's affidavit states, in only the most conclusory fashion, that Chiplease's assets – which neither he nor Chiplease even bother to identify[2] – are "illiquid and have no ready market." Affidavit of Leon Greenblatt at ¶ 3. This self-serving and unsubstantiated statement is

---

[2] Such information is so fundamental to Chiplease's defense that the failure of Chiplease to provide it cannot be overlooked by this Court, especially given Mr. Greenblatt's testimony that Chiplease prepares financial statements, such as balance sheets and income statements and statements summarizing its sources and uses of cash. *See* 2/13/08 Tr. at pp. 26-27.

4

insufficient on its face to support Chiplease's defense[3] and serves only to underscore the fact that Chiplease and Mr. Greenblatt do not take this matter or the orders of this Court seriously. If they did and they had any legitimate basis to oppose a contempt finding, they would have set forth the facts supporting that defense in the Response.

Further, Chiplease's claim of good faith is belied by the fact that it has failed to pay *any* amount into escrow when it admittedly has approximately $150,000 in *net* monthly income, a not insignificant amount of money. *See* Transcript of Proceedings Before the Honorable Eugene R. Wedoff, dated February 13, 2008 ("2/13/08 Tr.") at pp. 14, 189 (relevant portions attached as **Exhibit A**). *See also* Deposition of Leon Greenblatt, dated January 28, 2008 ("Greenblatt Dep."), at pp. 24-26 (relevant portions attached as **Exhibit B**). The two bank statements attached to the Response show that Chiplease paid out approximately $335,000 in June and July 2008, but Chiplease does not explain where any of this money went.[4] This is a fundamental flaw in Chiplease's "good faith" and "reasonable efforts" defense.

In truth, Chiplease's assets are being used by Mr. Greenblatt to fund the litigation of Chiplease and its affiliates before this Court, the Bankruptcy Court and the state courts. *See* Greenblatt Dep. at pp. 24-25; Petition for Sanctions Against Gregory Jordan at pp. 5 and 7 and Appendices 4-9 (copy and copies of relevant appendices attached as **Exhibit C**). The irony –

---

[3] *Huber v. Marine Midland Bank,* 51 F.3d 5, 10 (2d 1995) ("The alleged contemnor bears the burden of producing evidence of his inability to comply. . . . Conclusory statements are inadequate to carry this burden."); *Dodd Ins. Services, Inc. v. Royal Ins. Co. of America,* 935 F.2d 1152, 1160 (10th Cir. 1991) (an unsupported claim regarding financial status is clearly insufficient). *United States ex rel. Thom,* 760 F.2d at 739, 740 (explaining that self-serving statements of financial hardship or indigence, without corroboration by third parties or financial records including tax returns, canceled checks, or bank statements, do not satisfy the burden of production).

[4] Mr. Greenblatt testified at trial that Chiplease's principal expense was his salary, which is $10,000 per month. 2/13/08 Tr. at p. 35. Thus, approximately $300,000 is unaccounted for.

CHI 11549746.4

and real travesty here – is that a significant portion of the money Chiplease pays for legal

services (and which was not paid into an escrow account as required by the orders of this Court)

relates to litigation over the alleged rights of Chiplease and its affiliates under the very same

Settlement Agreement it has breached by failing to pay the $500,000 into escrow.  In addition to

the instant appeal, examples of such litigation include:

- *Illinois Investment Trust No. 92-7163 v. American Grading Co.*, Case No. 07-3993 (7th Circuit).  Appeal by Illinois Investment Trust No. 92-7163 ("IIT"), Chiplease's designee and affiliate[5], relating to its alleged right pursuant to the settlement with RTC's bankruptcy estate and related designation of rights agreement (collectively, the "RTC Settlement") to take assignment of a contract between RTC and AGC.  IIT lost at both the Bankruptcy Court and District Court levels.

- *Chiplease, Inc. v. Steinberg, Chapter 7 Trustee of Resource Technology Corporation*, Case No. 07-1879 (7th Circuit).  Seventh Circuit recently affirmed this Court's decision affirming the Bankruptcy Court's denial of Chiplease's motion to compel the Chapter 7 Trustee under the RTC Settlement to seek to assign to Chiplease a contract between RTC and American Disposal Services, Inc.

- *In re Resource Technology Corp.*, Case No. 08-cv- 02425 (N.D. Ill.) (J. Kennelly) (consolidated with Case Nos. 08-cv-2426 and 08-cv-2428).  Appeal by IIT relating to its alleged right under the RTC Settlement to assignment of contracts between RTC and Allied Waste Industries, Inc., American Disposal Service of Illinois, Inc., Sangamon Valley Landfill, Inc., City of Peoria, Illinois and the County of Peoria, Illinois. IIT lost at the Bankruptcy Court level.

- *In re Resource Technology Corp.*, Case No. 99-B-35434 (Bank. N.D. Ill.) (J. Wedoff).  Since the RTC Settlement was approved, Chiplease, IIT and their affiliates have litigated numerous issues relating to the RTC Settlement, including their rights under the related designation of rights agreement and their obligation to pay the administrative expenses of the RTC estate.  In fact, Chiplease has been litigating the validity of over $20 million in Chapter 7 administrative claims filed by numerous parties against the estate for the past two years.

- *Henderson v. Congress Development Company*, Case No. 06-CH-1427 (Cook County, Illinois) (J. Hall).  Chiplease is currently attempting to intervene in this case and file a Complaint for Replevin against Congress based upon Chiplease's alleged property rights obtained pursuant to the RTC Settlement.

---

[5] Among other things, Chiplease is one of IIT's beneficiaries.  2/13/08 Tr. at p. 15.

CHI 11549746.4

- *Banco Panamericano, Inc. at al v. Resource Technology Corporation*, Case No. 05-CH-22712 (Cook County, Illinois) (J. Hall). Pursuant to a questionable "agreed" order, Chiplease and its affiliates caused a receiver to be appointed over certain personal property owned by RTC. On multiple occasions, Chiplease has unsuccessfully sought to expand the scope of the receivership, including, just recently, to include claims and causes of actions Chiplease allegedly acquired under the RTC Settlement.

- *Scattered Corporation v. Resource Technology Corporation*, Case No. 05-CH-18421 (Cook County, Illinois) (J. Hall). Another highly questionable receivership proceeding where Scattered Corporation, another Chiplease affiliate, is seeking to enlarge the scope of the receivership to include claims and causes of actions Scattered Corporation allegedly acquired under the RTC Settlement.

The $500,000 is not a fine or penalty – it is consideration required by the Settlement Agreement pursuant to which Chiplease has already received and continues to receive substantial benefits, including the right to designate contracts for assumption and assignment, all of RTC's property, including certain purported causes of action, and dismissal of several very significant litigation against Chiplease and its affiliates. Chiplease's failure to pay this consideration while at the same time reaping the benefits of the Settlement Agreement compound the egregiousness of its actions and warrant significant sanctions.

### Point Three

Chiplease has not demonstrated that it is insolvent or in any kind of financial distress. Indeed, just six months ago, Mr. Greenblatt testified that Chiplease had $15-16 million in assets at a trial before Judge Wedoff regarding whether IIT, its affiliate, met the requirements of section 365 of the Bankruptcy Code in connection with the proposed assignment of certain contracts. 2/13/08 Tr. at pp. 12, 28. *See also* Greenblatt Dep. at p. 24. As of February 2008, $1.2 million of those assets were "liquid." 2/13/08 Tr. at pp. 28-29, 35. Further, John Connolly and Mr. Greenblatt testified that Chiplease and its commonly-owned and controlled affiliate Scattered Corp. were prepared to loan $3 million to IIT. 2/13/08 Tr. at pp 14-15, 23-25; Transcript of Proceedings Before the Honorable Eugene R. Wedoff, dated February 12, 2008 ("2/12/08 Tr.")

7

at pp. 39-42, 189 (relevant portions attached as **Exhibit D**); Greenblatt Dep. at pp. 38-40.  In this regard, Mr. Greenblatt testified:

> Q.    What, if any, commitments has it [Chiplease] made to the trust as a lender under those agreements?
>
> A.    We agreed to loan up to 25 percent or other amount as we might agree to of the total amount.
>
> Q.    How would you fund that 25 percent?
>
> A.    Cash flow.
>
> Q.    Okay.  And have you reviewed the projections from Mr. Connolly regarding the timing of when the cash flow is needed?
>
> A.    Yes.
>
> Q.    Do you have any doubt that Chiplease would be able to meet its obligations?
>
> A.    No.
>
> Q.    How will it meet those obligations and coming up with whatever, a quarter, $3 million or 750,000?
>
> A.    We would just pay.
>
> Q.    Are you going to accumulate cash?
>
> A.    If necessary.

2/13//08 Tr. at p. 15.

According to Mr. Greenblatt, merely six months ago, Chiplease's assets were plentiful and readily available for loan to IIT.  In fact, according to Mr. Greenblatt and IIT's counsel, there was so much money available to IIT from Chiplease and its affiliates, that there was no question that IIT could meet all of the monetary obligations under the contracts IIT was seeking to assume.  *See* 2/12/08 Tr. at pp. 11, 39-42, 192-95, 204 ; 2/13/08 Tr. at pp. 188-91.  Chiplease would now have this Court believe that it is "absolutely" unable to access any funds to meet its

CH1 11549746.4

court-ordered obligation to deposit $500,000 into an escrow account.[6]  Chiplease and Mr. Greenblatt simply are not credible.

Further, the defense of inability to comply with a court order is not available where the contemnor has voluntarily created the incapacity. *Electrical Workers Pension Trust Fund of Local Union |58, IBEW v. Gary's Elec. Service Co.*, 340 F.3d 373, 383 (6th Cir. 2003) (holding that the "present inability to comply" defense to civil contempt requires that the contemnor show that he is not responsible for the present inability to pay); *In re Count Liberty, LLC*, 370 B.R. 259  (Bankr. C.D.Cal. 2007) (inability to comply with court order is not available as defense to civil contempt charge when person charged is responsible for inability to comply); *Roman v. Korson*, 307 F.Supp.2d 908 (W.D.Mich. 2004) (respondent cannot meet its burden of showing inability to comply by evidence that respondent has made itself incapable of compliance since self-induced impossibility is not valid defense); *Steffen v. Gray, Harris & Robinson, P.A.*, 283 F.Supp.2d 1272, 1282 (M.D.Fla. 2003) (inability to pay is not a defense if the contemnor created the inability); *S.E.C. v. Showalter*,  227 F.Supp.2d 110, 120 (D.D.C. 2002) (to the extent that a defendant's inability to pay is self-induced, it is not a defense to a finding of contempt).

Given that Chiplease was highly solvent just six months ago, any inability to pay $500,000 into escrow now is self-induced.  Indeed, discovery will demonstrate either (1) that Chiplease is solvent and it is not unable to comply with the Court's orders, or (2) it is insolvent because of the voluntary dissipation of its assets, including fraudulent transfers to, among other

---

[6] Chiplease was ordered by the Bankruptcy Court to deposit the $500,000 into an escrow account on June 17, 2008.  *See* Bk. Dkt. No. 4301.  Because Chiplease refused to agree to a form of order consistent with the Bankruptcy Court's ruling, an order reflecting the Bankruptcy Court's ruling was not entered until June 25, 2008.  *See* Bk. Dkt. No. 4318.  Thus, Chiplease has been on notice of its obligation to pay the $500,000 for well over two months and, apparently, has done absolutely nothing to try to comply with this obligation during this time.

things, pay for the legal services of its affiliates.  In either case, Chiplease has no defense to the instant contempt charge.

### Point Four

Chiplease flippantly asserts that "no party has been harmed by its inability to comply with the Order."  Response at ¶ 7.  Besides being irrelevant, this statement is dead wrong.  Congress, AGC and numerous other parties have been involved in litigation with Chiplease and its affiliates for over two years based upon their asserted rights under the Settlement Agreement.  As it turns out, Chiplease has materially breached the Settlement Agreement it is seeking to enforce against others and the benefits of which it continues to enjoy.

For example, under the Settlement Agreement, Chiplease is required to pay the Chapter 7 administrative expenses of the RTC bankruptcy estate.  Congress and AGC have defended their administrative expense claims against attack by Chiplease because they understood that there was $500,000 in escrow to secure Chiplease's payment of those claims, and they have incurred significant costs in doing so.  It is simply naïve to suggest that, given the litigation posture of these claims, denying Congress and AGC the security they are entitled under the Settlement Agreement does not constitute harm.

### Point Five

This Court should hold Chiplease and Mr. Greenblatt (*see* Point Seven, *infra*) in contempt without an evidentiary hearing.  Chiplease has failed to set forth any facts in its Response that, if true, would excuse its compliance with this Court's orders.  As a result of this complete failure to detail how it can meet its burden of proof, Chiplease should not be allowed to further waste the time and resources of the Court and the parties at an evidentiary hearing.

However, in the event the Court does conduct an evidentiary hearing, the parties should be allowed to conduct discovery into Chiplease's finances, asset transfers and alleged "good faith" efforts to comply with the Court's orders, including third party discovery.

### Point Six

In addition to monetary penalties, this Court should freeze all of Chiplease's and Mr. Greenblatt's assets until there is full compliance with the orders of this Court. This remedy is well within the Court's discretion (*see, e.g. Steffen,* 283 F.Supp.2d at 1282), and is clearly necessary to compel compliance in this instance.

### Point Seven

In addition to Chiplease, the Court should hold Mr. Greenblatt in contempt since, as the sole officer and director, he controls Chiplease and is personally responsible for Chiplease's noncompliance with the orders of this Court.

Because an order against a corporation will be ineffective if the corporation's agents cannot be held liable for its violation, courts have long held that corporate officials not expressly named in the order who have notice of the order are as culpable for a breach of that order as the corporation itself. *See, e.g., Wilson v. U.S.,* 221 U.S. 361, 376, 31 S.Ct. 538, 543 (1911) (A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt); *Gary's Elec. Serv.,* 340 F.3d at 383 ("[I]f a corporate officer avoids a court's order to the corporation by failing to take action or attempt compliance, 'they, no less than the corporation itself, are guilty of disobedience and may be punished for contempt.") (internal

quotation omitted); *NLRB v. Sequoia Dist. Council of Carpenters, AFL-CIO,* 568 F.2d 628, 633

(9th Cir. 1977) ("It can hardly be argued that the principal officers of a labor union are not legally

identified with it, and thus liable in contempt for disobeying an order directed to the union.").

While no court can make a decree binding upon the "world at large," a nonparty "may be

punished [if he] either abet[s] the defendant or [is] legally identified with him." *Alemite Mfg.*

*Corp. v. Staff,* 42 F.2d 832, 833 (2d Cir. 1930); *See also* Fed. R. Civ. P. 65(d) (Every ...

injunction ... is binding upon the parties to the action, their officers, agents . . . and upon those

persons in active concert or participation with them who receive actual notice of the order by

personal service or otherwise."); *Cent. States, Southeast and Southwest Areas Pension Fund v.*

*Wintz Props., Inc.,* 155 F.3d 868, 876 (7th Cir. 1998) (deciding that the company's president and

owner, a non-party to the lawsuit, also was subject to the injunction when the court's order was

directed at the company and its officers); *Chicago Truck Drivers v. Bhd. Labor Leasing,* 207

F.3d 500, 507 (8th Cir. 2000) (corporate officer can be bound by a court's payment orders even

when the "orders [make] no specific reference to him.") (quoting *Int'l Longshoremen's Ass'n v.*

*Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 75-76, 88 S.Ct. 201 (1967)); *International*

*Brotherhood of Electrical Workers, Local 474 v. Eagle Electric Co., Inc.,* 2007 WL 622504 *4-5

(W.D.Tenn. 2007) (corporate officers held in contempt for failing to cause corporation to pay

retirement funds pursuant to court injunction).

Thus, if an officer prevents compliance or fails to take action that is within his corporate

duty, the court may hold the officer in contempt of court. *Gary's Elec.,* 340 F.3d at 382. The

only requirement is a showing that the corporation did not comply with the order. For example,

in *Gary's Elec. Serv.,* the Sixth Circuit ruled that an owner of a company could be held in

contempt for the company's violations of a court order requiring the company to, among other

things, pay approximately $75,000 in fringe benefits contributions on behalf of the company's

employees. 340 F.3d at 377. Specifically, the Court held:

> Pipia, as an officer of the corporation and the one responsible for the corporation's affairs, was subject to the court's order just as the corporation itself was. Because Pipia either "prevent[ed] compliance or fail [ed] to take appropriate action within [his] power for the performance of the corporate duty," the district court had the authority to hold Pipia in contempt. The Funds only needed to show that Gary's Electric did not comply with the district court's judgment in order to meet their burden. That said, the Funds met their initial burden for a contempt finding against Pipia when they presented to the district court the previous order of the court affirming the LMC awards and Pipia's own deposition testimony admitting that he knew of the court's order yet failed to observe it. The Funds presented clear and convincing evidence-undisputed, even-that Pipia, the sole owner and officer of Gary's Electric, "with knowledge of the court's order," chose to violate the court's order by not making the required contributions to the Funds. Moreover, the district court's order was in effect because Gary's Electric did not file a supersedeas bond and because Gary's Electric did not obtain a stay of the district court's judgment pending appeal. Thus, because Pipia is bound by the district court's order directed at Gary's Electric and because the Funds presented evidence that no payments had been made although the payments were due, the district court improperly dismissed the petition to hold Pipia in contempt.

*Id.* at 382 (internal citations and footnote omitted). The Court went on to note that Pipia, the

corporate officer, failed to meet his burden of proof on his inability and good faith defense given

that, rather than make the payments required by the court's order, Pipia paid off all of the

corporation's other creditors and funneled the corporation's assets elsewhere. *Id.* at 383-84.

Here, there is no dispute that Chiplease violated the Court's orders and that Mr.

Greenblatt, who submitted an affidavit in connection with Chiplease's Response, was aware of

those orders and that he decided on behalf of Chiplease not to comply with them. When asked at

his deposition how Chiplease uses its income, Mr. Greenblatt responded, "However I want it to."

Greenblatt Dep. at p. 25. Further, the bank statements submitted by Chiplease with its Response

CH1 11549746.4

demonstrate without question that Chiplease and Mr. Greenblatt simply elected to pay other parties rather than comply with this Court's orders.  Under these circumstances, there are more than ample grounds to hold Mr. Greenblatt in contempt and impose sanctions upon him personally.

### Point Eight

Chiplease suggests that it might comply with the Court's orders by September 15, 2008. (Response at p. 7).  Even if it does, Chiplease and Mr. Greenblatt should still be sanctioned because:  (i) Chiplease could have at least partially complied with the Court's orders earlier; (ii) Chiplease would not have complied with the Court's orders at all unless the Rule to Show Cause was filed and it was compelled to do so; and (iii) the Court and the parties have expended time and resources forcing Chiplease to do what it should have done voluntarily and on a timely basis in the first instance.

