# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Hon. Matthew F. Kennelly |
| | ) | Case No. 08CV4040 |
| **RESOURCE TECHNOLOGY** | ) | (consolidated) |
| **CORPORATION,** | ) | |
| | ) | |
| Debtor. | ) | |

## APPELLANT CHIPLEASE, INC.'S BRIEF IN SUPPORT OF APPEAL

Louis D. Bernstein (ARDC # 6192379)
Colleen E. McManus(ARDC # 06243473)
**Much Shelist Denenberg Ament & Rubenstein, P.C.**
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606
Phone: (312) 521-2000
Fax:  (312) 521-2595
cmcmanus@muchshelist.com

*Attorneys for Appellant*

## TABLE OF CONTENTS

I.    Statement of Jurisdiction ............................................................................ 1

II.   Statement of Issues and Standard of Review ........................................... 1,2

III.  Statement of Facts ......................................................................................... 2

IV.   Legal Argument ............................................................................................. 9

    A.    Chiplease complied with the Settlement Agreement by using the $500,000 to pay expenses. ...................................................................... 11

        1.    The plain language of the Agreement indicates that the funds be used to pay expenses. ............................................................................. 11

        2.    The plain language of the Settlement Agreement indicates that Chiplease's obligation to pay expenses ends once operations cease ... 12

        3.    The $500,000 is not a security deposit ........................................... 13

    B.    The Bankruptcy Court erred in requiring Chiplease to pay interest on the $500,000 ..................................................................................................... 14

        1.    The Settlement Agreement did not call for interest ........................... 14

        2.    The Bankruptcy Court's trustee analogy is not applicable because the $500,000 is not property of the bankruptcy estate. ........................... 14

    C.    The Bankruptcy Court erred in requiring that the $500,000 plus interest be deposited at Arnstein & Lehr .............................................................. 15

    D.    The Bankruptcy Court should have held an evidentiary hearing. ................. 16

V.    Conclusion .................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Wade,*
991 F.2d 402 (7th Cir. 1993) .................................................................................1

*Monarch Air Serv. V. Solow*
*(In re Midway Airlines, Inc.),* 383 F.3d 663 (7th Cir. 2004) ...................................2

*In re Continental Airlines Corp.,*
907 F.2d 1500 (5th Cir. 1990) ..........................................................................2, 10

*In re Woodbrook Associates,*
19 F.3d 312 (7th Cir. 1994) ...................................................................................2

*USA Commercial Mortgage Co. v. Lowe Enterprises Residential Investors, LLC,*
163 Fed.Appx. 578...............................................................................................10

*Jackim v. CC-Lake, Inc.,*
*363 Ill.App.3d 759* (1st Dist. 2006) .....................................................................13

*Krawczyk v. Livaditis,* 366 Ill.App.3d 375 (1st Dist. 2006) ........................................13

*Plambeck v. Greystone Mgmt. & Columbia Natl. Trust Co.,* 281 Ill.App.3d 260 (1st Dist.
1996). ...................................................................................................................13

*In re Sanders,*
969 F.2d 591 (7th Cir. 1992) ...............................................................................15

*Carey v. Piphus,*
435 U.S. 247, 98 S.Ct. 1042 (1978).....................................................................16

*Board of Regents of State Colleges v. Roth,*
408 U.S. 564, 92 S.Ct. 2701 (1972).....................................................................16

*In re Gonzalez-Ruiz,*
341 B.R. 371 (1st Cir. BAP 2006)........................................................................17

**STATUTES**

28 U.S.C. § 158.......................................................................................................1, 2

11 U.S.C. § 541(a)(1) ................................................................................................................14

11 U.S.C. § 541(a)(3) ................................................................................................................15

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 8001 ................................................................................................................1

I.      **Statement of Jurisdiction**

The order being appealed constitutes a final order from the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"). *In re Wade*, 991 F.2d 402, 406 (7th Cir. 1993). This Court has jurisdiction over Chiplease, Inc.'s ("Chiplease") appeal pursuant to 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8001.

II.     **Statement of Issues and Standard of Review**

Issues on Appeal[1]

1.      Did the Bankruptcy Court err in requiring Chiplease to put $500,000 into an account for payment of Chapter 7 operating expenses even though Chiplease already deposited more than $500,000 into the Dykema Gossett account and paid more than $500,000 of operating expenses from it?