[Intentionally left blank]

## CONCLUSION

For the foregoing reasons, Congress and AGC respectfully request that the Court (1) find Chiplease and Mr. Greenblatt to be in contempt of this Court's orders, impose monetary sanctions, and freeze all of their assets until there is full compliance with the orders of this Court, including payment of any sanctions, (2) to the extent the Court determines to conduct an evidentiary hearing on the contempt allegations, authorize the parties to conduct discovery, including third-party discovery, and (3) grant such further relief as is appropriate under the circumstances.

DATED:  August 29, 2008

Respectfully submitted,

**AMERICAN GRADING CO. and CONGRESS DEVELOPMENT COMPANY**

By:   /s/ Sara E. Lorber
　　　　　One of Their Attorneys

Philip L. Comella
Sara E. Lorber
SEYFARTH SHAW LLP
131 South Dearborn Street
Chicago, Illinois  60603
Tel. (312) 460-5000
Fax: (312) 460-7000
Email: pcomella@seyfarth.com
　　　　slorber@seyfarth.com

## CERTIFICATE OF SERVICE

I, Sara E. Lorber, an attorney, do hereby certify that I have caused a true and correct copy of the foregoing document to be served by U.S. Mail this 29th day of August, 2008, upon:

> Barry A. Chatz
> George P Apostolides
> Arnstein & Lehr LLP
> 120 South Riverside Plaza
> Suite 1200
> Chicago, IL  60606
>
> Louis D. Bernstein
> Colleen E. McManus
> Much Shelist Denenberg Ament & Rubenstein, P.C.
> 191 N. Wacker Drive, Suite 1800
> Chicago, IL 60606

/s/ Sara E. Lorber

16

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Resource Technology Corporation,)　No. 99 B 35434
　　　　　　　　　　　　　　　　　)　Chicago, Illinois
　　　　　　　　　　　　　　　　　)　9:30 a.m.
　　　　　　　　　　　Debtor.　　　)　February 13, 2008


TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE EUGENE R. WEDOFF


APPEARANCES:


For the Trustee:　　　　　　Mr. George Apostolides;


For IIT:　　　　　　　　　　Mr. Gregory Jordan;
　　　　　　　　　　　　　　Mr. Peter Schmidt;

For Allied:　　　　　　　　Mr. David Bohan;
　　　　　　　　　　　　　　Mr. Robert O'Meara;

For the City and County
of Peoria:　　　　　　　　　Ms. Linda Kujaca;