2.      Did the Bankruptcy Court err in construing the Settlement Agreement to require compound interest on the $500,000 deposit?

3.      Did the Bankruptcy Court err in not considering Chiplease's evidence in opposition to the motion to compel Chiplease to post security and in not conducting an evidentiary hearing on issues of fact?

4.      Did the Bankruptcy Court err in analogizing the $500,000 deposit for operating expenses to a bankruptcy trustee account?

5.      Did the Bankruptcy Court err in holding that the $500,000 deposit must be held in an Arnstein & Lehr account when the funds are not property of the estate?

---

[1]      Chiplease raised seven issues for appeal but addresses them in combination where there is overlap of facts and argument.

6.      Did the Bankruptcy Court err in ignoring the plain language of the Settlement Agreement, namely the provision "$500,000 to be used to pay the Expenses"?

7.      Did the Bankruptcy Court contradict the meaning of the plain language of the Settlement Agreement by providing in its June 25, 2008 order that Chiplease "deposit into an escrow account to be maintained by the Trustee in accordance with the Settlement Order," whereas the Settlement Agreement's plain language was "$500,000 to be used to pay the Expenses"?

<u>Standard of Review</u>

The United States District Court has jurisdiction to hear appeals from the final rulings of the Bankruptcy Court. 28 U.S.C. § 158. On appeal, the District Court reviews factual findings of the Bankruptcy Court under the clearly erroneous standard and reviews the Bankruptcy Court's legal conclusions under the *de novo* standard. *Monarch Air Serv. V. Solow (In re Midway Airlines, Inc.)*, 383 F.3d 663, 668 (7th Cir. 2004). Interpretations of a settlement agreement are also subject to *de novo* review. *In re Continental Airlines Corp.*, 907 F.2d 1500, 1511 (5th Cir. 1990). The Bankruptcy Court's June 25, 2008 order is reviewed for an abuse of discretion. *In re Woodbrook Associates*, 19 F.3d 312, 322 (7th Cir. 1994).

**III.    Statement of Facts**

On November 15, 1999, certain creditors of RTC filed an involuntary petition under Chapter 7 of the Bankruptcy Code, initiating case no. 99-35434 pending before the United States Bankruptcy Court for the Northern District of Illinois. (Docket no. 1) On or about January 18, 2000, RTC consented to entry of an order for relief converting its case to Chapter 11 of the Bankruptcy Code. (Docket no. 52-53) RTC's case was converted to Chapter 11 as of February 1, 2000. (Docket no. 52) RTC remained in possession of its assets and operated its business as a debtor-in-possession until August 26, 2003. (Docket no. 1804)

Chiplease's involvement in RTC's case

By order dated March 2, 2000, the Bankruptcy Court entered an order authorizing RTC to obtain debtor-in-possession financing from Chiplease, Leon Greenblatt and Banco Panamericano (collectively, the "Lenders"). (Docket no. 189) On August 26, 2003, the U.S. Trustee appointed Gregg E. Szilagyi ("Szilagyi") as Chapter 11 trustee for RTC. (Docket no. 1804) Szilagyi operated RTC's business thereafter.

By order dated October 15, 2004, the Bankruptcy Court granted the Lenders' motion for relief from the automatic stay. (Docket no. 2163) The Lenders thus were permitted to exercise their state law rights against defined "collateral." (*Id.*) The Lenders also moved to prohibit Szilagyi from using their cash collateral following defaults that the Lenders had declared. (Docket no. 2192) By order dated December 30, 2004, the Bankruptcy Court denied their motion. (Docket no. 2292)

Meanwhile, the Lenders had initiated state court proceedings with respect to their collateral. Szilagyi moved to enforce the stay and award sanctions against the Lender for exercising their state law rights (docket no. 2206) and for a temporary restraining order to prohibit the Lenders from disposing of certain assets, including the Lenders' proposed sale of collateral related to their Chastang landfill. (Docket no. 2278) By order dated December 27, 2004, the Bankruptcy Court entered an order, under the broad provisions of Section 105 of the Bankruptcy Code, staying the Lenders' sale of their Chastang collateral until further order of court. (Docket no. 2284)