Court Reporter:　　　　　　Amy Doolin, CSR, RPR
　　　　　　　　　　　　　　U.S. Courthouse
　　　　　　　　　　　　　　219 South Dearborn
　　　　　　　　　　　　　　Room 661
　　　　　　　　　　　　　　Chicago, IL  60604.

```
 1                    I N D E X

 2

 3

 4   Witness:          DX      CX      REDX     RECX

 5

 6   Leon Greenblatt    10      23       48

 7   Patrick Sloan      54      91      106

 8   Michael Reed      123     167      176

 9                     165

10   John Connolly     177

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      Q      And can you tell me whether it has been a

2  lender since at least 1999 or not?

3      A      Yes.

4      Q      Okay.  And can you tell me whether it was a

5  lender to Resource Technology Corporation?

6      A      It was.

7      Q      And at the time of the filing of the case,

8  was it, along with you and Banco Panamericana, the

9  sole secured lender?

10     A      Yes.

11     Q      Okay.  Has it been a lessor since the year

12  2000 or not?

13     A      Yes.

14     Q      Okay.  To whom is Chiplease a lessor?

15     A      Chiplease is a lessor to dry cleaning

16  shops.

17     Q      Okay.  How long has it been a lessor to dry

18  cleaning shops?

19     A      Since its inception.

20     Q      How long has it -- I'm sorry.

21            Approximately how much are its current

22  assets?

23     A      About 15, 16 million.

24     Q      Now, yesterday in court Mr. Jahelka

25  testified with regard to a lawsuit relating to the

1        Q       Okay.  And do you know what the status of

2    those entities are at the current time?

3        A       They filed Chapter 7.

4        Q       Okay.  Have you -- has 401 Dearborn owners

5    ever heard from the trustee in their cases?

6        A       Yes.

7        Q       And what was the purpose of that

8    communication?

9        A       They offered to settle the specific

10   performance suit for $10,000.

11       Q       Okay.  Is that acceptable to the owners of

12   the 401 South Dearborn property?

13       A       No.  We are just going to wait the 60 days.

14       Q       Okay.  Approximately how much each month

15   does Chiplease receive from its loans and leases?

16       A       $150,000.

17       Q       Okay.  And after expenses, what's the net

18   amount available to Chiplease to lend or what's

19   available after expenses?

20       A       That was after expenses.

21       Q       Oh, okay, $150,000 a month?

22       A       Yes.

23       Q       It's my understanding that Chiplease is a

24   party to a loan agreement with the trust; is that

25   correct?

1      A    Yes.

2      Q    What, if any, commitments has it made to

3    the trust as a lender under those agreements?

4      A    We agreed to loan up to 25 percent or other

5    amount as we might agree to of the total amount.

6      Q    How would you fund that 25 percent?

7      A    Cash flow.

8      Q    Okay.  And have you reviewed the

9    projections from Mr. Connolly regarding the timing of

10   when the cash flow is needed?

11     A    Yes.

12     Q    Do you have any doubt that Chiplease would

13   be able to meet its obligations?

14     A    No.

15     Q    How will it meet those obligations and

16   coming up with whatever, a quarter, $3 million or

17   750,000?

18     A    We would just pay.

19     Q    Are you going to accumulate cash?

20     A    If necessary.

21     Q    Okay.  Now, Chiplease, when did it become a

22   beneficiary of the Illinois Investment Trust?

23     A    A year or two ago.  I don't remember

24   exactly.

25     Q    Would it have been in August '06?

1      A      Its greenhouse gas credits and its electric

2   revenue.

3      Q      The electric revenue from these sites?

4      A      Yes.

5      Q      Now, it's my understanding that the

6   renewable energy credits from these sites are very

7   minimal; is that correct?

8      A      I have no idea.

9      Q      You've never investigated that?

10     A      I don't recall.

11     Q      Okay.  Mr. Greenblatt, in the event that

12   these contracts are assigned, does Chiplease or do

13   you anticipate having any role in the operation of

14   the gas plants?

15     A      No.

16     Q      Does Chiplease or you have any interest in

17   making or advising on any operational decisions?

18     A      No.

19                  MR. JORDAN:  Thank you.  Pass the

20   witness.

21                  CROSS-EXAMINATION

22   BY MR. BOHAN:

23     Q      Mr. Greenblatt, did you testify on direct

24   examination that Chiplease's obligation to fund the

25   loan to IIT was limited by a 25 percent participation

1   in that loan?

2       A    I said that it was 25 percent or such other

3   amount as we would agree to.

4       Q    Well, there's been no agreement between

5   Chiplease and Scattered as to which of the two

6   companies will contribute which portion of the loan,

7   true?

8       A    That's not my understanding.

9       Q    Isn't that what you told me when I took

10  your deposition last week?

11      A    That was last week and this is now.

12      Q    Well, is there an agreement?  Has Chiplease

13  entered into an agreement with Scattered in the last

14  seven days regarding the portion of the loan that

15  each of the two would contribute?

16      A    Yes.

17      Q    All right.  And what's the agreement?

18      A    Twenty-five percent or such other amount as

19  the two parties may agree.

20      Q    Is that agreement between Chiplease and

21  Scattered memorialized in any document?

22      A    I believe so.

23      Q    Who negotiated it on behalf of Chiplease?

24      A    I did.

25      Q    Who negotiated it on behalf of Scattered?

1       A      Mr. Jahelka.

2       Q      When?

3       A      In the last week.

4       Q      You signed an agreement with Scattered by

5    which Chiplease is on the hook for no more than

6    25 percent of the loan unless otherwise agreed?

7       A      I believe the agreement says that we would

8    do 25 percent or such other amount as we would agree

9    to.

10                  MR. BOHAN:  Your Honor, I have to move

11   to strike that testimony, because we've made requests

12   for those document, as you can imagine, from the

13   very -- you know, for the last several months.  And

14   we have no -- we have never been provided any updated

15   agreement between Chiplease and Scattered regarding

16   the fundamental question who is going to fund this

17   trust.  It seems --

18                  THE COURT:  Do you have a copy of this

19   document?

20                  MR. JORDAN:  I don't think there's a

21   document.  I don't think he said there's a document,

22   and I haven't seen one, if there is.

23                  THE WITNESS:  There is a loan

24   agreement.

25                  MR. JORDAN:  Oh, it's in the loan --

1                I think Mr. Greenblatt is mistaken.

2                THE COURT:  Well, I don't want to hear

3  your testimony on a subject like that, Mr. Jordan.  I

4  simply asked if you had a document and the answer to

5  that question should have been no.

6                MR. JORDAN:  It was no.

7                THE COURT:  Without an elaboration

8  suggesting that the witness might want to change his

9  testimony.

10               MR. JORDAN:  Your Honor -- sorry.

11               THE COURT:  That's really very

12  problematic as far as I am concerned.

13               In any event, I am not going to strike

14  the testimony.  You can ask another question.

15               MR. BOHAN:  I will.  Thank you, Your

16  Honor.

17  BY MR. BOHAN:

18     Q    Does Chiplease prepare financial

19  statements?

20     A    Yes.

21     Q    Does Chiplease have a current balance

22  sheet?

23     A    Reasonably current.

24     Q    Does it have a current income statement?

25     A    Yes.

1      Q      How about a statement summarizing the

2   sources and uses of its cash?

3      A      Yes.

4      Q      How current are those financial statements?

5      A      Either through mid -- the third quarter of

6   last year.

7      Q      The third calendar quarter 2007?

8      A      Yes.

9      Q      All right.  What is your relationship with

10   Rumplestiltskin Corporation?

11      A      I am believe I'm the 50 percent

12   shareholder.

13      Q      Who owns the other 50 percent?

14      A      Mr. Jahelka, and I think Mr. Nichols'

15   family partnership.

16      Q      Are you also a director of Rumplestiltskin?

17      A      I may be.  I don't recall.

18      Q      Are you an officer of that company?

19      A      I don't actually recall, but I might be.

20      Q      Is it the sole owner of RTC?

21      A      Yes.

22      Q      When Chiplease negotiated its loan to RTC,

23   who negotiated on behalf of Chiplease?

24      A      I would have.

25      Q      Who negotiated on behalf of RTC?

1      A      I have no recollection.

2      Q      Well, what role, if any, did you play in

3   the approval by RTC of that loan agreement?

4      A      Which loan agreement?

5      Q      The one you testified to on direct

6   examination, the very first loan that Chiplease

7   entered into with RTC.

8      A      I have no recollection.

9      Q      Did you say Chiplease has current assets of

10   15 to $16 million?

11      A      Yes.

12      Q      What do you mean by current assets?

13      A      Assets that it has now.

14      Q      Okay.  So let me ask you the question:  Are

15   you including then lease payments receivable as a

16   current asset?

17      A      I am including all of the assets that it

18   currently has.

19      Q      Does that include obligations to Chiplease

20   under its leases to dry cleaning companies?

21      A      Yes.

22      Q      All right.  Well, what are Chiplease's

23   current liquid assets?

24      A      About $1.2 million.

25      Q      And that's cash or marketable securities?

1     A     Yes.

2     Q     Chiplease has obligated itself in this

3 bankruptcy proceeding, has it not, to pay the

4 operating -- the Chapter 7 operating expenses of the

5 debtor beyond $150,000, correct?

6     A     Yes.

7     Q     And how much has Chiplease paid pursuant to

8 that obligation?

9     A     I have no idea.

10     Q     That's an ongoing obligation of Chiplease,

11 correct?

12     A     To the extent there are operating expenses,

13 yes.

14     Q     And is it reflected -- is that obligation

15 reflected as a liability on Chiplease's balance

16 sheet?

17     A     No, because we don't believe there is any

18 further operating expenses of something that's

19 disposed of all its assets.

20     Q     So there is no -- so Chiplease has no

21 reserve or created no allowance for the payment of

22 Chapter 7 operating expenses beyond the $150,000 that

23 were the responsibility of the trustee or debtor?

24     A     Chiplease has not reserved anything for any

25 further expenses because it doesn't believe there are

Page 35

1    Q    And what's the market value?

2    A    $40,000.

3    Q    As of what date did Chiplease have cash or

4    cash equivalents in the amount of $1.2 million?

5    A    Right now.

6    Q    The family trust that owns Chiplease owns

7    all of Banco Panamericana, correct?

8              MR. JORDAN:  Objection.  Relevance,

9    Your Honor.  Banco Panamericana is not a lender here.

10              THE COURT:  It's overruled.

11              THE WITNESS:  What's your question?

12    BY MR. BOHAN:

13    Q    The entity or entities that own Chiplease,

14    own all of the shares of Chiplease, also own all the

15    outstanding shares of Banco Panamericana?

16    A    Yes.

17    Q    What is your salary at Chiplease?

18    A    It varies, but I generally get about

19    $10,000 a month.

20    Q    Is your salary Chiplease's only expense?

21    A    Probably not, but it is the major portion

22    of it.

23    Q    Now, as of January 28th, Chiplease had on

24    hand approximately a hundred thousand dollars in

25    cash, correct?

1    so, and then it had another quarter like that, at

2    some point Citicorp could fail.

3                    But what we have today is we have an

4    active corporation which is Scattered Corporation,

5    which is getting -- has a right to get $700,000 a

6    month, plus it only has to come up with a portion of

7    that money this year, even though Mr. Jahelka said he

8    was willing to come up with the hundred percent, the

9    $3 million.

10                    And Mr. Greenblatt, who has the

11   million dollars from Sugar Loaf, whatever they are,

12   and I really have no idea who they are, he can come

13   up with the monies this year, which are $1,250,000.

14   Between them they have far in excess of capacity.  In

15   addition to which -- now, I don't know that Scattered

16   Corporation could sell the 401 South Dearborn

17   property tomorrow.  But since the next time that

18   money comes up it is owing is 2010, it is almost

19   unbelievable to think that an office building in

20   Chicago could not be sold in two years, on top of the

21   $700,000 a month that Scattered is getting, and in a

22   market in which energy prices are rising.

23                    And, frankly, since they are not

24   making any more of it, there is no reason to think

25   that energy prices are going to decline any time

1    soon.  And there is no testimony to hear to indicate

2    that there is any reason to question the cash flows

3    of Scattered Corporation or Chiplease's ability.

4                    Mr. Greenblatt testified that there is

5    $150,000 a month clear that is coming out of

6    Chiplease after expenses.  And between those things

7    that -- you know, that adds up to some serious money.

8    And on top of that, Chiplease has lent substantial

9    sums of money to RTC over the years such that its

10    ability to operate as a lender has been shown.

11                    THE COURT:  Okay.  Let me just point

12    out that the best security you're offering to the

13    counter-parties to these agreements that IIT will

14    have the money that is needed to comply with IIT's

15    obligations is the unsecured promise of Chiplease and

16    Scattered Corporation to honor a loan commitment.

17    That's the security.

18                    There is no lien on the property that

19    you referred to.  There is no guarantee that if that

20    property is sold that the funds will remain in

21    Scattered Corporation or Chiplease.  And there is no

22    opportunity, as I can see, for -- or at best a

23    lawsuit under a third-party beneficiary theory when

24    they are not a named third-party beneficiary in the

25    agreement.

1          So although you're very confident that

2     would be successful, they might reasonably be less

3     confident.  Ordinarily third-party beneficiaries are

4     named in the agreements that they seek to enforce as

5     third-party beneficiaries.  Now, it may not be always

6     the case, but it certainly would have given them a

7     great deal more comfort if they had been named.

8          But beyond that, it is completely

9     unsecured.  They are relying on an unsecured promise

10    by two corporations that are not publicly held, have

11    no documentation that's been produced here as to what

12    their financial circumstances are.  We have only the

13    testimony of two individuals as to what their net

14    worth and ability to make payments are.

15         MR. JORDAN:  And I'm sure that in the

16    two years that Allied and two years that Peoria has

17    had to investigate these people and these things and

18    the time that has passed, that if they had

19    information to rebut the fact that Scattered

20    Corporation had the ability, they would have brought

21    that forward.

22         And if they had the ability, not

23    just -- we are talking about Allied and Chiplease,

24    and we're talking about somebody who has been in a

25    case almost since the beginning and has been dealing

1    with Chiplease since then.  If they have something

2    that could show Chiplease's inability to act as a

3    lender, I would imagine that they would have found

4    that and they would have brought that forward in this

5    trial.

6                   It is rebutted, their ability to

7    obtain those monies.  Now, I can't do -- you know, I

8    don't know how anyone can do more than provide

9    unrebutted testimony as to a party's ability --

10                  THE COURT:  Let me make a suggestion

11   as to how someone could do more.  Someone could have

12   an entity proposed to be the counter-party to these

13   agreements that would have sufficient capital of its

14   own to comply with the agreements, an entity that has

15   some track record of generating a profit in its

16   business operations.

17                  Instead, we have a shell, the only

18   assets of which will be these contracts and the loan

19   agreement that they have with Scattered and with

20   Chiplease.  That's it.  There is no other security

21   here.  Isn't that right?

22                  MR. JORDAN:  Are you referring to the

23   trust?

24                  THE COURT:  I am talking about IIT.

25   It's a shell containing only the agreements sought to

# EXHIBIT B

Page 1

1              IN THE UNITED STATES BANKRUPTCY COURT

2                  NORTHERN DISTRICT OF ILLINOIS

3                       EASTERN DIVISION

4

5    In Re:                    )  Chapter 7 Bankruptcy

6    RESOURCE TECHNOLOGY        )  Case No. 99 B 35434

7    CORPORATION,              )  Hon. Eugene Wedoff

8              Debtor.         )

9

10

11           The videotaped 30(b)(6) deposition of

12   CHIPLEASE, INC. and deposition of LEON A.

13   GREENBLATT, III, called for examination, taken

14   pursuant to the Federal Rules of Civil Procedure of

15   the United States District Courts pertaining to the

16   taking of depositions, taken before SUSAN K. TODAY,

17   C.S.R. No. 84-2212, a Notary Public within and for

18   the County of DuPage, State of Illinois, and a

19   Certified Shorthand Reporter of said state, at

20   Suite 4000, 10 South Wacker Drive, Chicago,

21   Illinois, on the 28th day of January, A.D. 2008,

22   commencing at 9:35 a.m.

23

24

LEON A. GREENBLATT, III, JANUARY 28, 2008
30(b)(6) deposition of CHIPLEASE, INC.

Page 14

1    MR. JORDAN:  It may be on the list, David.
2  That doesn't make it relevant or --
3    MR. BOHAN:  No, but if you questioned its
4  relevance, the proper response under the federal
5  rules would have been to file an objection to the
6  notice of deposition, not to wait until the
7  deposition, interpose an objection based on
8  relevance then, and ask the witness not to answer.
9    MR. JORDAN:  I didn't ask him not to.
10 BY THE WITNESS:
11   A.   I have looked at No. 1 of Schedule A,
12 and it says, "The assignment, transfer, sale or
13 designation by Chiplease to the Illinois Investment
14 Trust No. 92-7163" -- in parens "the Trust" -- "of
15 any contracts, rights or other property purchased
16 by Scattered and/or Chiplease pursuant to the
17 Designation Rights Agreement relating to the
18 proposed assignment of RTC contracts involving the
19 Sangamon, Bloomington, Litchfield, and Peoria
20 landfills, including any consideration paid for
21 such designations."
22   I don't understand --
23   MR. JORDAN:  Actually, I think you couldn't
24 find it in any of those.

Page 15

1  BY MR. BOHAN:
2    Q.   Look at No. 2.
3    MR. JORDAN:  Chiplease --
4    MR. BOHAN:  Mr. Jordan, I'll conduct the
5  deposition, please.
6    MR. JORDAN:  Please don't get upset.
7  BY MR. BOHAN:
8    Q.   Look at No. 2, Mr. Greenblatt, and let's
9  talk for a moment about Chiplease's affiliates.
10 Does Chiplease have any affiliate companies?
11   MR. JORDAN:  Objection.
12 BY THE WITNESS:
13   A.   What's your definition of an affiliate?
14 It says, No. 2, "Chiplease's corporate
15 organization, including the identity of its
16 officers, directors, shareholders and employees,
17 and the identity of any of its subsidiaries,
18 parents, affiliates or partners."
19 BY MR. BOHAN:
20   Q.   Does Chiplease have any affiliates?
21   A.   What's an affiliate?
22   Q.   What do you understand the word to mean?
23   A.   I don't know exactly.  You will have to
24 explain it to me.

Page 16

1    Q.   Are there any business entities that are
2  under common control with Chiplease?
3    A.   What do you mean by "control"?
4    Q.   Well, are there any -- I asked you the
5  question earlier.  I will get back to it.  Does the
6  family trust that is Chiplease's sole shareholder
7  own stock in any other company?
8    A.   Yes.
9    MR. JORDAN:  Objection.
10 BY MR. BOHAN:
11   Q.   What companies does it hold?
12   MR. JORDAN:  Objection; relevance, financial
13 privacy.
14   You can answer.  I don't see it in
15 there.  It has to do with Chiplease's affiliates,
16 not with the shareholders of Chiplease's
17 affiliates.
18   MR. BOHAN:  Companies that are under common
19 control are affiliates.  It's a term that's
20 commonly used in the business world.  It's also a
21 defined term in the Securities Act of 1933 and
22 Securities Exchange Act of 1934.  And as a result,
23 I'm entitled to inquire of companies that are under
24 common control with Chiplease as controlling

Page 17

1  parties.
2  BY THE WITNESS:
3    A.   We are not subject to the Securities Act
4  of '33 or '34.  And the definitions in the
5  Securities Act of '33 and '34 are specifically
6  restricted to the companies which fall under the
7  acts.
8  BY MR. BOHAN:
9    Q.   I am using those definitions for
10 purposes of this deposition today whether you are
11 subject to their control or not.
12   A.   Well, I don't know what the definitions
13 are in those acts.
14   Q.   I have just told you how I want you to
15 construe the word "affiliate" for purposes of this
16 deposition.
17   A.   Okay.  Well, I am not going to answer
18 that on the advice of my attorney.
19   MR. JORDAN:  I am not telling you not to
20 answer.  I just don't think it's relevant to
21 anything.
22 BY MR. BOHAN:
23   Q.   Are you going to answer the question or
24 not?

5 (Pages 14 to 17)

LEON A. GREENBLATT, III, JANUARY 28, 2008
30(b)(6) deposition of CHIPLEASE, INC.

Page 22

1 party to an agreement which is called a joint
2 venture.
3     Q.   Does Chiplease have any -- I'm sorry.
4 Before the filing of RTC's bankruptcy did Chiplease
5 have any business, commercial, financial
6 relationship, with RTC?
7     A.   Yes.
8     Q.   What was its relationship with RTC?
9     A.   It was a lender.
10     Q.   For how long had it been a lender?
11     A.   I don't recall exactly.
12     Q.   How much had it loaned to RTC?
13     A.   I don't know the numbers. It was a
14 participant with the other lenders to the tune of
15 20-some million dollars.
16     Q.   And you don't know what Chiplease's
17 portion of the 20 million was?
18     A.   No, not to date.
19     Q.   What, if anything, secured Chiplease's
20 loans to RTC?
21     A.   All of the assets of the company.
22     Q.   Except other than as lender did
23 Chiplease have any relationship to RTC?
24     MR. JORDAN: Objection; vague.

Page 23

1 BY THE WITNESS:
2     A.   No, I don't believe so.
3 BY MR. BOHAN:
4     Q.   What is the nature of Chiplease's
5 business?
6     A.   Chiplease is a lender and lessor.
7     MR. BOHAN: Could you read it back, please?
8       (WHEREUPON, the record was read
9       by the reporter as requested.)
10 BY MR. BOHAN:
11     Q.   To whom other than RTC is Chiplease a
12 lender?
13     A.   I don't know. I can't count the number
14 of parties and give you an exhaustive list.
15     Q.   Can you identify any of the other
16 parties that have borrowed from Chiplease?
17     A.   No. I don't recall.
18     Q.   To whom is Chiplease a lessor?
19     A.   To various dry cleaning companies.
20     Q.   How many?
21     A.   I have no idea.
22     Q.   Approximately.
23     A.   A hundred.
24     Q.   For how long has Chiplease been a lessor

Page 24

1 to dry cleaning companies?
2     A.   Since its inception.
3     Q.   Approximately how many businesses or
4 individuals have borrowed money from Chiplease?
5     A.   I have no idea.
6     Q.   Can you approximate the number for me?
7     A.   Somewhere between a hundred and a
8 thousand.
9     Q.   What are Chiplease's current assets?
10     A.   About $15 million.
11     Q.   15?
12     A.   15.
13     Q.   Consisting of what?
14     A.   Loans and leases.
15     Q.   Does Chiplease have any current liquid
16 assets?
17     A.   Yes.
18     Q.   What are they?
19     A.   Whatever comes in every month from the
20 loans and leases.
21     Q.   Approximately how much comes in each
22 month on Chiplease's loans and leases?
23     A.   Approximately $165,000.
24     Q.   Does Chiplease have any cash on hand?

Page 25

1     A.   I don't know. I haven't looked.
2     Q.   Does Chiplease own any marketable
3 securities?
4     A.   No.
5     Q.   Does Chiplease own any assets other than
6 its loans and leases?
7     A.   It may, but if it has, it doesn't -- it
8 has written them off.
9     Q.   What are Chiplease's expenses?
10     A.   My salary.
11     Q.   And how does Chiplease make use of the
12 cash it receives on a monthly basis other than to
13 pay you?
14     A.   However I want it to.
15     Q.   And how have you wanted it to recently,
16 Mr. Greenblatt?
17     A.   I wanted it to use it to fight with
18 Allied.
19     Q.   Are there any other recent uses of
20 Chiplease's cash other than paying your salary and
21 fighting with Allied?
22     A.   New leases of dry cleaning equipment.
23     Q.   Pardon me?
24     A.   New leases or participating in leases of

7 (Pages 22 to 25)

LEON A. GREENBLATT, III, JANUARY 28, 2008
30(b)(6) deposition of CHIPLEASE, INC.

Page 26

1  dry cleaning equipment.
2       Q.    Does Chiplease have cash on hand?
3       A.    Yes.
4       Q.    In what amount?
5       A.    Generally it's about a $100,000 cash
6  balance, but I can't tell you exactly what it has
7  on hand. I haven't checked lately.
8       Q.    Does Chiplease have a treasurer?
9       A.    No.
10      Q.    Does it have a financial officer?
11      A.    I don't know what you mean by a
12 financial officer. It has the president and the
13 secretary, who is myself, who perform all duties
14 for the corporation.
15      Q.    Where is its place of business?
16      A.    I beg your pardon?
17      Q.    Where does it conduct its business?
18      A.    330 South Wells.
19      Q.    Does it own its space there?
20      A.    No.
21      Q.    From whom does it lease?
22      A.    I believe it has a sublease from Banco
23 PanAmericano.
24            And I wouldn't say that it has a

Page 27

1  sublease. It occupies a space of Banco
2  PanAmericano.
3       Q.    Does it pay rent for that space?
4       A.    No.
5       Q.    Has it ever?
6       A.    I don't know.
7       Q.    Is Chiplease a beneficiary of the
8  Illinois Investment Trust No. 92-7163?
9       A.    I would have to look at the document.
10      Q.    Which document is that?
11      A.    The trust agreement.
12      MR. BOHAN: May I have the trust agreement
13 marked as Deposition Exhibit 2, please?
14            (WHEREUPON, a certain document was
15            marked Greenblatt Deposition
16            Exhibit No. 2, for identification,
17            as of 1/28/08.)
18            (WHEREUPON, discussion was had off
19            the record between the witness and
20            his counsel.)
21      MR. JORDAN: Are we on or off, David?
22      MR. BOHAN: We are on.
23      MR. JORDAN: Okay.
24

Page 28

1  BY THE WITNESS:
2       A.    This is a 1992 trust agreement. I
3  believe this agreement was amended. I have no
4  idea.
5       MR. BOHAN: May I have marked as Deposition
6  Exhibit 3 a document entitled "Memorandum of
7  Beneficiary Designation"?
8       MR. JORDAN: Just Deposition Exhibit 3, not
9  Greenblatt Deposition Exhibit 3 or --
10      MR. BOHAN: Greenblatt Deposition Exhibit 3.
11      MR. JORDAN: Okay.
12            (WHEREUPON, a certain document was
13            marked Greenblatt Deposition
14            Exhibit No. 3, for identification,
15            as of 1/28/08.)
16 BY MR. BOHAN:
17      Q.    Is Chiplease a beneficiary of Illinois
18 Investment Trust No. 92-7163?
19      A.    Yes.
20      Q.    When did Chiplease become a beneficiary
21 of the trust?
22      A.    I don't recall. Whenever it says on
23 Exhibit 3.
24      Q.    So if it says on Exhibit 3 August 15,

Page 29

1  2006, is that consistent with your recollection of
2  when Chiplease became a beneficiary of the trust?
3       A.    I have no recollection, so it's
4  consistent with my lack of recollection.
5       Q.    Who determined that Chiplease would be
6  added as a beneficiary to the trust?
7       A.    I don't recall.
8       Q.    What role, if any, did you play,
9  Mr. Greenblatt, in having Chiplease added as a
10 beneficiary to Illinois Investment Trust?
11      A.    I have no recollection.
12      Q.    For what purpose was Chiplease added as
13 a beneficiary to the trust?
14      A.    I don't recall.
15      Q.    Did you as the director -- the sole
16 director of Chiplease approve Chiplease's being
17 added as a beneficiary to Illinois Investment Trust
18 No. 92-7163?
19      A.    Presumably but I don't recall the event.
20      Q.    Do you recall whose idea it was that
21 Chiplease would be a beneficiary of the trust?
22      MR. JORDAN: Objection; asked and answered.
23 BY THE WITNESS:
24      A.    As I said before, I have really no

8 (Pages 26 to 29)

LEON A. GREENBLATT, III, JANUARY 28, 2008
30(b)(6) deposition of CHIPLEASE, INC.

Page 34

1   or leases expire or come due?
2       A.   They are five-year loans or leases.
3       Q.   When were the loans extended?
4       A.   Oh, between probably seven or eight
5   years ago and two or three years ago.
6       Q.   When were the leases entered into?
7       A.   The same time period.
8       Q.   What are the revenues that Chiplease
9   derives from those loans or leases involving Texas
10  generation facilities?
11      A.   I haven't disaggregated them from the
12  gross loans or leases.  I don't know exactly.
13      Q.   What portion of Chiplease's revenue do
14  they account for?
15      A.   I haven't actually disaggregated them
16  from the general loans and leases, so I have no
17  idea.
18      Q.   Other than loans or leases involving
19  Texas power generation facilities what loans or
20  leases is Chiplease a party to?
21      A.   Various dry cleaning equipment.
22      Q.   What role, if any, did Chiplease play in
23  designating Illinois Investment Trust No. 92-7163
24  as the assignee of the gas contracts that are the

Page 35

1   subject of the Designation Rights Agreement?
2       A.   I am not going to answer that.  That's a
3   matter of attorney-client privileged
4   communications.
5       Q.   My question is not -- doesn't deal with
6   the subject of conversations Chiplease may have had
7   with its counsel.  My question is simply what role
8   did Chiplease play in determining that Illinois
9   Investment Trust No. 92-7163 would be designated as