In the interim, on or about December 17, 2004, Szilagyi filed a motion for approval of a settlement regarding the Chastang landfill. (Docket no. 2271) The Lenders objected to that motion (docket no. 2302), and, by letter dated January 26, 2005, made a higher, better offer to

purchase the Chastang assets from Szilagyi. (Docket no. 2360 at Ex. A)  The Lenders' offer had a number of components, that:  (i) the Lenders give Szilagyi cash; (ii) the Lenders execute a release of their substantial claims against the estate; (ii) Szilagyi abandon the estate's interest in the Chastang property; (iv) the Lenders take the Chastang property subject to existing liens and claims.  (*Id.*)  By order dated February 1, 2005, the Bankruptcy Court approved Szilagyi's original settlement of Chastang and rejected the Lenders' counteroffer.  (Docket no. 2354)

In September 2005, Szilagyi filed a motion for approval of a settlement with the Lenders and dismissal of RTC's case.  (Docket no. 2463)  The settlement proposed that the Lenders pay the estate $2 million, with $1 million paid immediately for Szilagyi's counsel, in exchange for a release of claims and dismissal of the case.  (*Id.* at Ex. A)  By order dated September 21, 2005, the Bankruptcy Court denied the settlement motion.  (Docket no. 2566)  The Bankruptcy Court, however, did not order a return of the $1 million of settlement funds to the Lenders.

The Settlement Agreement

On September 27, 2005, Jay A. Steinberg (the "Trustee") was appointed Chapter 7 trustee.  (Docket no. 2577)  On February 17, 2006, the Trustee filed a motion for authority to enter into a settlement agreement with Leon Greenblatt, Banco Panamericano, Chiplease and Scattered Corporation to compromise all disputes between the settling parties and to convey RTC estate assets, including certain executory contracts and leases, to Scattered and/or Chiplease or their designee (the "Settlement Agreement").  (Docket no. 3091)  The parties simultaneously entered into a Designation Rights Agreement whereby the Trustee would assume and assign certain executory contracts to Chiplease, Scattered or their designee.  (Docket no. 3170)  On March 16, 2006, the Bankruptcy Court entered an order granting the Trustee's motion and approving the Settlement Agreement.  (*Id.*)

4

The Settlement Agreement provides four primary obligations of Chiplease:  (i) pay to RTC's estate $275,000.00; (ii) execute the requisite releases; (iii) execute an agreed order authorizing disbursement of Section 506(c) funds to RTC's estate; and (iv) deposit $500,000 in an account at its own counsel's law firm (then Dykema Gossett).  (Docket no. 3170 at Settlement Agreement, ¶ 11.)

It is undisputed that Chiplease performed of these obligations.  With respect to the fourth obligation, paragraph 11 of the Settlement Agreement provides, in pertinent part:

> <u>Chiplease shall pay all unpaid Chapter 7 operating expenses above $150,000 and any expenses incurred while the Estate continues to operate the Debtor's business</u> ("Expenses").  The Estate shall pay the first $150,000 of these expenses.  On or before the Closing Date, <u>Chiplease shall deliver to its counsel, Dykema Gossett PLLC the sum of $500,000.00 to be used to pay the Expenses</u> ("Adequate Security").  After the Estate has paid a total of $150,000 in Chapter 7 Expenses, Chiplease will be requested to pay all additional Chapter 7 operating expenses.

(*Id.*) (emphasis added).

In addition, the Settlement Agreement articulated the parties' expectation as to the aggregate Chapter 7 operating expenses:

> Whereas the Estate lacks sufficient resources to assume any Executory Contracts or to satisfy the costs of administration of the Chapter 7 Estate that are currently estimated to be approximately $250,000 to $400,000 based upon the information and analysis of the Chapter 7 Trustee and John Connolly.