10  the assignee of those contracts.
11      A.   We have made no decisions other than in
12  consultation with our attorneys and in
13  communication with them, and I am -- as a matter of
14  privilege, I am not going to answer the question.
15      Q.   Well, did Chiplease play a role in
16  designating Illinois Investment Trust as the
17  assignee of those contracts?
18      A.   Yes.
19      Q.   Who was Chiplease's attorney at the
20  time?
21      A.   Mr. Jordan.
22      Q.   When was that decision made?
23      A.   I don't recall exactly.
24      Q.   Did any consideration flow to Chiplease

Page 36

1   from Illinois Investment Trust as a result of
2   Illinois Investment Trust being designated the
3   potential assignee of the Allied gas contracts?
4       MR. JORDAN:  Objection; calls for a legal
5   conclusion.
6           You can answer.
7   BY THE WITNESS:
8       A.   I don't understand your question.  It's
9   too legalese for me.
10  BY MR. BOHAN:
11      Q.   Did -- well, let me see if I can
12  simplify it for you.  Did anything of value flow
13  from Illinois Investment Trust to Chiplease in
14  return for Chiplease's decision to designate
15  Illinois Investment Trust as the potential assignee
16  of the gas contracts involving the Sangamon,
17  Bloomington, and Litchfield landfill sites?
18      A.   I don't recall exactly, but I know that
19  we became a beneficiary of the trust.
20      Q.   Has Chiplease loaned any money to
21  Illinois Investment Trust?
22      A.   Have any funds been advanced as of yet?
23      Q.   Yes.
24      A.   No, they have not.

Page 37

1       Q.   Does Chiplease -- is Chiplease a party
2   to any agreements with Scattered Corporation?
3       A.   I believe we have agreed to loan money
4   to the investment trust.
5       Q.   Other than that agreement, is Chiplease
6   a party to any agreements with Scattered?
7       A.   No, I don't think so.
8       Q.   Is Chiplease a party to any lawsuit?
9       A.   Not to my knowledge.
10      Q.   Or regulatory proceeding?
11      A.   Chiplease has never been regulated.
12      Q.   So is the answer no?
13      A.   That's correct.
14      Q.   Is Chiplease to your knowledge the
15  subject of any governmental investigation?
16      A.   No.
17      MR. JORDAN:  Objection; relevance.
18  BY THE WITNESS:
19      A.   Not to my --
20      MR. JORDAN:  Go ahead.
21      THE WITNESS:  Did you want to say something?
22      MR. JORDAN:  I was going to say I am not sure
23  it's a proper question under the federal rules, but
24  you can answer.  I don't know that being

10 (Pages 34 to 37)

LEON A. GREENBLATT, III, JANUARY 28, 2008
30(b)(6) deposition of CHIPLEASE, INC.

Page 38

1  investigated is an appropriate line of inquiry
2  under whatever rule number that is, but he can
3  answer.
4  BY THE WITNESS:
5      A.   Not to my knowledge.
6  BY MR. BOHAN:
7      Q.   Are there any unsatisfied judgments
8  pending against Chiplease?
9      A.   No.
10     Q.   Is Chiplease a party to any agreement
11  with Mr. John Connolly?
12     A.   I believe Mr. Connolly is the trustee of
13  the investment trust.
14     Q.   So other than the loan agreement among
15  Chiplease, Scattered and the investment trust, is
16  Chiplease a party to any agreement with
17  Mr. Connolly?
18     A.   No, I don't think so.
19     Q.   What is the maximum amount that
20  Chiplease has committed to make available to
21  Illinois Investment Trust?
22     A.   We haven't determined the maximum
23  amount.
24     Q.   "We" meaning Chiplease?

Page 39

1      A.   Chiplease and Scattered were doing it
2  together, and as I said, we hadn't determined what
3  proportion Chiplease will be doing.
4      Q.   The maximum for the two businesses,
5  Chiplease and Scattered, is $3 million; is that
6  right?
7      A.   No.  The maximum that's initially set
8  forth in the loan agreement I think was $3 million.
9      Q.   Is there any agreement in place between
10  Chiplease and Scattered regarding how that $3
11  million will be shared between the two?
12     A.   No.  I don't think it has been signed
13  yet.
14     Q.   What -- how would -- I'm sorry.  How
15  will Chiplease fund the portion of the loan to
16  Illinois Investment Trust if -- to the extent
17  Chiplease funds any portion of that loan?
18     A.   Out of working capital or other sources.
19     Q.   What are the other sources?
20     A.   I have no idea.  I haven't really
21  thought about it.
22     Q.   How much in working capital could
23  Chiplease make available to Illinois Investment
24  Trust to fund that loan?

Page 40

1      A.   $165,000 a month.
2      Q.   Who negotiated the loan agreement on
3  behalf of Chiplease with Scattered and Illinois
4  Investment Trust?
5      A.   I don't recall.
6      Q.   Were you a party to those negotiations?
7      A.   I may have been.  I don't recall.
8      Q.   Do you recall which of the three parties
9  you represented in the negotiations; that is,
10  Chiplease, Scattered, or Illinois Investment Trust?
11     A.   Chiplease.
12     Q.   Who represented Scattered?
13     A.   I don't recall the negotiations as I
14  said.
15     Q.   Were there any negotiations?
16     A.   I don't recall the negotiations, but I
17  do recall that we discussed it.  I don't remember
18  when and I don't remember the content of the
19  discussions.
20     Q.   With whom did you discuss the loan?
21     A.   Andrew Jahelka, Richard Nichols, maybe
22  John Connolly, and I discussed it with attorneys
23  for Chiplease.
24     Q.   Was Scattered represented by counsel

Page 41

1  during those discussions?
2      A.   I have no idea.
3      Q.   Was the trust?
4      A.   I have no idea.
5      Q.   Were any lawyers involved other than
6  Mr. Jordan or his partners or associates?
7      A.   I don't know.
8      Q.   Did you discuss the loan agreement with
9  any attorneys other than Mr. Jordan or his partners
10  or associates?
11     A.   I don't really recall so I can't answer
12  the question.
13     Q.   Does Chiplease have any credit
14  facilities available to it?
15     A.   No.  Chiplease has never borrowed any
16  money, but it could have credit facilities to it at
17  any time for the pledge of its assets if it made
18  the attempt.
19     Q.   Is it a party to any agreement by which
20  a lender has committed to make credit available to
21  Chiplease?
22     A.   That's what I just said.  No, it has
23  not.
24     Q.   Has it ever been a party to an agreement

11 (Pages 38 to 41)

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **WACHOVIA SECURITIES, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.  04  C  3082** |
| | ) | |
| **DAVID NEUHAUSER;  ANDREW A.** | ) | |
| **JAHELKA;  RICHARD O. NICHOLS;** | ) | |
| **LEON A. GREENBLATT III;  BANCO** | ) | Judge Virginia M. Kendall |
| **PANAMERICANO, INC.,** a South Dakota | ) | |
| Corporation; **LOOP CORP.,** a South | ) | Magistrate Judge Maria Valdez |
| Dakota corporation; **LOOP PROPERTIES,** | ) | |
| **INC.,** an Illinois corporation; and | ) | |
| **SCATTERED CORP.,** a South Dakota | ) | |
| corporation; | ) | |
| | ) | |
| Defendants. | ) | |

## WACHOVIA SECURITIES, LLC'S PETITION
## FOR SANCTIONS AGAINST GREGORY JORDAN

Now comes Plaintiff, Wachovia Securities, LLC ("Wachovia"), by its attorneys, Gary I. Blackman, Christopher S. Griesmeyer and Adam B. Rome of Levenfeld Pearlstein, LLC, and for its Petition For Sanctions Against Gregory Jordan, states as follows:

### Preliminary Statement

Gregory Jordan ("Jordan") took the stand in the trial of this matter and perjured himself. Jordan was called to testify about his representation of one of the Defendants in this case, Loop Corp., related, in particular, to the payment of Loop Corp.'s attorneys' fees and the source of those payments. After arguing for months that any testimony revealing the third party source of the payment of his legal representation for Loop Corp. would prejudice the payor by creating negative inferences, this Court ruled that not only was the inquiry relevant to Plaintiff's piercing the corporate veil/alter ego claims, but that no attorney/client privilege attached. Jordan then

but his intimate knowledge of monies received and his personal involvement in the application of monies from other Greenblatt Related Entities - to the legal bills of Loop Corp.

On Tuesday, January 8, 2008, the day following his testimony, and while the trial was still ongoing, Mr. Jordan emailed another attorney at his former firm (Dykema) asking "*Can you confirm that Dykema has never received any monies from Loop Corp.*" See, *Jordan E-mail dated January 8, 2008*, Appendix Exhibit 4.

In response, and on Wednesday, January 9, 2008, at 8:30 am., Mr. Jordan received an email from the Dykema firm stating, in part, as follows:

> **On 4/18/07 we received two checks from Chiplease totally, $100,000. Greg, you sent an email to Kirsten directing her to tell Arin Martinez to apply them against certain invoices, including Loop Corp's then outstanding invoices. A PDF of the checks and your email is attached. The amount that you directed be applied against Loop Corp's invoices was sufficient to pay all then outstanding invoices (although additional invoices were subsequently issued)** (emphasis added).

Attached to the January 9, 2008 email were two checks dated April 17, 2007 made payable to Dykema and drawn on an account at Chiplease, Inc. (330 South Wells, Suite 718) in the amounts of $29,184.59 and $70,815.41 along with a copy of an email, dated April 18, 2007, from Mr. Jordan describing in detail how the checks should be applied. At Mr. Jordan's direction, the $100,000 Chiplease payment was utilized to pay legal fees incurred by Mr. Greenblatt personally, Scattered Corp, Chiplease *and Loop*. See, *Dykema E-mail dated January 9, 2008 with attached Gregory Jordan email dated April 18, 2007 and Chiplease checks number 1222 and 1223*, Appendix Group Exhibit 5.

Thus, by the morning of Wednesday, January 9, 2008 (within 48 hours of his testimony), Mr. Jordan knew he had not told the truth; and that Loop and NOLA's legal bills had, in fact, been paid by another entity – something no one would have known had this Court not allowed Plaintiff to subpoena Jordan's billing records post trial. Because Mr. Jordan's inquiry to Dykema regarding the Loop bills did not occur until after his testimony, his testimony at trial - that he had confirmed with Dykema that it had not received any payments before being called to testify - was also untrue. (Tr. Vol. 1-B, page 252).

$20,569.64 representing approximately 75 hours of attorney time.  See, *Polsinelli Loop Corp Ledger History and Billed and Unbilled Time and Fee Summary*, Appendix Exhibit 6.  Also, and contrary to Mr. Jordan's testimony that the bills for all work done for Loop were sent to Mr. Jahelka (Tr. Vol. 1-B, Pgs. 244-245), the bills for his representation of Loop were all sent to Mr. Greenblatt.  Appendix Exhibit 6. Likewise, and despite testifying that Mr. Jordan's firm had never been paid any monies for work done on behalf of NOLA, LLC (the other entity against whom Wachovia has a judgment that Mr. Jordan has been defending on post judgment proceedings before Judge Keys), the records reveal that Chiplease had made payments to Dykema on behalf of NOLA in April of 2007.  See, *Ledger History (NOLA, LLC)*, Appendix Exhibit 7.

And, despite testifying that, like Loop, NOLA, LLC has no assets and has never paid for its representation (Tr. Vol. 1-B, Pg. 238) Jordan and his colleagues billed for work for NOLA through December, 2007; sent the bills to Leon Greenblatt at 300 S. Wells, 7th Floor and had them paid by Chiplease.  Appendix Group Exhibit 7.

The law firm records also reveal the extent to which Jordan oversaw this entire enterprise. Various checks in large amounts would come in from Chiplease and then be applied to various accounts pursuant to the specific directions of Mr. Jordan.  See, *Chiplease $100,000 Check*, dated August 15, 2006 and confirming e-mail from Jordan, dated August 15, 2006, as to how the monies should be applied; Banco Client Trust Fund check in the amount of $185,000, dated April 20, 2006 and accompanying April, 2006 e-mail confirming to which account the monies would be applied.  Appendix Exhibit 8.  The extent of Mr. Jordan's involvement in the billing is also demonstrated in the e-mails directed to him related to payment issues on the various Greenblatt accounts.  Appendix Exhibit 9.

After the trial, and after Judge Keys entered a sanctions order against NOLA arising directly from Jordan's dilatory and evasive conduct (in producing a NOLA representative for a citation deposition), Jordan filed motions to withdraw from the Loop and NOLA post judgment matters before Judge Keys

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WACHOVIA SECURITIES, LLC,                )
                                     )
           Plaintiff,                )
                                     )
   v.                )     **Case No.  04 C 3082**
                                     )
DAVID NEUHAUSER;  ANDREW A.                )
JAHELKA;  RICHARD O. NICHOLS;                )
LEON A. GREENBLATT III;  BANCO                )     Judge Virginia Kendall
PANAMERICANO, INC., a South Dakota                )
Corporation; LOOP CORP., a South                )
Dakota corporation; LOOP PROPERTIES,                )
INC., an Illinois corporation; and                )     Magistrate Judge Maria Valdez
SCATTERED CORP., a South Dakota                )
corporation;                )
                                     )
          Defendants.                )

## APPENDIX TO PLAINTIFF'S POST TRIAL
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.    Trial Subpoena on Gregory Jordan (September 27, 2007)

2.    Jordan Motion to Quash (September 14, 2007) (Denied)

3.    Jordan Claim of Attorney/Client Privilege Memorandum (October 8, 2007) (Denied)

4.    Jordan E-mail to Dykema Requesting Payment Information (Tuesday, January 8, 2008) (5:17 p.m.)

5.    Dykema Response (with attachments) to Jordan E-mail (Wednesday, January 9, 2008) (8:35 a.m.)

6.    Loop Dykema/Polsinelli Billings Records

7.    NOLA Dykema/Polsinelli Billing Records

8.    Chiplease Payments to other Greenblatt Entities at Jordan's Direction

9.    Dykema Demand for Payment (Jordan Involvement)

10.    Magistrate Keys Sanctions Award and Opinion (October 14, 2007) and Report and Recommendation (October 19, 2007)

11.    Jordan's Motions for Leave to Withdraw (Loop and NOLA) (March 18, 2008)

12.    Transcript of Proceedings on NOLA Motion to Withdraw, Judge Keys (March 21, 2008)

13.    Schmidt E-mail dated August 1, 2007

**4**

**Gregory Jordan**

| | |
|---|---|
| **From:** | Gregory Jordan |
| **Sent:** | Tuesday, January 08, 2008 5:17 PM |
| **To:** | Michael Sexton |
| **Subject:** | Loop Properties |

Can you confirm that Dykema has never received any monies from Loop Corp.



**Gregory J. Jordan**          Two Prudential Plaza
*Attorney*                    180 N. Stetson, Suite 4525
                             Chicago, IL 60601

                                  tel: (312) 873-3626
gjordan@polsinelli.com            fax: (312) 819-1910
*Add me to your address book...*

**5**

Case 1:08-cv-04040    Document 36-4    Filed 08/29/2008    Page 9 of 50
Case 1:04-cv-03082    Document 357-4    Filed 03/24/2008    Page 23 of 27
Loop Corp.                                                     Page 1 of 1

## Gregory Jordan

| | |
|---|---|
| **From:** | Sexton, Michael F. [MSexton@dykema.com] |
| **Sent:** | Wednesday, January 09, 2008 8:35 AM |
| **To:** | Gregory Jordan |
| **Subject:** | Loop Corp. |

Here's the scoop:

On 4/18/07 we received two checks from Chiplease totaling $100,000. Greg, you sent an email to Kirsten directing her to tell Erin Martinez to apply them against certain invoices, including Loop Corp.'s then outstanding invoices. A PDF of the checks and your email is attached. The amount that you directed be applied against Loop Corp's invoices was sufficient to pay all then outstanding invoices (although additional invoices were subsequently issued).

There you have it.

<<im4511_20080109_081945.pdf>>

Michael F. Sexton
Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606
Direct Line: (312) 627-2162
Direct Fax: (866) 741-0103
email: msexton@dykema.com

Notice from Dykema Gossett PLLC:

To comply with U.S. Treasury regulations, we advise you that any discussion of Federal tax issues in this communication was not intended or written to be used, and cannot be used, by any person (i) for the purpose of avoiding penalties that may be imposed by the Internal Revenue Service, or (ii) to promote, market or recommend to another party any matter addressed herein.

This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately.

Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

DYKEMA

Martinez, Erin M.

| From: | Jordan, Gregory J. |
|---|---|
| Sent: | Wednesday, April 18, 2007 2:25 PM |
| To: | Marzolf, Kirsten L. |
| Cc: | Sexton, Michael F.; Kimbro, Michelle; Martinez, Erin M. |
| Subject: | Payment |
| | |
| Attachments: | lm4511_20070418_135958.pdf |

Kirsten,

Please deliver the checks totaling $100,000 that I left on your desk to accounting.

Have Erin apply the checks as follows:

| | | | Application | Amount Remaining |
|---|---|---|---|---|
| Starting Sum | | | $100,000 | $100,000 |
| Leon Greenblatt | | | $ 29,184.59 | $ 70,815.41 |
| | | | | |
| **Scattered** | | | | |
| Invoice | Amount | | | |
| 5/17/2006 | 1096487 | 9,133.00 | $ 9,133.00 | $ 61,682.41 |
| 6/13/2006 | 1100295 | 18,538.00 | $ 18,538.00 | $ 43,144.41 |
| | | | | |
| **Loop** | 99855 | | | |
| 6/13/2006 | $5,018.08 | | $ 5,018.08 | $ 38,126.33 |
| | | | | |
| **Chiplease - 0999** | | | | |
| Date | Invoice | Amount | | |
| 8/14/2006 | 1110840 | 15,704.34 | $ 15,704.34 | $ 22,421.99 |
| | | | | |
| **Chiplease 1** | | | | |
| 8/14/2006 | 1110852 | 11,912.51 | $ 11,912.51 | $ 10,509.48 |
| 12/8/2006 | 1133119 | 21,398.78 | $10,509.48 | $     0.00 |

Greg

Gregory J. Jordan
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago Illinois 60606-7439
(312) 627-2171 (Direct)
(312) 543-7354 (Mobile)
(866) 698-0830 (Facsimile)

This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately.

Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

-----Original Message-----
From: chi-dsender@dykema.com [mailto:chi-dsender@dykema.com]
Sent: Wednesday, April 18, 2007 2:00 PM
To: Jordan, Gregory J.

1

Subject: Scanned Image from CH-21CopyA

DEVICE NAME: CH-21CopyA
DEVICE MODEL: im4511
LOCATION: Chicago 21st Floor Copy Center

FILE FORMAT: PDF MMR(G4)
RESOLUTION: 300dpi x 300dpi

Attached file is scanned image in PDF format.
This file can be read by Adobe Acrobat Reader.
The reader can be downloaded from the following URL:

http://www.adobe.com/



im4511_200704
l_135958.pdf (58

2

Chiplease Inc.
330 South Wells, Suite 718
Chicago, IL 60606

PAY
TO THE
ORDER OF      Dykema Gossett PLLC

***** Twenty nine thousand one hundred eighty four Dollars and 59/100*****

4/17     20   07

$ ****29,184.59*

2-173/710

MB Financial Bank
1 South Wacker
Chicago, IL 60606

DOLLARS

Security Features Included.     Details on back.

memo  Leon Greenblatt
098 951- 0001
RTC Bailey's Case

⑈"00 1 2 2 2⑈"  ⑉0 7 1 0 0 1 7 3⑉:  50⑈000⑈31 1⑈"

Chiplease Inc.
330 South Wells, Suite 718
Chicago, IL 60606

PAY TO THE ORDER OF    Dykema Gossett PLLC

*** Seventy thousand eight hundred fifteen Dollars and 41/100***

MB Financial Bank
1 South Wacker
Chicago, IL 60606

4/17    20    07

$**70,815.41

DOLLARS

Security Features Included. Details on back.

⑈001123⑈  ⑆071001737⑆  504000143⑈

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WACHOVIA SECURITIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  04  C  3082 |
| | ) | |
| DAVID NEUHAUSER;  ANDREW A. | ) | |
| JAHELKA;  RICHARD O. NICHOLS; | ) | |
| LEON A. GREENBLATT III;  BANCO | ) | Judge Virginia Kendall |
| PANAMERICANO, INC., a South Dakota | ) | |
| Corporation; LOOP CORP., a South | ) | |
| Dakota corporation; LOOP PROPERTIES, | ) | Magistrate Judge Maria Valdez |
| INC., an Illinois corporation; and | ) | |
| SCATTERED CORP., a South Dakota | ) | |
| corporation; | ) | |
| | ) | |
| Defendants. | ) | |

**PART A (#6) OF APPENDIX TO PLAINTIFF'S POST-TRIAL PROPOSED**
**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

6

Ledger History - [099855 - LOOP CORP.]
Currency Code:    1/29/2008 4:48:02 PM

| Type | Invoice # / Document # | Credit Description | Credit Note | Date | Fees | Costs/Other | Unalloc Credits | Total |
|---|---|---|---|---|---|---|---|---|
| BILL | 1100299b | | | 06/13/2006 | 423.50 | 0.00 | 0.00 | 423.50 |
| BILL | 1104904b | | | 08/14/2006 | 2,426.50 | 9.00 | 0.00 | 2,435.50 |
| BILL | 1117623 | | | 08/19/2006 | 192.50 | 0.00 | 0.00 | 192.50 |
| BILL | 1123495 | | | 10/18/2006 | 231.00 | 0.00 | 0.00 | 231.00 |
| BILL | 1145426 | | | 02/27/2007 | 1,200.00 | 0.00 | 0.00 | 1,200.00 |
| BILL | 1147994 | | | 03/15/2007 | 360.00 | 175.58 | 0.00 | 535.58 |
| BILL | 1152439 | | | 04/13/2007 | 791.00 | 0.00 | 0.00 | 791.00 |
| PAY | 1100299 | 1223 | | 04/18/2007 | -423.50 | 0.00 | 0.00 | -423.50 |
| PAY | 1110846 | 1223 | | 04/18/2007 | -2,426.50 | -9.00 | 0.00 | -2,435.50 |
| PAY | 1117623 | 1223 | Chiplease Inc | 04/18/2007 | -192.50 | 0.00 | 0.00 | -192.50 |
| PAY | 1123495 | 1223 | Chiplease Inc | 04/18/2007 | -231.00 | 0.00 | 0.00 | -231.00 |
| POS | 1145426 | 1223 | Chiplease Inc | 04/18/2007 | -1,200.00 | 0.00 | 0.00 | -1,200.00 |
| POS | 1147994 | 1223 | Chiplease Inc | 04/18/2007 | -360.00 | -175.58 | 0.00 | -535.58 |
| BILL | 1576899 | | | 05/14/2007 | 472.00 | 0.00 | 0.00 | 472.00 |
| BILL | 1163384 | | | 05/29/2007 | 8,549.00 | 0.00 | 0.00 | 8,549.00 |
| BILL | 1163386 | | | 06/19/2007 | 120.00 | 0.00 | 0.00 | 120.00 |
| BILL | 1170242 | | | 07/31/2007 | 177.50 | 3.00 | 0.00 | 180.50 |
| GRAND TOTAL | | | | | 10,109.50 | 3.00 | 0.00 | 10,112.50 |

Ledger History - [053483-118678 - REPRESENTATION OF LOOP CORP.]                    Page
Client:053483 - LOOP CORP.   2/19/2008 1:26:52 PM

| Type | Invoice | Document | Credit Description | Credit Note | Date | Fees | Costs/Other | Unalloc Credits | Total |
|------|---------|----------|--------------------|-------------|------|------|-------------|-----------------|-------|
| BILL | 433443 | | | | 09/11/2007 | 6,914.00 | 15.00 | 0.00 | 6,929.0 |
| BILL | 439480 | | | | 10/10/2007 | 3,042.00 | 7.44 | 0.00 | 3,049.4 |
| BILL | 444913 | | | | 11/29/2007 | 10,270.00 | 17.44 | 0.00 | 10,287.4 |
| BILL | 448637 | | | | 12/30/2007 | 194.00 | 0.00 | 0.00 | 194.0 |
| BILL | 451217 | | | | 01/16/2008 | 102.00 | 7.76 | 0.00 | 109.7 |
| GRAND TOTA | | | | | | 20,522.00 | 47.64 | 0.00 | 20,569.6 |

Billed and Unbilled
Currency Code:  2/19/2008 1:42:28 PM

| Initials | Timekeeper | Rate | Hours | Percent | Fees | Percent | Cost |
|---|---|---|---|---|---|---|---|
| 1224 | GREGORY J. JORDAN | 400.00 | 7.10 | 9.57 | 2,840.00 | 13.84 | 109.64 |
| 1225 | PETER J. SCHMIDT | 332.31 | 26.00 | 35.04 | 8,640.00 | 42.10 | |
| 2435 | JEAN SOH | 220.00 | 41.10 | 55.39 | 9,042.00 | 44.06 | |
| | GRAND TOTAL | 276.58 | 74.20 | 100.00 | 20,522.00 | 100.00 | 109.64 |

Chiplease Inc
330 South Wells, Suite 718
Chicago, IL 60606

1223

2-173/710

PAY
TO THE
ORDER OF    Dykema Gossett PLLC

***** Seventy thousand eight hundred fifteen Dollars and 41/100*****

4/17                20   07

$    *** 70,815.41

DOLLARS

MB Financial Bank
1 South Wacker
Chicago, IL 60606

Security Features included.    Details on back.

⑆001223⑆  ⑆071004173⑈  504000431⑆

Dykema

SCATTERED CORPORATION

CLIENT-MATTER NO.   099026-0001
RESOURCE TECHNOLOGY
BANKRUPTCY
INVOICE NO.  1096487
PAGE NO.  5

MAY 17, 2006

FEES .................................................................. $    9,133.00

TOTAL AMOUNT DUE ............................................ $    9,133.00

REMITTANCE

DYKEMAGOSSETT PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787

CLIENT CHECK INFORMATION
PLEASE COMPLETE:      THIS INVOICE IS PAYABLE UPON RECEIPT.
CHECK #: 1223        DATE: 4/17/07        AMOUNT: 70,815.41
PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.

FOR FIRM USE:

RECEIVED DATE:_____

DYKEMA

SCATTERED CORPORATION

CLIENT-MATTER NO.   099026-0001
RESOURCE TECHNOLOGY
BANKRUPTCY
INVOICE NO.  1100295
PAGE NO.  5

JUNE 13, 2006

FEES ............................................................$    18,538.00

TOTAL AMOUNT DUE ...............................$    18,538.00

DYKEMAGOSSETT PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787

CLIENT CHECK INFORMATION
PLEASE COMPLETE: THIS INVOICE IS PAYABLE UPON RECEIPT.
CHECK #: 1223    DATE: 4/17/07    AMOUNT: 70,815. 41
PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.

FOR FIRM USE:

RECEIVED DATE:_____

# DYKEMA

LOOP CORP.

JUNE 13, 2006

CLIENT-MATTER NO.    099855-0001
WACHOVIA CITATION
INVOICE NO.  1100299
PAGE NO.  4

FEES ................................................................$        423.50

TOTAL AMOUNT DUE .............................$_____423.50



DYKEMAGOSSETT PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787

CLIENT CHECK INFORMATION
PLEASE COMPLETE:
THIS INVOICE IS PAYABLE UPON RECEIPT.
CHECK #: 1223        DATE: 4/17/07        AMOUNT: 70,815. 41
PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.

FOR FIRM USE:

RECEIVED DATE:_____

DYKEMA

LOOP CORP.

AUGUST 14, 2006

CLIENT-MATTER NO.   099855-0001
WACHOVIA CITATION
INVOICE NO.  1110846
PAGE NO.  5

FEES .......................................................................... $    2,426.50

DISBURSEMENTS ...................................................         9.00

TOTAL AMOUNT DUE ............................................. $    2,435.50

DYKEMAGOSSETT PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787

CLIENT CHECK INFORMATION
PLEASE COMPLETE:

THIS INVOICE IS PAYABLE UPON RECEIPT.

CHECK #: 1223    DATE: 4/17/02    AMOUNT: 20,815.41

PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.

FOR FIRM USE:

RECEIVED DATE: _____

# DYKEMA

LOOP CORP.                                          CLIENT-MATTER NO.   099855-0001
                                                   WACHOVIA CITATION
SEPTEMBER 19, 2006                                 INVOICE NO.  1117623
                                                   PAGE NO.  4


FEES..............................................................$         192.50


TOTAL AMOUNT DUE..........................................$_____192.50



DykemaGossett PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787


CLIENT CHECK INFORMATION
PLEASE COMPLETE:
                    THIS INVOICE IS PAYABLE UPON RECEIPT.
CHECK #: 1223          DATE: 4/17/07       AMOUNT: 70,815.41
PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.


FOR FIRM USE:

RECEIVED DATE:_____

_____

# DYKEMA

LOOP CORP.

OCTOBER 18, 2006

CLIENT-MATTER NO.   099855-0001
WACHOVIA CITATION
INVOICE NO. 1123495
PAGE NO. 4

FEES ............................................................ $    231.00

TOTAL AMOUNT DUE........................................ $    231.00



DYKEMA GOSSETT PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787

CLIENT CHECK INFORMATION
PLEASE COMPLETE:

THIS INVOICE IS PAYABLE UPON RECEIPT.

CHECK #: 1223    DATE: 4/17/07    AMOUNT: 70,815.41

PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.

FOR FIRM USE:

RECEIVED DATE:_____

# DYKEMA

LOOP CORP.

FEBRUARY 27, 2007

CLIENT-MATTER NO.    099855-0001
WACHOVIA CITATION
INVOICE NO.  1145426
PAGE NO.  4

FEES ...................................................... $    1,200.00

TOTAL AMOUNT DUE ............................... $    1,200.00



DYKEMA GOSSETT PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787

CLIENT CHECK INFORMATION
PLEASE COMPLETE:
                    THIS INVOICE IS PAYABLE UPON RECEIPT.
CHECK #: 1223        DATE: 4/17/07        AMOUNT: 70,815.41
PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.

FOR FIRM USE:

RECEIVED DATE:_____

DYKEMA

LOOP CORP.

MARCH 15, 2007

CLIENT-MATTER NO.    099855-0001
WACHOVIA CITATION
INVOICE NO.  1147994
PAGE NO.  5


FEES........................................................................$        360.00

DISBURSEMENTS .....................................................        175.58

TOTAL AMOUNT DUE...........................................$_____535.58

REMITTANCE

DYKEMA GOSSETT PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787


CLIENT CHECK INFORMATION
PLEASE COMPLETE:
          THIS INVOICE IS PAYABLE UPON RECEIPT.
CHECK #: 1223          DATE: 4/17/07        AMOUNT: 70,815.41
          PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.


FOR FIRM USE:

RECEIVED DATE:_____

# DYKEMA

CHIPLEASE, INC.

AUGUST 14, 2006

CLIENT-MATTER NO.    098953-0999
GENERAL
INVOICE NO.  1110840
PAGE NO.  6

FEES ................................................................$    15,256.50

DISBURSEMENTS .......................................        447.84

TOTAL AMOUNT DUE ...........................................$    15,704.34

DYKEMA GOSSETT PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787

CLIENT CHECK INFORMATION
PLEASE COMPLETE:
                              THIS INVOICE IS PAYABLE UPON RECEIPT.
CHECK #: 1223        DATE: 4/17/07        AMOUNT: 70,815.41
                    PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.

FOR FIRM USE:

RECEIVED DATE: _____

REMITTANCE

**DYKEMA**

CHIPLEASE, INC.
AUGUST 14, 2006

CLIENT-MATTER NO.   098953-0001
INVOICE NO.  1110852
PAGE NO.  20

FEES .................................................................$   99,608.50

DISBURSEMENTS ..........................................   21,248.12

TOTAL AMOUNT DUE...............................$   120,856.62

33.3% OF FEES .............................................$   33,199.50

33.3% OF DISBURSEMENTS ..........................   7,082.11

TOTAL AMOUNT DUE (YOUR SHARE)...........$   40,281.61

11,912.51

DYKEMA GOSSETT PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787

CLIENT CHECK INFORMATION
PLEASE COMPLETE:   THIS INVOICE IS PAYABLE UPON RECEIPT.
CHECK #: 1223      DATE: 4/17/07      AMOUNT: 70,815.41
PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.

FOR FIRM USE:

RECEIVED DATE:_____

REMITTANCE

DYKEMA

CHIPLEASE, INC.
DECEMBER 8, 2006

CLIENT-MATTER NO.    098953-0001
INVOICE NO.  1133119
PAGE NO.  14

FEES.................................................................$    50,978.50

DISBURSEMENTS .................................................    13,224.35

TOTAL AMOUNT DUE...............................$    64,202.85

33.3% OF FEES.......................................$    16,991.14

33.3% OF DISBURSEMENTS ............................    4,407.64

TOTAL AMOUNT DUE (YOUR SHARE)........$    21,398.78

10,509.48

DYKEMA GOSSETT PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787

CLIENT CHECK INFORMATION
PLEASE COMPLETE:
                              THIS INVOICE IS PAYABLE UPON RECEIPT.
CHECK #: 1223    DATE: 4/17/07    AMOUNT: 70,815.41
              PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.

FOR FIRM USE:

RECEIVED DATE: _____

REMITTANCE





Shalton | Flanigan | Suelthaus PC

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                                    FILE NO: 053483-118678
LEON A GREENBLATT
330 S. WELLS
7TH FLOOR
CHICAGO, IL 60606                             INVOICE NO.: 451217

                                              JANUARY 16, 2008
```