(*Id.* at p. 4)

Chiplease's payments of Expenses

Subsequent to approval of the Settlement Agreement, John Connolly, the president of RTC, and the Trustee signed a list of the operating expenses up to $150,000 that the Trustee would pay, plus the additional expenses over $150,000 that Chiplease was expected to pay. (Docket no. 4316 at Ex. A)  Chiplease deposited in excess of $500,000 into the Dykema account, which was used to pay "expenses" pursuant to the Settlement Agreement.  (Docket no. 4286) Invoices were addressed to Connolly at RTC's office (*see e.g.*, docket no. 4315 at Ex. E, G); Connolly communicated with the Trustee and/or his accountant regarding payment (Docket no. 4316 generally and Ex. C); and then Connolly submitted them to Dykema for payment out of Chiplease's account. *Id.* By virtue of these communications, and at least one occasion on which Chiplease gave written notice to the Trustee that it was disbursing funds from the Dykema account to pay these expenses, the Trustee had notice of Chiplease's payment of RTC expenses submitted to it. ( Docket no. 4286 at Ex. E; Docket no.4316 at Ex. C)

The time period between approval of the Settlement Agreement and the Trustee's cessation of operations of RTC's business was short, *i.e.*, March 16-28, 2006.  But examples of the expenses that were submitted to Chiplease, and that Chiplease in fact paid pursuant to the Settlement Agreement during that time period, are delineated below:

| Type of expense | amount | invoice date |
|---|---|---|
| RTC payroll (including applicable taxes) | $44,116.99 | March 15, 2006 |
| Trinity Consultants (handled regulatory filings for RTC's estate) | $1,926.20 | March 1, 2006 |
| Trinity Consultants | $1,156.45 | March 1, 2006 |
| Trinity Consultants | $7,280.44 | March 1, 2006 |
| Trinity Consultants | $1,451.63 | March 30, 2006 |
| Trinity Consultants | $8,855.44 | March 30, 2006 |

| Trinity Consultants | $2,327.28 | March 20, 2006 |
| Trinity Consultants | $8,871.19 | March 30, 2006 |
| Thilman Filippini, LLC | $10,480.00 | March 10, 2006 |
| (insurance premiums; RTC's estate was the named insured) | | |
| Thilman Filippini, LLC | $7,717.00 | March 10, 2006 |
| Thilman Filippini, LLC | $4,379.20 | March 10, 2006 |
| Thilman Filippini, LLC | $7,721.40 | March 10, 2006 |
| Thilman Filippini, LLC | $3,775.60 | March 10, 2006 |
| Thilman Filippini, LLC | $1,891.20 | March 10, 2006 |
| Thilman Filippini, LLC | $5,000.00 | March 10, 2006 |

TOTAL: $116,950.02

(Docket no. 4316 at Ex. D, E and G)

The foregoing expenses are the same types of expenses that the Szilagyi and the Trustee paid in the ordinary course prior to the Settlement Agreement, for example:

| Type of expense | amount | invoice date |
| --- | --- | --- |
| Hilb Rogal & Hobbs | $6,250.00 | January 27, 2005 |
| (insurance premiums; RTC's estate was the named insured) | | |
| Hilb Rogal & Hobbs | $120,736.00 | January 27, 2005 |
| Hilb Rogal & Hobbs | $11,316.00 | January 27, 2005 |
| Trinity Consultants | $13,109.51 | October 27, 2005 |
| (handled regulatory filings for RTC's estate) | | |
| Trinity Consultants | $10,385.03 | November 29, 2005 |
| Trinity Consultants | $22,629.82 | December 31, 2005 |
| Trinity Consultants | $8,205.75 | January 31, 2006 |
| Trinity Consultants | $16,692.38 | January 31, 2006 |
| Run Energy | $25,000.00 | August 2005 |

(Docket no. 4316 at Ex. A, D, F and G)

Chiplease continued to pay these same types of expenses after the Trustee ceased operating RTC's business.  (*See e.g.*, docket no. 4316 at Ex. B: Dykema checks payable to RTC

employees in May-November, 2006; Ex. D: Trinity Consultants invoices dated May and June

2006 and Thilman Filippini invoices dated August 2006; Ex. J: Dykema check payable to

Guardian dental insurance in June 2006)  Chiplease ultimately paid more than $1 million of

expenses. (Docket no. 4316 generally)

Events giving rise to the instant appeal

On or about April 17, 2008, American Grading Company and Congress Development

Corporation filed a motion (the "Motion") seeking to compel Chiplease to post $5 million as

security for Chapter 7 operating expenses. (Docket no. 4241)  The movants alleged, among

other things, that Chiplease did not comply with the Settlement Agreement by failing to deposit

$500,000 with Dykema Gossett on or before closing. (*Id.*)

On June 3, 2008, Chiplease filed a response in opposition to the Motion. (Docket no.