RE: REPRESENTATION OF LOOP CORP.

```
   TOTAL CURRENT PROFESSIONAL SERVICES                102.00
   TOTAL CURRENT DISBURSEMENTS                          7.76
                                                   -----------

   TOTAL CURRENT CHARGES                           $109.76

      PREVIOUS BALANCE AS OF JANUARY 16, 2008     $20,459.88
         SUMMARY PROVIDED ON FINAL PAGE
                                                   -----------

   TOTAL BALANCE DUE                              $20,569.64
```

```
******************************************************************
*                                                                *
*      PLEASE RETURN THIS REMITTANCE PAGE WITH YOUR PAYMENT       *
*                                                                *
******************************************************************
BA 1224
```

# Polsinelli

### Shalton | Flanigan | Suelthaus<sub>PC</sub>

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                              FILE NO: 053483-118678
LEON A GREENBLATT
330 S. WELLS
7TH FLOOR
CHICAGO, IL 60606                       INVOICE NO.: 451217

                                        JANUARY 16, 2008
```

RE: REPRESENTATION OF LOOP CORP.

```
TOTAL CURRENT PROFESSIONAL SERVICES             102.00
TOTAL CURRENT DISBURSEMENTS                        7.76
                                             -----------

TOTAL CURRENT CHARGES                          $109.76

    PREVIOUS BALANCE AS OF JANUARY 16, 2008   $20,459.88
    SUMMARY PROVIDED ON FINAL PAGE
                                             -----------

TOTAL BALANCE DUE                           $20,569.64
```

```
**********************************************************
*                                                        *
*        PLEASE RETAIN THIS COPY FOR YOUR RECORDS        *
*                                                        *
**********************************************************
BA 1224
```



**Polsinelli**

Shalton | Flanigan | Suelthaus℠

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                           JANUARY 16, 2008    PAGE    2
FILE NUMBER: 053483-118678
INVOICE NO.: 451217
```

FOR PROFESSIONAL SERVICES RENDERED THROUGH DECEMBER 31, 2007

REGARDING: REPRESENTATION OF LOOP CORP.

BILLING ATTORNEY: GREGORY J. JORDAN

DESCRIPTION OF PROFESSIONAL SERVICES

```
12/14/07 PJSCH                                              .30

              TOTAL SERVICES:                           102.00


           DESCRIPTION OF DISBURSEMENTS


10/08/07 On-Line Searches - PACER        1.60
10/18/07 On-Line Searches - PACER        6.16

              TOTAL DISBURSEMENTS:            7.76
                                         -----------

           TOTAL CURRENT CHARGES:          $109.76
```

late payment charge of 1 1/2%.

# Polsinelli

### Shalton | Flanigan | Suelthaus PC

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

LOOP CORP.                                      JANUARY 16, 2008     PAGE     3
FILE NUMBER: 053483-118678
INVOICE NO.: 451217


THE FOLLOWING IS A STATEMENT OF THE OUTSTANDING BALANCE AS OF 01/16/08


| INVOICE DATE | INVOICE NUMBER | FEES & DISB | OTHER | PAYMENTS | BALANCE DUE |
|---|---|---|---|---|---|
| 09/11/07 | 433443 | $6929.00 | $.00 | $.00 | $6929.00 |
| 10/10/07 | 439480 | $3049.44 | $.00 | $.00 | $3049.44 |
| 11/29/07 | 444913 | $10287.44 | $.00 | $.00 | $10287.44 |
| 12/30/07 | 448637 | $194.00 | $.00 | $.00 | $194.00 |

TOTAL BALANCE DUE FROM PREVIOUS INVOICES     $20459.88

A late payment charge of 1 1/2%

DUE UPON RECEIPT





# Polsinelli

Shalton | Flanigan | Suelthaus pc

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                          FILE NO: 053483-118678
LEON A GREENBLATT
330 S. WELLS
7TH FLOOR
CHICAGO, IL 60606                   INVOICE NO.: 448637

                                    DECEMBER 30, 2007
```

RE: REPRESENTATION OF LOOP CORP.

```
    TOTAL CURRENT PROFESSIONAL SERVICES            194.00
    TOTAL CURRENT DISBURSEMENTS                      0.00
                                               -----------

    TOTAL CURRENT CHARGES                         $194.00

        PREVIOUS BALANCE AS OF DECEMBER 30, 2007  $20,265.88
          SUMMARY PROVIDED ON FINAL PAGE
                                               -----------

    TOTAL BALANCE DUE                          $20,459.88
```

```
************************************************************
*                                                          *
*      PLEASE RETURN THIS REMITTANCE PAGE WITH YOUR PAYMENT *
*                                                          *
************************************************************
BA 1224
```

# Polsinelli

### Shalton | Flanigan | Suelthaus rc

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                              FILE NO: 053483-118678
LEON A GREENBLATT
330 S. WELLS
7TH FLOOR
CHICAGO, IL 60606                       INVOICE NO.: 448637

                                        DECEMBER 30, 2007

RE: REPRESENTATION OF LOOP CORP.


  TOTAL CURRENT PROFESSIONAL SERVICES              194.00
  TOTAL CURRENT DISBURSEMENTS                        0.00
                                            -----------

  TOTAL CURRENT CHARGES                          $194.00

    PREVIOUS BALANCE AS OF DECEMBER 30, 2007   $20,265.88
      SUMMARY PROVIDED ON FINAL PAGE
                                            -----------

  TOTAL BALANCE DUE                           $20,459.88



************************************************************
*                                                          *
*          PLEASE RETAIN THIS COPY FOR YOUR RECORDS        *
*                                                          *
************************************************************
BA 1224
```

# Polsinelli

### Shalton | Flanigan | Suelthaus pc

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                              DECEMBER 30, 2007   PAGE    2
FILE NUMBER: 053483-118678
INVOICE NO.: 448637
```

FOR PROFESSIONAL SERVICES RENDERED THROUGH NOVEMBER 30, 2007

REGARDING: REPRESENTATION OF LOOP CORP.

BILLING ATTORNEY: GREGORY J. JORDAN

### DESCRIPTION OF PROFESSIONAL SERVICES

```
11/15/07 GJJOR                                           .40

11/15/07 PJSC                                            .10

              TOTAL SERVICES:                         194.00

                                                  -----------

              TOTAL CURRENT CHARGES:               $194.00
```

A late payment charge of 1½%

# Polsinelli

### Shalton | Flanigan | Suelthaus PC

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

LOOP CORP.                                    DECEMBER 30, 2007    PAGE    3
FILE NUMBER: 053483-118678
INVOICE NO.: 448637


THE FOLLOWING IS A STATEMENT OF THE OUTSTANDING BALANCE AS OF 12/30/07

| INVOICE DATE | INVOICE NUMBER | FEES & DISB | OTHER | PAYMENTS | BALANCE DUE |
|---|---|---|---|---|---|
| 09/11/07 | 433443 | $6929.00 | $.00 | $.00 | $6929.00 |
| 10/10/07 | 439480 | $3049.44 | $.00 | $.00 | $3049.44 |
| 11/29/07 | 444913 | $10287.44 | $.00 | $.00 | $10287.44 |

TOTAL BALANCE DUE FROM PREVIOUS INVOICES    $20265.88

---

DUE UPON RECEIPT

A late payment charge of 1 1/2%

MAKE CHECKS PAYABLE TO: POLSINELLI SHALTON FLANIGAN SUELTHAUS PC





# Polsinelli

### Shalton | Flanigan | Suelthaus PC

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                              FILE NO: 053483-118678
LEON A GREENBLATT
330 S. WELLS
7TH FLOOR
CHICAGO, IL 60606                       INVOICE NO.: 444913

                                        NOVEMBER 29, 2007

RE: REPRESENTATION OF LOOP CORP.


    TOTAL CURRENT PROFESSIONAL SERVICES        10,270.00
    TOTAL CURRENT DISBURSEMENTS                    17.44
                                             -----------

    TOTAL CURRENT CHARGES                      $10,287.44

       PREVIOUS BALANCE AS OF NOVEMBER 29, 2007   $9,978.44
         SUMMARY PROVIDED ON FINAL PAGE
                                             -----------

    TOTAL BALANCE DUE                          $20,265.88



************************************************************
*                                                          *
*      PLEASE RETURN THIS REMITTANCE PAGE WITH YOUR PAYMENT *
*                                                          *
************************************************************
BA 1224
```

# Polsinelli

### Shalton | Flanigan | Suelthaus℠

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                              FILE NO: 053483-118678
LEON A GREENBLATT
330 S. WELLS
7TH FLOOR
CHICAGO, IL 60606                       INVOICE NO.: 444913

                                        NOVEMBER 29, 2007

RE: REPRESENTATION OF LOOP CORP.


     TOTAL CURRENT PROFESSIONAL SERVICES          10,270.00
     TOTAL CURRENT DISBURSEMENTS                      17.44
                                                 -----------

     TOTAL CURRENT CHARGES                       $10,287.44

        PREVIOUS BALANCE AS OF NOVEMBER 29, 2007  $9,978.44
           SUMMARY PROVIDED ON FINAL PAGE
                                                 -----------

     TOTAL BALANCE DUE                           $20,265.88




     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
     *                                                                     *
     *           PLEASE RETAIN THIS COPY FOR YOUR RECORDS                  *
     *                                                                     *
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
     BA 1224
```

# Polsinelli

### Shalton | Flanigan | Suelthaus℞

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                              NOVEMBER 29, 2007   PAGE    2
FILE NUMBER: 053483-118678
INVOICE NO.: 444913
```

FOR PROFESSIONAL SERVICES RENDERED THROUGH OCTOBER 31, 2007

REGARDING: REPRESENTATION OF LOOP CORP.