4286)  In its response, Chiplease argued essentially that (i) the Settlement Agreement did not

require a $5 million deposit and the order approving the Settlement Agreement has *res judicata*

effect; and (ii) Chiplease in fact had abided by the terms of the Settlement Agreement by paying

operating expenses in excess of $500,000. (*Id.*)  Chiplease's response and supporting exhibits

demonstrated that after the $500,000 deposited into the Dykema Gossett account had been

exhausted, Chiplease deposited additional funds to pay for additional operating expenses. (*Id.*)

On June 17, 2008, this Court ruled on the Motion by directing Chiplease to pay

$500,000.00 into a new account at the Arnstein & Lehr law firm (the Trustee's counsel).

(Transcript of June 17, 2008 hearing)  The Court also ordered Chiplease to pay interest on the

$500,000 but did not specify a rate of interest; the Court suggested that the parties determine the

rate of interest that would have been earned on the funds at Dykema Gossett. (*Id.*)  The

Bankruptcy Court interpreted the Settlement Agreement to require the $500,000 "to be held in

escrow until the conclusion of the case." (*Id.* at 10)  The Bankruptcy Court also referred to the $500,000 as "security." (*Id.* at 14)

On June 24, 2008, Chiplease filed the affidavit of John Connolly in further support of the statements in Chiplease's response to the Motion.  (Docket no. 4316)  The affidavit and its attachments detailed Chiplease's payments of more than $1 million of operating expenses.  (*Id.*)

The parties were unable to agree on a form of order.  On June 25, 2008, the Bankruptcy Court ruled that Chiplease must pay $500,000.00, plus compound interest in the amount of $47,367.47, by July 17, 2008, "for deposit into an escrow account to be maintained by the Trustee" at Arnstein & Lehr (the "Order").  The Bankruptcy Court accepted the movants' suggested rate of interest of 4.2% as being applicable in 2006.  (*Id.*)  The Bankruptcy Court rejected Chiplease's continuing objection to the imposition of interest, comparing it to "the requirement that an ordinary bankruptcy trustee hold funds of the estate in an interest-bearing account." (Transcript of June 25, 2008 hearing at 3) The Bankruptcy Court did not conduct an evidentiary hearing, and the Order did not contain any findings of fact.  (*Id.*)

On July 1, 2008, Chiplease filed a notice of appeal of the Order.  (Docket no. 4322) Chiplease also moved for a stay pending this appeal (docket no. 4328), which the Bankruptcy Court denied.  (Docket no. 4349)  At the July 16, 2008 hearing on the motion for stay, the Bankruptcy Court again referred to the $500,000 as "security" and explained that it was "required to be maintained, not expended." (Transcript of July 16, 2008 hearing at 8-9)

## IV.    Legal Argument

Settlement agreements are sacred bargains often resulting from laborious negotiations and entailing tough compromises on both sides.  This appeal is a dispute about two sentences of a settlement agreement, in bold as follows:

> **Chiplease shall pay all unpaid Chapter 7 operating expenses above $150,000 and any expenses incurred while the Estate continues to operate the Debtor's business ("Expenses").** The Estate shall pay the first $150,000 of these expenses. **On or before the Closing Date, Chiplease shall deliver to its counsel, Dykema Gossett PLLC the sum of $500,000.00 to be used to pay the Expenses ("Adequate Security").**

Settlement Agreement at ¶ 11(i) (emphasis added).

When interpreting a settlement agreement, a court should not read individual sections out of context to achieve a result not originally contemplated by the parties. *Continental Airlines*, 907 F.2d at 1511. In *Continental Airlines*, the airline and the pilot's union reached a settlement that, among other things, expressly provided that the bankruptcy court would retain jurisdiction to interpret and enforce the settlement, but they did not authorize the court to modify the terms or impose new terms upon them in the absence of their consent. *Id.* Following a dispute that brought the settlement before the court, the bankruptcy court's interpretation of their settlement resulted in entry of an order that materially changed the terms of the settlement. *Id.* at 1513-1514. The court of appeals affirmed the district court in vacating the bankruptcy court's order. *See also, USA Commercial Mortgage Co. v. Lowe Enterprises Residential Investors, LLC*, 163 Fed.Appx. 578 *1 (9th Cir. 2006) (holding that bankruptcy court had no authority to materially modify unambiguous terms of settlement agreement without parties' consent).