BILLING ATTORNEY: GREGORY J. JORDAN

DESCRIPTION OF PROFESSIONAL SERVICES

```
09/20/07 GJJOR                                          .30


10/02/07 PJSCH                                          .80
10/03/07 PJSCH                                         1.30

10/04/07 PJSCH                                         4.90

10/04/07 JESOH                                         2.30


10/05/07 PJSCH                                          .30
10/05/07 JESOH                                         2.30


10/07/07 JESOH                                          .85
```

DUE UPON RECEIPT
A late payment charge of 1 1/2%
per month will be charged on the
MAKE CHECKS PAYABLE TO: POLSINELLI SHALTON FLANIGAN SUELTHAUS℞.

# Polsinelli

### Shalton | Flanigan | Suelthaus pc

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

LOOP CORP.                                          NOVEMBER 29, 2007   PAGE    3
FILE NUMBER: 053483-118678
INVOICE NO.: 444913

| | | | |
|---|---|---|---|
| 10/08/07 | PJSCH | | 5.30 |
| 10/08/07 | JESOH | | 7.75 |
| 10/09/07 | GJJOR | | .50 |
| 10/09/07 | PJSCH | | .80 |
| 10/09/07 | JESOH | | 1.60 |
| 10/10/07 | JESOH | | 4.80 |
| 10/11/07 | PJSCH | | .20 |
| 10/11/07 | PJSCH | | 2.20 |
| 10/12/07 | PJSCH | | .20 |
| 10/17/07 | JESOH | | .10 |
| 10/18/07 | JESOH | | .80 |

TOTAL SERVICES:        10,270.00

DUE UPON RECEIPT
MAKE CHECKS PAYABLE TO: POLSINELLI SHALTON FLANIGAN SUELTHAUS PC

# Polsinelli

### Shalton | Flanigan | Suelthaus PC

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                              NOVEMBER 29, 2007   PAGE   4
FILE NUMBER: 053483-118678
INVOICE NO.: 444913
```

### DESCRIPTION OF DISBURSEMENTS

```
09/18/07 On-Line Searches - Pacer                    5.44
10/04/07 Travel - - VENDOR: PETER SCHMIDT CAB TO COURT    6.00
10/04/07 Travel - - VENDOR: PETER SCHMIDT CAB FROM COURT  6.00

            TOTAL DISBURSEMENTS:               17.44
                                           - - - - - - - - - - -

            TOTAL CURRENT CHARGES:        $10,287.44
```



# Polsinelli

### Shalton | Flanigan | Suelthaus PC

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                                    NOVEMBER 29, 2007   PAGE    5
FILE NUMBER: 053483-118678
INVOICE NO.: 444913
```

THE FOLLOWING IS A STATEMENT OF THE OUTSTANDING BALANCE AS OF 11/29/07

| INVOICE DATE | INVOICE NUMBER | FEES & DISB | OTHER | PAYMENTS | BALANCE DUE |
|---|---|---|---|---|---|
| 09/11/07 | 433443 | $6929.00 | $.00 | $.00 | $6929.00 |
| 10/10/07 | 439480 | $3049.44 | $.00 | $.00 | $3049.44 |

TOTAL BALANCE DUE FROM PREVIOUS INVOICES    $9978.44

A late payment charge of 1 1/2%
per month will be charged on the

DUE UPON RECEIPT
MAKE CHECKS PAYABLE TO: POLSINELLI SHALTON FLANIGAN SUELTHAUS PC.





**Polsinelli**

Shalton | Flanigan | Suelthaus ᵖᶜ

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

LOOP CORP.                          FILE NO: 053483-118678
LEON A GREENBLATT
330 S. WELLS
7TH FLOOR
CHICAGO, IL 60606                   INVOICE NO.: 439480

                                    OCTOBER 10, 2007

RE: REPRESENTATION OF LOOP CORP.


    TOTAL CURRENT PROFESSIONAL SERVICES            3,042.00
    TOTAL CURRENT DISBURSEMENTS                        7.44
                                                ------------

    TOTAL CURRENT CHARGES                         $3,049.44

        PREVIOUS BALANCE AS OF OCTOBER 10, 2007   $6,929.00
        SUMMARY PROVIDED ON FINAL PAGE
                                                ------------

    TOTAL BALANCE DUE                             $9,978.44



    ************************************************************
    *                                                        *
    *    PLEASE RETURN THIS REMITTANCE PAGE WITH YOUR PAYMENT *
    *                                                        *
    ************************************************************
    BA 1224


A late payment charge of 1½%                    DUE UPON RECEIPT
per month will be charged on the    MAKE CHECKS PAYABLE TO: POLSINELLI SHALTON FLANIGAN SUELTHAUS ᵖᶜ

# Polsinelli

### Shalton | Flanigan | Suelthaus℠

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                              FILE NO: 053483-118678
LEON A GREENBLATT
330 S. WELLS
7TH FLOOR
CHICAGO, IL 60606                       INVOICE NO.: 439480

                                        OCTOBER 10, 2007
```

RE: REPRESENTATION OF LOOP CORP.

```
   TOTAL CURRENT PROFESSIONAL SERVICES             3,042.00
   TOTAL CURRENT DISBURSEMENTS                         7.44
                                               ------------

   TOTAL CURRENT CHARGES                         $3,049.44

      PREVIOUS BALANCE AS OF OCTOBER 10, 2007    $6,929.00
         SUMMARY PROVIDED ON FINAL PAGE
                                               ------------

   TOTAL BALANCE DUE                             $9,978.44
```

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
*                                                                               *
*            PLEASE RETAIN THIS COPY FOR YOUR RECORDS                           *
*                                                                               *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
BA 1224
```

# Polsinelli

### Shalton | Flanigan | Suelthaus ℡

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                              OCTOBER 10, 2007   PAGE   2
FILE NUMBER: 053483-118678
INVOICE NO.: 439480
```

FOR PROFESSIONAL SERVICES RENDERED THROUGH SEPTEMBER 30, 2007

REGARDING: REPRESENTATION OF LOOP CORP.

BILLING ATTORNEY: GREGORY J. JORDAN

### DESCRIPTION OF PROFESSIONAL SERVICES

| Date | Initials | | Hours |
|---|---|---|---|
| 09/13/07 | GJJOR | | 1.00 |
| 09/18/07 | PJSCH | | .80 |
| 09/19/07 | PJSCH | | .70 |
| 09/24/07 | PJSCH | | 1.70 |
| 09/24/07 | JESOH | | |
| 09/25/07 | PJSCH | | .60 |
| 09/26/07 | PJSCH | | .80 |
| 09/26/07 | JESOH | | |

DUE UPON RECEIPT

MAKE CHECKS PAYABLE TO: POLSINELLI SHALTON FLANIGAN SUELTHAUS℡

# Polsinelli

### Shalton | Flanigan | Suelthaus pc

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                          OCTOBER 10, 2007    PAGE    3
FILE NUMBER: 053483-118678
INVOICE NO.: 439480

09/27/07 JESOH                                      `1.
```

```
                     TOTAL SERVICES:                 3,042.00


           DESCRIPTION OF DISBURSEMENTS


08/17/07 PACER                                      7.44

                     TOTAL DISBURSEMENTS:              7.44
                                             - - - - - - - - - - -

           TOTAL CURRENT CHARGES:            $3,049.44
```

# Polsinelli

### Shalton | Flanigan | Suelthaus PC

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                                    OCTOBER 10, 2007    PAGE    4
FILE NUMBER: 053483-118678
INVOICE NO.: 439480
```

THE FOLLOWING IS A STATEMENT OF THE OUTSTANDING BALANCE AS OF 10/10/07

| INVOICE DATE | INVOICE NUMBER | FEES & DISB | OTHER | PAYMENTS | BALANCE DUE |
|---|---|---|---|---|---|
| 09/11/07 | 433443 | $6929.00 | $.00 | $.00 | $6929.00 |
| | | TOTAL BALANCE DUE FROM PREVIOUS INVOICES | | | $6929.00 |





## Polsinelli

Shalton | Flanigan | Suelthaus PC

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                                FILE NO: 053483-118678
LEON A GREENBLATT
330 S. WELLS
7TH FLOOR
CHICAGO, IL 60606                         INVOICE NO.: 433443

                                          SEPTEMBER 11, 2007
```

RE: REPRESENTATION OF LOOP CORP.

```
    TOTAL CURRENT PROFESSIONAL SERVICES           6,914.00
    TOTAL CURRENT DISBURSEMENTS                       15.00
                                                -----------

    TOTAL CURRENT CHARGES                         $6,929.00
                                                -----------

    TOTAL BALANCE DUE                             $6,929.00
```

```
***********************************************************
*                                                         *
*    ·PLEASE RETURN THIS REMITTANCE PAGE WITH YOUR PAYMENT *
*                                                         *
***********************************************************
BA 1224
```

A late payment charge of 1 1/2%
per month will be charged on the

                              DUE UPON RECEIPT
MAKE CHECKS PAYABLE TO: POLSINELLI SHALTON FLANIGAN SUELTHAUS PC

# Polsinelli

### Shalton | Flanigan | Suelthaus℗ᴄ

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

LOOP CORP.
LEON A GREENBLATT
330 S. WELLS
7TH FLOOR
CHICAGO, IL 60606

FILE NO: 053483-118678

INVOICE NO.: 433443

SEPTEMBER 11, 2007

RE: REPRESENTATION OF LOOP CORP.

| | |
|---|---:|
| TOTAL CURRENT PROFESSIONAL SERVICES | 6,914.00 |
| TOTAL CURRENT DISBURSEMENTS | 15.00 |
| | ----------- |
| TOTAL CURRENT CHARGES | $6,929.00 |
| | ----------- |
| TOTAL BALANCE DUE | $6,929.00 |

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
*                                                                                               *
*              PLEASE RETAIN THIS COPY FOR YOUR RECORDS                                          *
*                                                                                               *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```
BA 1224

# Polsinelli

### Shalton | Flanigan | Suelthaus PC

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

LOOP CORP.                                  SEPTEMBER 11, 2007 PAGE    2
FILE NUMBER: 053483-118678
INVOICE NO.: 433443


FOR PROFESSIONAL SERVICES RENDERED THROUGH AUGUST 31, 2007

REGARDING: REPRESENTATION OF LOOP CORP.

BILLING ATTORNEY: GREGORY J. JORDAN


## DESCRIPTION OF PROFESSIONAL SERVICES

| | | |
|---|---|---|
| 06/27/07 JESOH | | .20 |
| 06/28/07 JESOH | | 1.20 |
| 07/03/07 JESOH | | 3.40 |
| 07/04/07 JESOH | | 4.50 |
| 07/05/07 PJSCH | | 1.20 |
| 07/05/07 JESOH | | 5.15 |
| 07/06/07 JESOH | | .80 |
| 07/10/07 GJJOR | | 1.20 |
| 07/26/07 JESOH | | .10 |

---

DUE UPON RECEIPT
MAKE CHECKS PAYABLE TO: POLSINELLI SHALTON FLANIGAN SUELTHAUS PC

# Polsinelli

### Shalton | Flanigan | Suelthaus ᴘᴄ

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
LOOP CORP.                              SEPTEMBER 11, 2007 PAGE    3
FILE NUMBER: 053483-118678
INVOICE NO.: 433443

07/27/07 GJJOR                                        2.00

07/27/07 JESOH                                         .10

07/27/07 JESOH                                         .10

07/30/07 GJJOR                                         .40

07/30/07 JESOH                                         .15

08/01/07 PJSCH                                         .20

08/02/07 GJJOR                                         .30

08/06/07 PJSCH                                         .20

08/20/07 GJJOR                                        1.00

08/20/07 PJSCH                                        3.40


            TOTAL SERVICES:                       6,914.00
```



# Polsinelli

### Shalton | Flanigan | Suelthaus℗

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

LOOP CORP.                              SEPTEMBER 11, 2007 PAGE    4
FILE NUMBER: 053483-118678
INVOICE NO.: 433443


                 DESCRIPTION OF DISBURSEMENTS


07/12/07 Travel - - VENDOR: PETER SCHMIDT  - 7/12/07        5.00
         LOOP - CAB TO FEDERAL COURT
07/12/07 Travel - - VENDOR: GREG JORDAN CAB TO COURT        5.00
07/27/07 Travel - - VENDOR: GREG JORDAN CAB TO COURT        5.00

                 TOTAL DISBURSEMENTS:                      15.00
                                                     -----------


                 TOTAL CURRENT CHARGES:           $6,929.00

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WACHOVIA SECURITIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  04  C  3082 |
| | ) | |
| DAVID NEUHAUSER;  ANDREW A. | ) | |
| JAHELKA;  RICHARD O. NICHOLS; | ) | |
| LEON A. GREENBLATT III;  BANCO | ) | Judge Virginia Kendall |
| PANAMERICANO, INC., a South Dakota | ) | |
| Corporation; LOOP CORP., a South | ) | |
| Dakota corporation; LOOP PROPERTIES, | ) | Magistrate Judge Maria Valdez |
| INC., an Illinois corporation; and | ) | |
| SCATTERED CORP., a South Dakota | ) | |
| corporation; | ) | |
| | ) | |
| Defendants. | ) | |

## PART B (#7-9) OF APPENDIX TO PLAINTIFF'S POST-TRIAL PROPOSED <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

7

Currency Code:   7/29/2008 4:46:59 PM

| Type | Invoice # | Document | Credit Description | Credit Note # | Date | Fees | Costs/Other | Unalloc. Credits | Total |
|---|---|---|---|---|---|---|---|---|---|
| BILL | 1096489 | | | | 05/17/2006 | 295.00 | 0.00 | 0.00 | 295.00 |
| BILL | 1100298 | | | | 06/13/2006 | 154.00 | 0.00 | 0.00 | 154.00 |
| BILL | 1110845 | | | | 08/14/2006 | 1,098.50 | 0.00 | 0.00 | 1,098.50 |
| BILL | 1117622 | | | | 09/19/2006 | 385.00 | 0.00 | 0.00 | 385.00 |
| PAY | 1096489 | 2286 | | | 09/25/2006 | -295.00 | 0.00 | 0.00 | -295.00 |
| BILL | 1145425 | | | | 02/27/2007 | 3,433.50 | 0.00 | 0.00 | 3,433.50 |
| BILL | 1147993 | | | | 03/15/2007 | 3,944.00 | 481.80 | 0.00 | 4,425.80 |
| PAY | 1100298 | 4216 | Chiplease inc | | 04/13/2007 | -154.00 | 0.00 | 0.00 | -154.00 |
| PAY | 1110845 | 4216 | Chiplease inc | | 04/13/2007 | -1,098.50 | 0.00 | 0.00 | -1,098.50 |
| PAY | 1117622 | 1216 | Chiplease inc | | 04/13/2007 | -385.00 | 0.00 | 0.00 | -385.00 |
| BILL | 1163383 | | | | 06/19/2007 | 1,385.00 | 7.00 | 0.00 | 1,392.00 |
| BILL | 1170741 | | | | 07/31/2007 | 732.50 | 0.00 | 0.00 | 732.50 |
| BILL | 1178738 | | | | 09/19/2007 | 355.00 | 0.00 | 0.00 | 355.00 |
| BILL | 1178739 | | | | 09/19/2007 | 0.00 | 5.00 | 0.00 | 5.00 |
| GRAND TOT | | | | | | 9,850.00 | 493.80 | 0.00 | 10,343.80 |

Ledger History - [CORRESPONDENT/DOCUMENTATION DEPARTMENTL
Client:053722 - NOLA, LLC   2/19/2008 3:35:39 PM

| Type | Invoice | Document | Credit Description | Credit Note | Date | Fees | Costs/Other | Unalloc Credits | Total |
|------|---------|----------|--------------------|-------------|------|------|-------------|-----------------|-------|
| BILL | 433453 | | | | 09/11/2007 | 3,093.00 | 23.00 | 0.00 | 3,116.00 |
| BILL | 444924 | | | | 11/29/2007 | 2,724.00 | 0.00 | 0.00 | 2,724.00 |
| BILL | 448648 | | | | 12/30/2007 | 68.00 | 0.00 | 0.00 | 68.00 |
| GRAND TOT | | | | | | 5,885.00 | 23.00 | 0.00 | 5,908.00 |

Chiplease Inc
330 South Wells, Suite 718
Chicago, IL 60606

1216

2-173/710

3/30      20    07

PAY
TO THE
ORDER OF  Dykema Gossett PLLC

$  *** 1,637.50

**** One thousand six hundred thirty seven Dollars and 50/100****

DOLLARS

**MB Financial Bank**
1 South Wacker
Chicago, IL 60606

Security Features Included.    Details on back.

⑆001216⑆ ⑆071001737⑆ 50400041311⑈

90LA
LLC

Dykema

NOLA LLC

JUNE 13, 2006

CLIENT-MATTER NO.     099854-0001
WACHOVIA CITATION
INVOICE NO.   1100298
PAGE NO.   4

FEES..........................................................................$       154.00

TOTAL AMOUNT DUE ............................................$       154.00



DykemaGossett PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787

CLIENT CHECK INFORMATION
PLEASE COMPLETE:
THIS INVOICE IS PAYABLE UPON RECEIPT.
CHECK #: 1216     DATE: 3/30/07     AMOUNT: 1637.50
PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.

FOR FIRM USE:

RECEIVED DATE:_____

Dykema

NOLA LLC

AUGUST 14, 2006

CLIENT-MATTER NO.    099854-0001
WACHOVIA CITATION
INVOICE NO.  1110845
PAGE NO.  4

FEES.......................................................................$      1,098.50

TOTAL AMOUNT DUE .........................................$      1,098.50



DykemaGossettPLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787

CLIENT CHECK INFORMATION
PLEASE COMPLETE:
                THIS INVOICE IS PAYABLE UPON RECEIPT.
CHECK #: 1216      DATE: 3/30/07      AMOUNT: 1637.50
        PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.

FOR FIRM USE:

RECEIVED DATE:_____

DYKEMA

NOLA LLC

SEPTEMBER 19, 2006

CLIENT-MATTER NO.   099854-0001
WACHOVIA CITATION
INVOICE NO.  1117622
PAGE NO.  4

FEES........................................................................$      385.00

TOTAL AMOUNT DUE.............................................$      385.00



DykemaGossett PLLC

DRAWER #1787
P. O. BOX 79001
DETROIT, MI 48279-1787

CLIENT CHECK INFORMATION
PLEASE COMPLETE:
THIS INVOICE IS PAYABLE UPON RECEIPT.
CHECK #: 1216   DATE: 3/30/07   AMOUNT: 1637.50
PLEASE RETURN THIS PAGE WITH YOUR REMITTANCE.

FOR FIRM USE:

RECEIVED DATE:_____



# Polsinelli

Shalton | Flanigan | Suelthaus pc

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

NOLA, LLC                                    FILE NO: 053722-119154
LEON GREENBLATT
300 S. WELLS, 7TH FLOOR                      INVOICE NO.: 433453
CHICAGO, IL 60606

                                             SEPTEMBER 11, 2007

RE: REPRESENTATION OF NOLA, LLC


    TOTAL CURRENT PROFESSIONAL SERVICES              3,093.00
    TOTAL CURRENT DISBURSEMENTS                         23.00
                                                   -----------

    TOTAL CURRENT CHARGES                           $3,116.00
                                                   -----------

    TOTAL BALANCE DUE                               $3,116.00


    ************************************************************
    *                                                          *
    *     PLEASE RETURN THIS REMITTANCE PAGE WITH YOUR PAYMENT  *
    *                                                          *
    ************************************************************
    BA 1224

A late payment charge of 11/2%                DUE UPON RECEIPT

# Polsinelli

Shalton | Flanigan | Suelthaus₌

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
NOLA, LLC                                    FILE NO: 053722-119154
LEON GREENBLATT
300 S. WELLS, 7TH FLOOR
CHICAGO, IL 60606                            INVOICE NO.: 433453

                                            SEPTEMBER 11, 2007
```