Here, Chiplease and the Trustee bargained for, and compromised on, only the terms contained in the Settlement Agreement. Chiplease did <u>not</u> agree to--and, indeed, would never have agreed to:  (a) maintaining a so-called half a million dollar security deposit that would not be used to pay ongoing operating expenses for which Chiplease was responsible, (b) paying interest on the amount it paid in and then out for such expenses, and (c) keeping such funds at the Trustee's counsel's law firm.

**A.    Chiplease complied with the Settlement Agreement by using the $500,000 to pay expenses**.

The Trustee and the movants argue that, upon closing of the Settlement Agreement, Chiplease should have made a deposit of $500,000 into a Dykema account and "maintained" those funds there. The Bankruptcy Court too likened the $500,000 to a security deposit, and the Order requires that the $500,000 be re-paid with interest and "maintained" in an interest-bearing account at Arnstein & Lehr. In fact, there were no such requirements under the Settlement Agreement. These interpretations contradict both the plain language of the Settlement Agreement and Chiplease's ongoing compliance.

**1.    The plain language of the Agreement indicates that the funds be used to pay expenses**.

A review of the pertinent provision of the Settlement Agreement is necessary. Paragraph 11(i) of the Settlement Agreement requires a deposit of $500,000 at the Dykema firm but does not provide that the $500,000 be "maintained" on deposit there. In fact, the precise language is that the $500,000 is "to be used to pay the Expenses." This phrase reveals two concepts: First, the "Expenses" to be paid were defined one sentence previously in paragraph 11 as "unpaid Chapter 7 operating expenses above $150,000 and any expenses incurred while the Estate continues to operate the Debtor's business." This phrase explicitly provides for payment of ongoing expenses. The Trustee and the movants, however, deliberately confute the concepts of Chapter 7 operating expenses and other expenses incurred while the estate operates the business. The former could become allowed Chapter 7 administrative claims according to the mechanisms provided later in paragraph 11 of the Agreement, while the latter are simply the expenses that arise in the ordinary course of operating RTC's business. The latter are plainly payable by Chiplease under the agreed-upon terms of the Settlement Agreement.

The second concept revealed in paragraph 11 of the Agreement is the "use" of the funds. "Maintaining" and "using" are two entirely different verbs. The former means to keep on hand, and the latter means to expend. The word "maintain" was not even mentioned in paragraph 11; that paragraph makes clear that the $500,000 be "used" to pay operating expenses.

So that is what Chiplease did: It deposited funds with Dykema. Connolly at RTC received the payroll information and service providers' invoices, communicated with the Trustee and/or his accountant and then submitted them to Dykema for payment from Chiplease's account. Chiplease was not required to set up a separate bank account and did not receive invoices and payroll information directly. In short, Chiplease was not able to pick and choose which expenses to pay. It simply paid the same types of expenses that RTC's trustees had been paying during operation of RTC's business and even after operations ceased, *e.g.*, health insurance, payroll, consulting fees for work at the landfills and insurance premiums, *supra*. (Chiplease paid requested operating expenses from its own account as well.) In the aggregate, Chiplease paid more than $1 million of RTC expenses submitted to it, which is more than three times the Chapter 7 operating expenses estimated by the parties at the time they entered into the Settlement Agreement.

2.    **The plain language of the Settlement Agreement indicates that Chiplease's obligation to pay expenses ends once operations cease**.

The first sentence of paragraph 11 reads, in part, "Chiplease shall pay…any expenses incurred while the Estate continues to operate the Debtor's business." Read on its face, this obligation to pay expenses incurred begins when the Settlement Agreement takes effect and ends when operation of the Debtor's business ceases. Because the parties also executed a Designation Rights Settlement Agreement, the Trustee obviously knew that Chiplease and Scattered wanted

to preserve estate contracts and, thus, he negotiated for them to fund estate operations in the meantime.