RE: REPRESENTATION OF NOLA, LLC

```
    TOTAL CURRENT PROFESSIONAL SERVICES              3,093.00
    TOTAL CURRENT DISBURSEMENTS                         23.00
                                                   -----------

    TOTAL CURRENT CHARGES                           $3,116.00
                                                   -----------

    TOTAL BALANCE DUE                               $3,116.00
```

```
*****************************************************************
*                                                               *
*            PLEASE RETAIN THIS COPY FOR YOUR RECORDS           *
*                                                               *
*****************************************************************
BA 1224
```

A late payment charge of 1 1/2%                    DUE UPON RECEIPT

# Polsinelli

### Shalton | Flanigan | Suelthaus ᴘᴄ

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

NOLA, LLC                                      SEPTEMBER 11, 2007 PAGE    2
FILE NUMBER: 053722-119154
INVOICE NO.: 433453


FOR PROFESSIONAL SERVICES RENDERED THROUGH AUGUST 31, 2007

REGARDING: REPRESENTATION OF NOLA, LLC

BILLING ATTORNEY: GREGORY J. JORDAN


### DESCRIPTION OF PROFESSIONAL SERVICES

| Date | Code | Hours |
|---|---|---|
| 08/06/07 | GJJOR | 1.20 |
| 08/06/07 | JESOH | 2.75 |
| 08/07/07 | JESOH | 3.25 |
| 08/08/07 | GJJOR | 1.50 |
| 08/08/07 | JESOH | .15 |
| 08/15/07 | PJSCH | .20 |
| 08/24/07 | GJJOR | 1.50 |

TOTAL SERVICES:                        3,093.00

---

A late payment charge of 1 1/2%                DUE UPON RECEIPT

# Polsinelli

### Shalton | Flanigan | Suelthaus

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
NOLA, LLC                                SEPTEMBER 11, 2007 PAGE    3
FILE NUMBER: 053722-119154
INVOICE NO.: 433453
```

DESCRIPTION OF DISBURSEMENTS

```
08/06/07 Travel - - VENDOR: GREG JORDAN CAB TO COURT       6.00
08/06/07 Travel - - VENDOR: GREG JORDAN CAB FROM COURT     6.00
08/08/07 Travel - - VENDOR: GREG JORDAN CAB TO COURT       5.00
08/08/07 Travel - - VENDOR: GREG JORDAN CAB TO COURT       6.00

                   TOTAL DISBURSEMENTS:                    23.00
                                                   - - - - - - - - - - -

                   TOTAL CURRENT CHARGES:            $3,116.00
```

DUE UPON RECEIPT

a late payment charge of 1½%

 

# Polsinelli

Shalton | Flanigan | Suelthaus ᴾᶜ

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
NOLA, LLC                              FILE NO: 053722-119154
LEON GREENBLATT
300 S. WELLS, 7TH FLOOR
CHICAGO, IL 60606                      INVOICE NO.: 444924

                                       NOVEMBER 29, 2007

RE: REPRESENTATION OF NOLA, LLC


    TOTAL CURRENT PROFESSIONAL SERVICES        2,724.00
    TOTAL CURRENT DISBURSEMENTS                    0.00
                                           -----------

    TOTAL CURRENT CHARGES                     $2,724.00

       PREVIOUS BALANCE AS OF NOVEMBER 29, 2007   $3,116.00
       SUMMARY PROVIDED ON FINAL PAGE
                                           -----------

    TOTAL BALANCE DUE                         $5,840.00



    ********************************************************
    *                                                      *
    *     PLEASE RETURN THIS REMITTANCE PAGE WITH YOUR PAYMENT  *
    *                                                      *
    ********************************************************
    BA 1224
```

# Polsinelli

### Shalton | Flanigan | Suelthaus pc

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com


NOLA, LLC                                      FILE NO: 053722-119154
LEON GREENBLATT
300 S. WELLS, 7TH FLOOR
CHICAGO, IL 60606                              INVOICE NO.: 444924

                                               NOVEMBER 29, 2007

RE: REPRESENTATION OF NOLA, LLC


     TOTAL CURRENT PROFESSIONAL SERVICES              2,724.00
     TOTAL CURRENT DISBURSEMENTS                          0.00
                                                   -----------

     TOTAL CURRENT CHARGES                           $2,724.00

       PREVIOUS BALANCE AS OF NOVEMBER 29, 2007      $3,116.00
          SUMMARY PROVIDED ON FINAL PAGE
                                                   -----------

     TOTAL BALANCE DUE                               $5,840.00



**************************************************************
*                                                            *
*          PLEASE RETAIN THIS COPY FOR YOUR RECORDS          *
*                                                            *
**************************************************************
BA 1224

DUE UPON RECEIPT

# Polsinelli

### Shalton | Flanigan | Suelthaus ₚc

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

NOLA, LLC                                     NOVEMBER 29, 2007   PAGE   2
FILE NUMBER: 053722-119154
INVOICE NO.: 444924


FOR PROFESSIONAL SERVICES RENDERED THROUGH OCTOBER 31, 2007

REGARDING: REPRESENTATION OF NOLA, LLC

BILLING ATTORNEY: GREGORY J. JORDAN


             DESCRIPTION OF PROFESSIONAL SERVICES

10/20/07 JESOH                                          2.40


10/21/07 PJSCH                                           .50


10/21/07 JESOH                                          3.80

10/22/07 PJSCH                                          3.50



             TOTAL SERVICES:                        2,724.00

                                                  - - - - - - - - - - -


             TOTAL CURRENT CHARGES:                $2,724.00




DUE UPON RECEIPT

# Polsinelli

### Shalton | Flanigan | Suelthaus

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
NOLA, LLC                           NOVEMBER 29, 2007   PAGE    3
FILE NUMBER: 053722-119154
INVOICE NO.: 444924
```

THE FOLLOWING IS A STATEMENT OF THE OUTSTANDING BALANCE AS OF 11/29/07

| INVOICE DATE | INVOICE NUMBER | FEES & DISB | OTHER | PAYMENTS | BALANCE DUE |
|---|---|---|---|---|---|
| 09/11/07 | 433453 | $3116.00 | $.00 | $.00 | $3116.00 |
| | | TOTAL BALANCE DUE FROM PREVIOUS INVOICES | | | $3116.00 |

 

# Polsinelli

Shalton | Flanigan | Suelthaus

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

NOLA, LLC                                    FILE NO: 053722-119154
LEON GREENBLATT
300 S. WELLS, 7TH FLOOR
CHICAGO, IL 60606                            INVOICE NO.: 448648

                                             DECEMBER 30, 2007

RE: REPRESENTATION OF NOLA, LLC


TOTAL CURRENT PROFESSIONAL SERVICES              68.00
TOTAL CURRENT DISBURSEMENTS                       0.00
                                             ------------

TOTAL CURRENT CHARGES                            $68.00

   PREVIOUS BALANCE AS OF DECEMBER 30, 2007    $5,840.00
      SUMMARY PROVIDED ON FINAL PAGE
                                             ------------

TOTAL BALANCE DUE                             $5,908.00


***********************************************************
*                                                         *
*      PLEASE RETURN THIS REMITTANCE PAGE WITH YOUR PAYMENT *
*                                                         *
***********************************************************
BA 1224

# Polsinelli

### Shalton | Flanigan | Suelthaus PC

700 West 47th Street, Suite 1000  |  Kansas City, MO 64112-1802
(816) 753-1000  |  Facsimile: (816) 753-1536  |  www.polsinelli.com

```
NOLA, LLC                                    FILE NO: 053722-119154
LEON GREENBLATT
300 S. WELLS, 7TH FLOOR
CHICAGO, IL 60606                            INVOICE NO.: 448648

                                             DECEMBER 30, 2007
```

RE: REPRESENTATION OF NOLA, LLC

```
    TOTAL CURRENT PROFESSIONAL SERVICES              68.00
    TOTAL CURRENT DISBURSEMENTS                        0.00
                                               -----------

    TOTAL CURRENT CHARGES                          $68.00

        PREVIOUS BALANCE AS OF DECEMBER 30, 2007   $5,840.00
        SUMMARY PROVIDED ON FINAL PAGE
                                               -----------

    TOTAL BALANCE DUE                            $5,908.00
```

```
*********************************************************************
*                                                                   *
*            PLEASE RETAIN THIS COPY FOR YOUR RECORDS               *
*                                                                   *
*********************************************************************
BA 1224
```

# Polsinelli

Shalton | Flanigan | Suelthaus p.c.

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

NOLA, LLC                                              DECEMBER 30, 2007   PAGE    2
FILE NUMBER: 053722-119154
INVOICE NO.: 448648


FOR PROFESSIONAL SERVICES RENDERED THROUGH NOVEMBER 30, 2007

REGARDING: REPRESENTATION OF NOLA, LLC

BILLING ATTORNEY: GREGORY J. JORDAN


          DESCRIPTION OF PROFESSIONAL SERVICES

11/05/07 PJSCH                                                    .20

               TOTAL SERVICES:                       68.00


                                              -----------


          TOTAL CURRENT CHARGES:                  $68.00

# Polsinelli

Shalton | Flanigan | Suelthaus<sub>rc</sub>

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