The Settlement Agreement was approved on March 16, 2006, and the Trustee ceased operating RTC's business on March 28, 2006. Although Chiplease did pay additional expenses after March 28, 2006 in the interest of being able to have assumed and assigned to it the contracts related to the landfills (*e.g.*, maintenance of insurance coverage), it was not required to do so.

### 3.     The $500,000 is not a security deposit.

A security deposit secures a tenant's payment of rent or compensation for damage to property and gives the landlord a right of setoff in the event of such damages. *Jackim v. CC-Lake, Inc., 363 Ill.App.3d 759, 764* (1st Dist. 2006). A tenant's security deposit generally must be (a) held in a separate, interest-bearing account, (b) correspond with the term of the lease; (c) not commingled with other assets, (d) returned to the tenant upon a certain date or event; and (e) available for setoff by the landlord against damages to the property. *See e.g., Krawczyk v. Livaditis*, 366 Ill.App.3d 375 (1st Dist. 2006); *Plambeck v. Greystone Mgmt. & Columbia Natl. Trust Co.*, 281 Ill.App.3d 260 (1st Dist. 1996).

When measured against the plain language of the Settlement Agreement, Chiplease's $500,000 does not bear the traits of a security deposit, to wit: (i) there is no provision for interest on the $500,000 (*see* Section B below); (ii) there is no provision for return of the $500,000 to the Trustee or any third-party beneficiary; (iii) there is no provision that the $500,000 be held or maintained for any period of time; (iv) there is no provision for setoff; and (v) there is no provision against commingling at Dykema. The parties did not intend to create a security deposit in paragraph 11.

13

Under the Bankruptcy Court's interpretation, if the parties had intended the $500,000 to serve as a security deposit, then the "Expenses" would never be paid as the first and third sentences of paragraph 11 require.  The Order is contradictory to the plain language of the Settlement Agreement and destroys the parties' intentions and expectations.

**B.    The Bankruptcy Court erred in requiring Chiplease to pay interest on the $500,000.**

The Order required that Chiplease post the $500,000 plus compound interest in the amount of $47,367.47.  The Bankruptcy Court likened the imposition of interest to a bankruptcy trustee's fiduciary duty to put funds in an interest-bearing account.  In so ordering, the Bankruptcy Court erred in two respects:  (1) the Settlement Agreement did not include a provision for interest; and (2) the Bankruptcy Court's analogy to an interest-bearing trustee account is not applicable here.

**1.    The Settlement Agreement did not call for interest.**

The Bankruptcy Court should have respected the plain language of the Settlement Agreement as approved by the Court's own order in March 2006.  Nowhere in the Agreement is there a requirement that the $500,000 be deposited into an interest-bearing account.  Moreover, there was no evidence that Dykema necessarily required all client funds to be held in interest-bearing accounts in 2006.  If the parties wanted the account to bear interest, they could have negotiated accordingly.  But they did not.

**2.    The Bankruptcy Court's trustee analogy is not applicable because the $500,000 is not property of the bankruptcy estate.**

Bankruptcy Code Section 541(a)(1) provides that all property in which the debtor has a legal or equitable interest as of the bankruptcy petition date becomes property of the bankruptcy estate.  A bankruptcy trustee succeeds only to the title and rights in property that the debtor had

at the time he filed bankruptcy.  *In re Sanders*, 969 F.2d 591 (7th Cir. 1992).  The only other interests a trustee can succeed to are assets that he recovers under another section of the Bankruptcy Code, *e.g.*, Section 550.  11 U.S.C. § 541(a)(3).

At the hearing on June 25, 2008, Chiplease argued that interest was not provided for in the Settlement Agreement and that the Dykema account in 2006 would not necessarily have been interest-bearing in any event.  The Bankruptcy Court rejected these arguments and analogized the situation to a bankruptcy trustee account whereby the trustee would have a fiduciary duty to maintain estate funds in an interest-bearing account.

The problem with the Bankruptcy Court's analogy is that the $500,000 was not and is not property of RTC's bankruptcy estate.  The Settlement Agreement was crystal clear that the $500,000 be deposited <u>at Chiplease's counsel's office</u>—not in the Trustee's account for RTC's estate or the Trustee's law firm's account.  Accordingly, the Trustee never took title to or possession of the $500,000.  Nor was this a constructive trust situation in which the parties agreed that the Trustee would hold the funds for Chapter 7 administrative claimants.