```
NOLA, LLC                                DECEMBER 30, 2007   PAGE   3
FILE NUMBER: 053722-119154
INVOICE NO.: 448648
```

THE FOLLOWING IS A STATEMENT OF THE OUTSTANDING BALANCE AS OF 12/30/07

| INVOICE DATE | INVOICE NUMBER | FEES & DISB | OTHER | PAYMENTS | BALANCE DUE |
|---|---|---|---|---|---|
| 09/11/07 | 433453 | $3116.00 | $.00 | $.00 | $3116.00 |
| 11/29/07 | 444924 | $2724.00 | $.00 | $.00 | $2724.00 |

TOTAL BALANCE DUE FROM PREVIOUS INVOICES   $5840.00

DUE UPON RECEIPT

8

Chiplease Inc
330 South Wells, Suite 718
Chicago, IL 60606

1167

2-173/710

PAY
TO THE
ORDER OF    Dykema Gossett

8/15    20    06

$ ** 100,000.00

**** One hundred thousand Dollars and NO/100****

DOLLARS

**MB Financial Bank**
1 South Wacker
Chicago, IL 60606

Security Features Included. 🔒 Details on back.

⑈0011671⑈ ⑆0710017301⑆ 50400041311⑆

Sent
8/15/06

**Martinez, Erin M.**

| | |
|---|---|
| **From:** | Salas, Alan R. |
| **Sent:** | Tuesday, August 15, 2006 4:39 PM |
| **To:** | Martinez, Erin M. |
| **Subject:** | FW: Chiplease Money Application |

Erin,

Here is the back-up on how the 100,000 will be applied.

Al Salas

Greg,

**From:** Salas, Alan R.
**Sent:** Tuesday, August 15, 2006 4:32 PM
**To:** Jordan, Gregory J.
**Subject:** Chiplease Money Application

Per our discussion, this is how the 100,000 will be applied.

Repurchase Corporate Bankruptcy 098797-0001, $ 11,178.93. All invoices. This is the net balance. As part of paying this off, the 20,000 retainer will be applied also.

Repurchase Corporate Bankruptcy 098797-0099, $ 5,283.45. All invoices.

Leon Greenblatt, Resource Technology 098851-0001, invoice 1065545, 11-09-05, $ 29,605.62.
Leon Greenblatt, Resource Technology 098851-0001, invoice 1082202, 02-21-06, $ 108.00.
Leon Greenblatt, Resource Technology 098851-0001, invoice 1090052, 04-19-06, $ 25,415.00.

Leon Greenblatt, Trustee V. Greenblatt 098951-0002, invoice 1086318, 03-16-06, $ 415.00.

8/16/2006

8/16/2006

Banco Panamerico, Resource Technology, 098652-0001, invoice 1090053, $ 25,523.00.

Scattered Corporation, Resource Technology, 099026-0001, invoice 1089872, 04-19-06, $ 2,471.00.

Let me know if there is anything inaccurate here.

Alan R. Salas
Dykema Gossett PLLC
General Accounting Manager
10 S. Wacker Drive
Suite 2300
Chicago, Illinois 60606
Tel: 312-627-2556
Fax: 866-373-6094



DYKEMA GOSSETT ROOKS PITTS
CLIENT ESCROW ACCOUNT
10 S. WACKER DR., STE. 2300
CHICAGO, IL 60606

2558
2-50-710

LaSalle Bank
LaSalle Bank, N.A.
Chicago, Illinois 60603
lasallebank.com

DATE APRIL 20, 2006

PAY
TO THE
ORDER OF DYKEMA GOSSETT                    $ 185,146.79

ONE HUNDRED EIGHTY FIVE THOUSAND ONE HUNDRED FORTY SIX AND 79/100** DOLLARS

FOR BANCO

⑆00 2558⑆ ⑆07⑆0005 05⑆ 000 2 2 24 3⑆

A9626-1

**Martinez, Erin M.**

| | |
|---|---|
| **From:** | Cureton-McKinney, Monique K. |
| **Sent:** | Thursday, April 20, 2006 11:45 AM |
| **To:** | Martinez, Erin M. |
| **Cc:** | Salas, Alan R. |
| **Subject:** | FW: 98952 Banco, Scattered, Chiplease, Leon Greenblatt |
| **Importance:** | High |

Erin, Al, wanted this revised so here's the revision along with Jordan's okay. Also, I'm reversing the $5,000.00 retainer on Scattered Corp.

98952 (disbursements not on filed) 6,332.00 + 453.60 = 6,785.60  — *Retainer*

| | |
|---|---|
| 98951 1 (1071275) | 24,875.77 |
| (1074580) | 26,438.05 |
| (1090052) | 8,139.91 |
| | |
| 98952 1 (1071274) | 24,883.24 |
| (1074579) | 26,445.99 |
| (1090053) | 8,124.50 |
| | |
| 98953 1 (1071276) | 24,875.77 |
| (1074581) | 26,438.05 |
| (1090054) | 8,139.91 |

**TOTAL**                                **185,146.79**

| | |
|---|---|
| **From:** | Jordan, Gregory J. |
| **Sent:** | Thursday, April 20, 2006 11:31 AM |
| **To:** | Cureton-McKinney, Monique K. |
| **Subject:** | RE: 98952 Banco, Scattered, Chiplease, Leon Greenblatt |

Looks fine to me.

Gregory J. Jordan
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago Illinois 60606-7439
(312) 627-2171 (Direct)
(312) 543-7354 (Mobile)
(866) 698-0830 (Facsimile)

This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately.

Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

1

| From: | Cureton-McKinney, Monique K. |
|-------|-------------------------------|
| Sent: | Thursday, April 20, 2006 10:41 AM |
| To: | Jordan, Gregory J. |
| Subject: | 98952 Banco, Scattered, Chiplease, Leon Greenblatt |
| Importance: | High |

Now that we are back up and running just for verification purposes.  I am finalizing the following:

$200,000 is to be cut from trust to pay the following entities respectively:

In RE to Scattered Corp there's a $5,000 retainer invoice, that I will reverse.  Is that okay with you?

| 99026 1 Scattered Corp | 14,853.21 |
| 98951 1 Leon Greenblatt | 59,453.73 |
| 98952 1 Banco | 59,453.73 |
| 98953 1 Chiplease | 59,453.73 |
| **TOTAL** | **193,214.40** |

| Costs(not yet on matters) | 6332.00 |
| | 453.60 |
| **TOTAL** | **200,000.00** |

Chiplease, Inc.
330 South Wells Suite 718
Chicago, IL 60606

1094

2-173/710

12/5 _____ 20 _05_

PAY
TO THE
ORDER OF    Dykema Gossett PLLC                                          $ **29,614.52

***Twenty nine thousand six hundred fourteen Dollars and 52/100***                    DOLLARS

**MB Financial Bank**
1 South Wacker
Chicago, IL 60606

⑈′′001094⑈′   ⑆071001737⑆:   504000431 1⑈′

---

Date Received: _____          Check Date: _____ 12/5/2005

Check Number: _____ 1094            Check Amount: $ _____ 29,614.52

Name on Check: **Chiplease**

Client Name: **Banco Pamamericano**

Client Number: _____ 98952          Advance Amt. $ _____ 29,614.52

Matter Number: _____ 1

12/8/2005 - 2:38 PM

9

**Gregory Jordan**

| | |
|---|---|
| **From:** | Sexton, Michael F. [MSexton@dykema.com] |
| **Sent:** | Wednesday, February 13, 2008 3:09 PM |
| **To:** | Gregory Jordan |
| **Subject:** | Greenblatt |
| **Importance:** | High |

Any further word from Chip re getting paid this week?

Michael F. Sexton
Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606
Direct Line: (312) 627-2162
Direct Fax: (866) 741-0103
email: msexton@dykema.com

Notice from Dykema Gossett PLLC: To comply with U.S. Treasury regulations, we advise you that any discussion of Federal tax issues in this communication was not intended or written to be used, and cannot be used, by any person (i) for the purpose of avoiding penalties that may be imposed by the Internal Revenue Service, or (ii) to promote, market or recommend to another party any matter addressed herein. This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately. Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message. DYKEMA

2/20/2008

**Gregory Jordan**

| | |
|---|---|
| **From:** | Sexton, Michael F. [MSexton@dykema.com] |
| **Sent:** | Friday, February 15, 2008 9:25 AM |
| **To:** | BancoPanamericano; Leon Greenblatt; leon greenblatt; l greenblatt |
| **Cc:** | Gregory Jordan |
| **Subject:** | Update |

I didn't realize I had so many different email addresses for you.

I'm following up on our emails of last week - you and Greg both indicated you thought you might be coming into some money this week and that we'd receive a payment on account. What's the status of this?

Thanks

Michael F. Sexton
Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606
Direct Line: (312) 627-2162
Direct Fax: (866) 741-0103
email: msexton@dykema.com

Notice from Dykema Gossett PLLC: To comply with U.S. Treasury regulations, we advise you that any discussion of Federal tax issues in this communication was not intended or written to be used, and cannot be used, by any person (i) for the purpose of avoiding penalties that may be imposed by the Internal Revenue Service, or (ii) to promote, market or recommend to another party any matter addressed herein. This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately. Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message. DYKEMA

## Gregory Jordan

| | |
|---|---|
| **From:** | Sexton, Michael F. [MSexton@dykema.com] |
| **Sent:** | Thursday, December 06, 2007 8:23 AM |
| **To:** | l greenblatt; leon greenblatt |
| **Cc:** | Gregory Jordan |
| **Subject:** | Greetings! (IMPORTANT - PLEASE TAKE THE TIME TO READ THIS) |
| **Importance:** | High |

Leon:

We last spoke on October 15. I believe funding was requested from Prospect either just before or just after Thanksgiving but we've heard nothing further as to whether funding occurred. I would appreciate being advised of the status of that and, if funding has not occurred, whether you believe it likely that Prospect will fund prior to December 31.

Greg Jordan has twice told me within the past month or so that he understands you are expecting "a couple of million dollars" within the next "couple" of weeks. That information is consistent with the more general conversation you and I had in October.

My firm is on a calendar year fiscal year and we have been trying to keep our collections relatively current all along, but traditionally, many law firms wind up collecting a disproportionate amount in November and December. At this point, my senior management is trying to get a handle on anticipated collections for the balance of the month.

I could pepper you and Greg with emails and phone calls like I did in late September/early October, but I'm hoping that in lieu of making all of us go through that, you'll provide me with an clear, reasonably detailed update on (a) the Prospect funding and (b) how much you will be paying us in total in December (I'm aware of the $62,000 that was recently awarded to Chiplease in a bankruptcy proceeding - Greg told me about that late last week).

Leon, this is important to me - I know it may not be to you but we do have a deal and so far, for whatever reason, we haven't received *any* money from you since June (the $170,000 payment in early July was funded by Prospect). I've been patient and I've continued to counsel patience with my senior management, all of whom are growing exceedingly anxious again. Having been waiting since August for the monthly payments of $100,000 to commence, we're now very concerned about the prospects for receiving payment from you prior to December 31.

According to our deal, we are owed $230,000 which is to be funded from the proceeds of the Prospect closing and $500,000 more, representing the monthly installments for August through and including December. That's a lot of money, Leon. Greg and Peter and others worked tirelessly on your behalf while you were a client and you continue to engage Greg and Peter as your counsel at their new firm. **We need to be paid what we're entitled to be paid prior to December 31.**

I would very much appreciate a prompt reply. It's only common courtesy.

Thank you

Greetings (IMPORTANT - PLEASE NOTE THE TIME TO READ THIS)

Michael F. Sexton
Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606
Direct Line: (312) 627-2162
Direct Fax: (866) 741-0103
email: msexton@dykema.com

Notice from Dykema Gossett PLLC:

To comply with U.S. Treasury regulations, we advise you that any discussion of Federal tax issues in this communication was not intended or written to be used, and cannot be used, by any person (i) for the purpose of avoiding penalties that may be imposed by the Internal Revenue Service, or (ii) to promote, market or recommend to another party any matter addressed herein.

This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately.

Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

DYKEMA

## Gregory Jordan

**From:** Sexton, Michael F. [MSexton@dykema.com]
**Sent:** Wednesday, December 05, 2007 11:24 AM
**To:** Gregory Jordan
**Subject:** Greenblatt

Greg:

Bill Jackson isn't returning any of Dave Cellitti's email and voicemail messages. We're 27 days away from the close of our fiscal year. As you know, I made a deal with Leon right before you left - he may have cash flow problems, he may not have gotten funded the entire amount from Prospect, but none of that was part of our deal.

He hasn't paid us a dime since we received $170,000 at closing in early July. I'm incredulous that he could've had the good faith belief that he would pay us $100,000 a month starting in August and in fact not been able to find **any** money to pay us.

I believe I've spoken with Chip a total of three times since Dykema bought him lunch - each time, he's told me what's going on and still we haven't gotten paid.

In late September, I started a barrage of emails and phone calls to you and Chip which culminated in a call from Chip on October 15. He explained that he still hadn't been funded by Prospect and made cryptic references to paying us the past due installments and more in the near future.

It's now December 5 and we've not been paid anything.

You obviously speak with Chip on a regular basis - I could start another email and phone call barrage but it would be more effective, I think, if you would speak with him and **get something firm** in the way of a commitment - **when** is he going to pay us and **how much**. These are not unreasonable requests and God knows we've had the patience of Job.

Jackson going dark on us now has me more concerned than ever.

You and I each have our credibility on the line here - you may be gone, but you've previously told me on a number of occasions that you wanted to depart on a friendly basis and not have any lingering hard feelings or bad blood. Chip's failure to pay us **anything** is damaging to both of us.

Needless to say, Dykema can only be patient so long before it concludes that Chip does not intend to pay us and we have to take action. Part of me still believes (but only part of me) that Chip really does intend to pay us, but as the months roll by, my belief is fading.

Please contact him regarding his A/R - my expectation is that he will pay us $730,000 at a minimum prior to year-end - the $230,000 balance due from the Prospect closing and the $500,000 that he owes us for August through December in respect of his promised monthly installments. That's a lot of money, but that's what he promised.

Thank you for your help - please acknowledge this email and your agreement to contact Chip to bring this to conclusion.

I don't want to be sitting here the week between Christmas and New Year's screwing around with this, and no one else does either.

Michael F. Sexton
Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606
Direct Line: (312) 627-2162
Direct Fax: (866) 741-0103
email: msexton@dykema.com

Notice from Dykema Gossett PLLC:

To comply with U.S. Treasury regulations, we advise you that any discussion of Federal tax issues in this communication was not intended or written to be used, and cannot be used, by any person (i) for the purpose of avoiding penalties that may be imposed by the Internal Revenue Service, or (ii) to promote, market or recommend to another party any matter addressed herein.

This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately.

Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

DYKEMA

# EXHIBIT D

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


In re:                          )
                                ) No. 99 B 35434
RESOURCE TECHNOLOGY CORPORATION,)
                                ) Chicago, Illinois
                                ) February 12, 2008
                    Debtor.     ) 10:30 a.m.
                                )  1:00 p.m.


TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE EUGENE R. WEDOFF


APPEARANCES:

MR. PETER SCHMIDT
MR. GREGORY JORDAN
on behalf of Illinois Investment Trust 92-7163;

MR. GEORGE APOSTOLIDES
on behalf of Jay Steinberg, not individually but
soley as Chapter 7 trustee;

MR. DAVID BOHAN
MR. ROBERT O'MEARA
on behalf of Allied Waste Industries;

MR. LINDA KUJACA
on behalf of the City and County of Peoria.

1

2                          I N D E X

3

4

5    WITNESS:              DX      CX     REDX     RECX

6    ANDREW JAHELKA        27      42      66       71

7                                  64

8    JOHN CONNOLLY         74     179     271

9                                 264

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    the process that that is going on.  And the site

2    will be -- need to be built in that time and go

3    online.

4                    There will be testimony indicating

5    that there are funds that are going to be offered or

6    loaned by Chiplease and Scattered, primarily

7    Scattered, which is a corporation that Andrew

8    Jahelka, Drew Jahelka, is president of.  They have

9    $3 million now.  The testimony will be that probably

10    there will be draws in tranches about a

11    million-two-fifty this year, and then that will get

12    paid, and then the Litchfield site will go on, there

13    will be another draw, and then that will be paid

14    back.  And then, finally, Bloomington, there will be

15    a draw in about, I think, 2013 or 2015, Mr. Connolly

16    will testify to that, and that will be drawn and

17    paid back.

18                    We anticipate that the Peoria site,

19    being the one that is actually operating now, would

20    go on soon.  There's a stipulation.  Testimony will

21    show that there's a stipulation, it's in evidence

22    already and no one objected, between Peoria and IIT.

23    And that stipulation sets forth the various regimes

24    of things that Peoria and IIT agree have to be done

25    in order for this to be successful.

Page 38

1   Peoria and Springfield.

2        Q    Okay.  And does Scattered have the money

3   set aside right now to fund those cure payments?

4        A    Not as I sit here right now, but it

5   will -- we were talking about roughly a

6   million-two-fifty that will need to be paid in

7   fairly short order, and Scattered will have that

8   within 60 days.

9        Q    Okay.  And that's the time frame within

10  which you understand that the trust would have to

11  make the payments?

12       A    My understanding is that that's quick

13  enough for the trust to make its payments, yes.

14       Q    Okay.  And what, if any, is the nature of

15  the business relationship between Scattered and

16  Chiplease other than this loan?

17       A    There is none.

18       Q    Okay.  How is it that it came about that

19  Chiplease became an additional beneficiary on the

20  Illinois Investment Trust?

21       A    There was a discussion between me,

22  Mr. Greenblatt, and Mr. Nickels, who is the -- the

23  three of us constitute the entire board of Scattered

24  Corporation.  Mr. Greenblatt represented the

25  interest of Chiplease.  Chiplease was the owner of

Page 39

1   certain contracts and equipment that had previously

2   been owned by RTC and was going to contribute those

3   to the trust, and we agreed that Chiplease would be

4   named as an additional beneficiary of the trust at

5   that time.

6           Q    Okay.   And as a part of agreeing to enter

7   into the amended promissory note and the loan and

8   security agreement, amended loan and security

9   agreement, what, if any, financial information did

10  Scattered review regarding these sites?

11          A    John Connolly prepared pro forma

12  projections for IIT which were his estimates of

13  the -- each of the four sites and how he expected

14  those sites would perform based on certain

15  assumptions that he was making.   I reviewed those

16  with Mr. Connolly, and we discussed what -- in round

17  numbers when certain sites would be coming online,

18  how much would be required to complete those sites,

19  and laid out a schedule of when advances would be

20  needed to be made.   And it was arrived at that

21  $3 million would be enough to fund the four sites

22  that IIT wished to develop.

23          Q    Okay.   So are you or are you not

24  satisfied that the pro formas are reasonable?

25          A    They seemed reasonable.   And Mr. Connolly

Page 40

1    explained to me where the revenue numbers came from,

2    the estimates, where the expense numbers came from.

3    And based on his experience, I believe the numbers

4    to be reasonable.

5         Q    Okay.  Of the $3 million under the --

6    your agreement to fund a line of credit, what

7    portion is going to be made available by Scattered

8    and what portion is being made available by

9    Chiplease?

10        A    There's no agreement in place right now

11   as to how much each of those entities is going to

12   extend under the note and security agreement.

13   However, Scattered Corporation is prepared to loan

14   the entire $3 million.

15        Q    Okay.  And is there any question in your

16   mind that Scattered has the ability to fund up to

17   $3 million?

18        A    There's no question in my mind that

19   Scattered has the ability to fund $3 million.

20        Q    Okay.  Did Scattered have any involvement

21   in the operations of Resource Technology Corporation

22   pre-petition?

23        A    Scattered did not, no.

24        Q    Other than as a lender, did Scattered

25   have any involvement in the operations of RTC

1    post-petition?

2         A    No, it did not.

3         Q    Okay.  Does Scattered have an

4    understanding of what individuals or entities would

5    actually operate the gas plants at these sites in

6    the event the contracts are assigned to the trust?

7         A    Only the understanding that Mr. Connolly

8    will be responsible for the individuals or entities

9    that IIT retains to operate those sites.

10        Q    Have you discussed or directed Mr.

11   Connolly regarding hiring or retaining personnel?

12        A    No.  As trustee, Mr. Connolly has that

13   discretion.

14        Q    Okay.  Now, there's $3 million available.

15   In the event that that amount proved to be

16   inadequate, and presuming that the properties met

17   the pro formas, what, if any, interest would

18   Scattered have to fund more than $3 million?

19        A    If IIT is meeting the pro forma

20   projections, the only way that $3 million would be

21   inadequate for it to fund all those projects would

22   be because the projects are coming online more

23   quickly than IIT estimates that they'll be able to

24   come online.  In that case, Scattered would be very

25   willing to extend additional credit in order to

Page 42

1    complete the projects faster.  If IIT is not meeting

2    its pro formas and the $3 million is inadequate,

3    it's not likely Scattered would be willing to extend

4    any additional credit.

5         Q    Okay.  On a going-forward basis, what, if

6    any, involvement is Scattered going to have in the

7    operation of any of these sites?

8         A    Only pursuing its rights under the loan

9    and security agreement.

10        Q    Do you plan on having any -- directing

11   Mr. Connolly what to do or not to do regarding the

12   operations?

13        A    No, not at all.

14             MR. JORDAN:  Thank you.  We'll pass the

15   witness, Your Honor.

16             THE COURT:  Okay.

17                  Mr. Bohan?

18                  CROSS-EXAMINATION

19   BY MS. BOHAN:

20        Q    Scattered Corporation has no balance

21   sheet, does it, sir?

22        A    Scattered does not prepare financial

23   statements on a regular basis like a typical

24   operating entity might, yes.

25        Q    So Scattered doesn't prepare a balance

1        A    That's right.

2        Q    Okay.  And there's never been any

3    violations received?

4        A    No.

5        Q    IIT doesn't operate a gas collection

6    energy facility there, though, does it?

7        A    Well, the energy component we do not.  We

8    do operate gas collection.

9        Q    But no energy plant?

10        A    That's right.

11        Q    Never have?

12        A    Never have.

13        Q    Okay.  How about Lansing, Illinois?  I

14    think you testified that IIT operates there?

15        A    That's right.

16        Q    They operate a gas-to-energy conversion

17    facility there?

18        A    Not currently, no.

19        Q    Okay.  Was it Kewanee, Illinois?

20        A    Right.

21        Q    Okay.  I think you testified you've never

22    received any NOVs or compliance problems at that

23    site?

24        A    That's right.

25        Q    Okay.  Does IIT operate a gas-to-energy

1    the pro formas that go to IIT on the cash-flow-type

2    mortgage.

3         Q    Well, those are projections in the

4    future, right?

5         A    Sure.

6         Q    But as you sit here today, other than the

7    loan agreement with Scattered and Chiplease, IIT has

8    no other source of funds, does it?

9         A    No, that's not correct.

10        Q    What other source of funds does it have?

11        A    Well, we continue to -- we can use funds

12   from Chiplease in this interim period.

13        Q    Does IIT have any money in the bank?

14        A    Yes.

15        Q    How much?

16        A    I'm not sure.  It's less than a thousand

17   dollars.

18        Q    Is this in connection with the checking

19   account that you opened at MB Financial?

20        A    Right.

21        Q    Did you open that checking account with a

22   hundred dollars?

23        A    It may have been.  I can't recall the

24   exact amount.

25        Q    You don't recall testifying to that at

1   your deposition?

2       A   I'm trying to remember.  I know it's less

3   than a thousand, so...

4       Q   Now, if IIT doesn't have any funds, how

5   is it paying the operating expenses at the sites we

6   talked about?

7       A   Well, right now we're getting advances

8   through -- from Chiplease over to our RTC employees

9   while we're operating those sites.

10      Q   So Chiplease --

11      A   And Scattered.

12      Q   So Chiplease and Scattered are advancing

13  funds to IIT to cover their operating expenses?

14      A   Effectively, yes.  And the problem I'm

15  having here, we are in a transition phase.  And, you

16  know, it's not black and white.  But while we're

17  going through this transition, we, being the six

18  employees and our subcontractors, are out there

19  operating these sites.  And so we are getting funds.

20      Q   Well, I'm just asking where the money is

21  coming from, Mr. Connolly.

22      A   Right, I understand.

23      Q   Okay.  So is there an agreement other

24  than the loan agreement between Scattered,

25  Chiplease, and IIT to advance these operating costs?

Page 194

1    A    I believe there is under the Scattered

2    loan that it procured from Caterpillar Financial

3    Services Corp. to fund RTC operations.

4    Q    Those are RTC operations.  We're talking

5    about IIT's operation here.

6    A    I understand.  And we're in a transition

7    phase right now, so...

8              The fact is these people are out

9    there working the sites.  We're doing what we need

10   to do to keep things going until we get through

11   these assumption trials.

12   Q    So is IIT paying your compensation right

13   now for your work as trustee?

14   A    No.

15   Q    Who is?

16   A    Effectively that's nondebtor RTC because

17   that's --

18   Q    So nondebtor RTC is paying your salary,

19   but Chiplease and Scattered are fronting the

20   operating costs?

21   A    Right, right.

22   Q    Is IIT currently paying its employees

23   that you mentioned?

24   A    IIT is not.  IIT is not the payroll

25   company paying the employees presently.  But we do

1    plan to do that in very short order.

2         Q   So is it Scattered, Chiplease, or

3    nondebtor RTC who are paying those employees?

4         A   Nondebtor RTC.

5         Q   Is that pursuant to an agreement between

6    nondebtor RTC and IIT?

7         A   No, I'm not aware of any agreement.

8         Q   Is that an oral agreement?

9         A   No.

10        Q   Is that just the way you're doing it

11   because you're the president of nondebtor RTC and

12   you're the trustee?

13        A   Right, that's just the way we're doing it

14   through this transition.  And the plan is after this

15   trial, we will make the formal transition for IIT to

16   be paying the bills.

17        Q   Mr. Connolly, is Scattered or Chiplease

18   obligated to advance the funds for IIT's operating

19   expenses right now?

20        A   Yes.

21        Q   Pursuant to what?

22        A   The loan agreements that are out there

23   that are effective.

24        Q   Which loan agreements?

25        A   The ones we've looked at today, the

Page 204

1   were unable to get a permit renewal, you could apply

2   for a construction permit, construct something, then

3   apply for an operating permit, but that you could

4   operate during the interval; isn't that right?

5       A    Not exactly.  But I'm happy to go through

6   the process with you a little bit.

7       Q    Well, my point is is if you look at

8   subpart (3) under (b) --

9       A    Okay.

10      Q    -- the stipulation requires you to have

11  obtained all necessary permits before you begin

12  work; isn't that right?

13      A    It says, "All applicable government

14  regulatory permits or approvals required for IIT's

15  work at such site."  My testimony definitely allows

16  us to work on the site pursuant to the regulations.

17      Q    Now, you've testified that IIT is going

18  to draw on this $3 million line of credit with

19  Scattered and Chiplease to finance its operations at

20  Litchfield, Bloomington, Sangamon, and Peoria,

21  correct?

22      A    That's correct.

23      Q    Will you use the loan for any other

24  purposes or any other sites?

25      A    No.  In fact, I think the loan agreement