Moreover, on at least one occasion, the Trustee knew and did not object to RTC requesting and Chiplease then paying RTC operating expenses.  Indeed, the funds were Chiplease's funds "to be used to pay Expenses."  The Order materially and improperly changes the Settlement Agreement by creating a mechanism for non-property of the estate to become property of the estate.

**C.    The Bankruptcy Court erred in requiring that the $500,000 plus interest be deposited at Arnstein & Lehr.**

The Bankruptcy Court's requirement that the $500,000 plus interest be "maintained" in "escrow" at Arnstein & Lehr is an abuse of discretion for the same reason that the requirement of interest was an abuse of discretion, *supra Section B*.  To reiterate briefly, first, the Settlement

Agreement plainly provided that the $500,000 be deposited at Chiplease's counsel's office—not in the Trustee's RTC estate account or the Trustee's law firm's account.  The applicable provision of the Settlement Agreement does not even contain the word "escrow."  Chiplease and the Trustee absolutely did not make an agreement to maintain funds in escrow at Arnstein & Lehr.

Second, as argued above, the funds were not and are not property of the bankruptcy estate.  The Settlement Agreement requires that the $500,000 be deposited at Chiplease's counsel's office—not in the Trustee's account for RTC's estate or the Trustee's law firm's account.  Accordingly, the Trustee never took title to or possession of the $500,000.  They were not the Trustee's funds to administer; they were Chiplease's funds "to be used to pay Expenses." Yet again, the Order materially and improperly changes the Settlement Agreement by creating a mechanism for non-property of the estate to become property of the estate.

### D.     The Bankruptcy Court should have held an evidentiary hearing.

The Fifth and Fourteenth Amendments to the United States Constitution afford the right of due process to persons in all 50 states.  The concept of "procedural due process" has evolved to require that a person be given notice and an opportunity to be heard before being deprived of his property.  *See e.g., Carey v. Piphus*, 435 U.S. 247, 259, 98 S.Ct. 1042 (1978).  To have a protectable property interest, a person must have a legitimate claim of entitlement to the property.  *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701 (1972). "It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." *Id.*

For good reason, due process is incorporated into the bankruptcy procedural rules. Federal Rule of Bankruptcy Procedure 9014(a) provides, in pertinent part, that "'[I]n a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable

notice and opportunity for hearing shall be afforded the party against whom relief is sought." Rule 9014(c) provides that the Federal Rules of Civil Procedure, incorporated into the Federal Rules of Bankruptcy Procedure, apply to contested matters.　Where a party requests an evidentiary hearing and there are disputed facts, an evidentiary hearing is warranted.　*In re Gonzalez-Ruiz*, 341 B.R. 371, 381 (1st Cir. BAP 2006)

Chiplease believes it was and is correct on the legal issues.　However, once it filed a response in opposition to the Motion and raised factual issues about its payment of operating expenses submitted by RTC with the Trustee's knowledge as well as the imposition of interest, the Bankruptcy Court should have held a trial.　It held three hearings, one on initial presentation, one on the terms of the Order, and one on Chiplease's motion for a stay, but it never made factual findings or allowed for the presentation of evidence.　Indeed, the court did not always allow Chiplease to argue with respect to the Settlement Agreement.　(*See e.g.*, transcript of July 16, 2008 hearing at p. 10)　Instead, the Bankruptcy Court unilaterally modified the very terms of the Settlement Agreement for which the parties had bargained and already received court approval.

17

V.    **Conclusion**

For the reasons described above, Chiplease prays that this Court vacate the Order unilaterally modifying the terms of the Settlement Agreement, reverse the Bankruptcy Court's ruling and remand this matter for trial before the Bankruptcy Court.

**CHIPLEASE, INC.**

By: _/s/ Colleen E. McManus_
One of its attorneys

Louis D. Bernstein ARDC No. 6192379
Colleen E. McManus ARDC No. 06243473
**Much Shelist Denenberg Ament**
     **& Rubenstein, P.C.**
191 N. Wacker Drive
Suite 1800
Chicago, IL  60606
Phone:  312-521-2000
Fax:  312-521-2595
Email: cmcmanus@muchshelist.com